# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF GEORGIA

| | |
|---|---|
| **RICARDO HARRIS, BRANDON COBB, TOMMY GREEN, LEROY HENDERSON, TONY MOORE, JR., CHRISTOPHER SHIELDS, ANDREW SMITH, DARRELL SMITH, JR., and JORAE SMITH, on behalf of themselves and all others similarly situated,** | Civil Action No. <br><br> **<u>CLASS ACTION</u>** <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| Plaintiffs, v. | |
| **GEORGIA DEPARTMENT OF CORRECTIONS; GEORGIA STATE BOARD OF PARDONS AND PAROLES; GREGORY C. DOZIER, in his official capacity as Commissioner of the Georgia Department of Corrections; TERRY BARNARD, in his official capacity as Chairman of the Georgia State Board of Pardons and Paroles; TIMOTHY C. WARD, in his official capacity as the Chief of Staff of the Georgia Department of Corrections; CLAY NIX, in his official capacity as the Director of Professional Standards of the Georgia Department of Corrections; RICKY MYRICK, in his official capacity as the Assistant Commissioner of the Facilities Division of the Georgia Department of Corrections; JACK "RANDY" SAULS, in his official capacity as the Assistant Commissioner of Health Services for the Georgia Department of Corrections; JAY SANDERS, in his official capacity as the Assistant Commissioner of Inmate Services of the Georgia Department of Corrections; TOMMY BOWEN, in his official capacity as Warden of Central State Prison; TED PHILBIN, in his official capacity as Warden of Augusta State Medical Prison; ANTOINE CALDWELL, in his official capacity as Warden of Johnson State Prison,** | |
| Defendants. | |

## INTRODUCTION

1.      Plaintiffs are deaf and hard of hearing individuals[1] who are incarcerated in the Georgia Department of Corrections' prisons and are subject to the decision-making power of the Georgia State Board of Pardons and Paroles and its officials.  Plaintiffs seek to represent a class of similarly situated deaf and hard of hearing individuals.

2.      Defendants have denied, and continue to deny, Plaintiffs, and those similarly situated to Plaintiffs, equally effective communication required by the Americans with Disabilities Act and the Rehabilitation Act.  Because most Plaintiffs have extremely limited English, Plaintiffs and similarly situated deaf and hard of hearing individuals require qualified sign language interpreters, or other auxiliary aids and services, for effective communication access.  Defendants deny Plaintiffs this legally required communication access at every stage of their incarceration, including their access to parole and early release.

3.      Plaintiffs often begin their incarceration after a criminal legal process in which they were denied sign language interpreters, or other necessary communication aids, when they were arrested and interrogated, when they were meeting with their lawyers, and when they were persuaded to accept plea agreements.  As a result, Plaintiffs enter prison having had little or no opportunity to understand the charges against them or even the lengths of their sentences.

4.      In prison, Defendants deny Plaintiffs communication access to such basic information as the rules of the prison and the steps needed to become eligible for parole or early release.  Defendants deny communication access at disciplinary hearings and for medical appointments.  Defendants deny communication access to religious, educational, and vocational

---

[1] Plaintiffs use the terms deaf and hard of hearing to refer to individuals with hearing levels or hearing loss that qualify as "disabilities" under the Americans with Disabilities Act and the Rehabilitation Act.  Plaintiffs use the term "Deaf" to refer to individuals who are deaf from birth or childhood and who use sign language as their primary means of language. The phrase "deaf and hard of hearing" includes Deaf individuals.

Case 5:18-cv-00365-TES   Document 1   Filed 10/03/18   Page 3 of 70

programs.  Defendants even deny communication access to courses designated as a pre-requisite for early release.  As a consequence, Plaintiffs have no information on what rules they are to follow and what requirements they must meet.  They suffer arbitrary discipline, punishments, and abuses.  Plaintiffs with life-threatening illnesses go without treatment.  Plaintiffs have no access to the support and programming that would allow them to shorten their sentences and better prepare for a return to society.

5.      These communication barriers continue even as Plaintiffs approach release and then rejoin life in the community.  Plaintiffs have no communication access to the programs and communications that prepare incarcerated people for release. They have no communication access to critical information that prison counselors typically provide about the terms and conditions of their supervision on probation or parole.  Even after release, supervision officials deny deaf and hard of hearing people on probation and parole equally effective communication in meetings with their parole and probation officers, local sheriffs, and in reviewing the conditions of parole or probation.  Consequently, deaf and hard of hearing people on supervision are often cited for technical violations and returned to prison.  Many Plaintiffs and similarly situated incarcerated people have cycled through incarceration and release many times because of communication barriers.  In short, because Defendants and other state officials refuse to provide communication access as required by federal law, deaf and hard of hearing people are incarcerated more frequently, suffer harsher prison conditions, remain in prison longer, and return to prison faster.

6.      Without sign language interpreters and other auxiliary aids and services, Plaintiffs experience a range of harms while incarcerated, as detailed herein. For example, Plaintiffs have no information about the prison's rules and procedures because orientation and related

communication events are not accessible.  When deaf and hard of hearing inmates then fail to follow the unexplained rules and procedures, Defendants subject them to disciplinary hearings. At the disciplinary hearings, they are not only further denied sign language interpreters or other auxiliary aids and services needed to understand why they are there, but they are also routinely handcuffed behind their backs, so they cannot even gesture or write notes in their own defense. As a result, Plaintiffs and those similarly situated are more likely to be accused of rule violations, to face disciplinary proceedings, and to serve longer sentences because of their supposed "poor behavior."

7.      Further, when Plaintiffs, and similarly situated deaf and hard of hearing inmates, end up in a segregated setting such as solitary confinement, they experience particularly egregious deprivations.  Plaintiffs miss meals, showers, appointments, and medication because these are announced using only aural cues which are not accessible to Plaintiffs.  Plaintiffs have no ability to communicate with nearby guards, counselors, or other incarcerated people, thereby causing them more extreme isolation.

8.      When Plaintiffs and similarly situated deaf and hard of hearing inmates attend meetings with prison counselors and staff, Defendants routinely deny them sign language interpreters and other auxiliary aids and services.  The same is true for religious services, vocational and educational programming, including programming required for early release, and important meetings and programs regarding reentry.  These failures, too, make deaf and hard of hearing inmates more isolated, and make it more likely that they serve longer sentences, face unnecessary obstacles in prison, and are denied access to parole and early release.

9.      Without sign language interpreters and other auxiliary aids and services, deaf and hard of hearing inmates are denied basic health care.  Plaintiffs cannot understand

communications during appointments with health care professionals.  They cannot participate effectively in mental health therapy.  They cannot communicate regarding serious and even life-threatening health conditions.  They miss out on aural announcements related to health care, such as pill call.  Deaf and hard of hearing inmates are further denied hearing-related care, such as hearing aids, cochlear implants, and appointments with hearing specialists.  These failures not only violate the guarantees of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA") and Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 ("Section 504"), but also the guarantees of the U.S. Constitution.

10.     Because American Sign Language ("ASL") is a distinct language, with its own syntax and grammar, Deaf incarcerated people who use ASL as their primary language typically have extremely limited English and cannot read, fill out, or understand written documents without auxiliary aids and services.  When Deaf incarcerated people receive documents from the prison system, or from the Georgia State Board of Pardons and Paroles ("GBOP"), they are unable to understand these documents because their contents are not explained in ASL.  (This is akin to giving documents in Japanese to a person who understands only English.)  Without translation assistance, Deaf inmates are unable to respond appropriately to these documents.  Deaf incarcerated people are thus deprived of the information necessary to effectively participate in the parole and reentry process.  They often do not understand their sentences, their parole eligibility dates, how to maximize their chances for parole, or how to prepare for release.  They do not recognize or understand how to correct clerical and other errors in their sentence computations, putting them at risk of longer incarceration due to such errors.  These same barriers make the internal grievance procedure maintained by the Georgia Department of Corrections ("GDOC") inaccessible to Deaf inmates.

11.     Deaf and hard of hearing inmates are also denied equal access to phone calls. Telephone calls are a primary means by which incarcerated individuals stay in touch with family, friends, and attorneys.  Studies show that incarcerated persons who maintain family ties are more likely to leave incarceration and succeed in the community.  But deaf and hard of hearing inmates are denied access to videophones, TTYs, captioned telephones, and amplified telephones.  This denial of phone access is particularly difficult for the many Deaf incarcerated people who are not able to write or read letters.

12.     Emergency planning and preparation also exclude Plaintiffs and similarly situated inmates who are deaf and hard of hearing.  The prison system does not include effective visual alarms, bed-shaking devices, and evacuation planning for deaf and hard of hearing inmates. Other failures to provide reasonable modifications for Plaintiffs and similarly situated deaf and hard of hearing inmates are detailed below, including the absence of adequate policies or training for prison guards, wardens, and other personnel to understand the needs of such incarcerated people.

13.     Plaintiffs seek injunctive relief, declaratory relief, attorneys' fees and costs, and additional remedies on behalf of themselves and those similarly situated.

## JURISDICTION

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 2201, and 2202.

## VENUE

15.     Venue is proper in this District, under 28 U.S.C. § 1391(b), because numerous Defendants reside in the Middle District of Georgia.

## PARTIES

**Plaintiffs**

16.     Plaintiff RICARDO HARRIS is a 38-year-old man incarcerated at Central State Prison ("CSP") in Macon, Georgia, where he was transferred in 2018.  Mr. Harris has been incarcerated since 2015.  Prior to being transferred to CSP, Mr. Harris was incarcerated at Augusta State Medical Prison ("ASMP") in Grovetown, Georgia, and Georgia Diagnostic and Classification Prison ("GDCP") in Jackson, Georgia.  Mr. Harris is Deaf and communicates using ASL.  Mr. Harris has extremely limited English.  Mr. Harris is a qualified person with a disability within the meaning of Title II of the ADA and Section 504.  He has experienced the violations described herein.

17.     Plaintiff BRANDON COBB is a 30-year-old man incarcerated at CSP, where he was transferred in 2018.  Mr. Cobb has been incarcerated since 2015.  Prior to being transferred to CSP, Mr. Cobb was incarcerated at Johnson State Prison ("JSP") in Wrightsville Georgia, ASMP,[2] and GDCP.  Mr. Cobb is Deaf and uses ASL to communicate.  Mr. Cobb understands almost no written English.  Mr. Cobb is a qualified person with a disability within the meaning of Title II of the ADA and Section 504.  He has experienced the violations described herein.

18.     Plaintiff TOMMY GREEN is a 54-year-old man incarcerated at CSP.  Mr. Green has been incarcerated since 1997.  Prior to being transferred to CSP in 2011, Mr. Green was incarcerated at Coastal State Prison in Garden City, Georgia, ASMP, Men's State Prison in Milledgeville, Georgia, and GDCP.  Mr. Green is Deaf and communicates using ASL.  He does not use or understand written or spoken English.  Mr. Green is a qualified person with a

---

[2] In February 2018, Plaintiffs Andrew Smith, Jorae Smith, Brandon Cobb, and Ricardo Harris were all transferred simultaneously from ASMP to CSP.  Mr. Cobb was then transferred to JSP shortly thereafter, and was re-transferred back to CSP after five weeks.

disability within the meaning of Title II of the ADA and Section 504.  He has experienced the violations described herein.

19.     Plaintiff LEROY HENDERSON is a 65-year-old man incarcerated at JSP.  Mr. Henderson has been incarcerated since 2003.  Prior to being transferred to JSP in 2018, Mr. Henderson was incarcerated at Coastal State Prison.  Mr. Henderson has been transferred to ASMP on many occasions for medical appointments and procedures.  Mr. Henderson is hard of hearing.  Mr. Henderson communicates through speaking, residual hearing, and written notes; Mr. Henderson does not use ASL.  Mr. Henderson also has psychiatric disabilities and limited literacy.  Mr. Henderson is a qualified person with a disability within the meaning of Title II of the ADA and Section 504.  He has experienced the violations described herein.

20.     Plaintiff TONY MOORE, JR. is a 39-year-old man incarcerated at CSP.  Mr. Moore has been incarcerated since 2010.  Prior to being transferred to CSP in 2010, Mr. Moore was incarcerated at GDCP, Men's State Prison, and Coffee Correctional Facility in Nicholls, Georgia.  Mr. Moore is Deaf and communicates primarily through his first language, ASL.  Mr. Moore has very limited English, and he can understand or convey only simple information in written English.  Mr. Moore is a qualified person with a disability within the meaning of Title II of the ADA and Section 504.  He has experienced the violations described herein.

21.     Plaintiff CHRISTOPHER SHIELDS is a 38-year-old man incarcerated at CSP.  Mr. Shields has been incarcerated since 2010.  Mr. Shields has previously been incarcerated at GDCP, Men's State Prison, and Hancock State Prison in Sparta, Georgia.  Mr. Shields is Deaf and communicates primarily through his first language, ASL.  Mr. Shields can understand some

written English and can speech-read some communications,[3] but he has limited English.  Mr.

Shields also has diabetes, arthritis, and depression.  Mr. Shields is a qualified person with a

disability within the meaning of Title II of the ADA and Section 504.  He has experienced the

violations described herein.

22.     Plaintiff ANDREW SMITH is a 33-year-old man incarcerated at CSP.  Mr. A.

Smith has been incarcerated since 2017.  Mr. A. Smith has previously been incarcerated at

GDCP and ASMP.  Mr. A. Smith is Deaf and communicates primarily through his first language,

ASL.  Mr. A. Smith can understand some written English and can speech-read some

communications.  Mr. A. Smith also has an amputated leg and uses a prosthetic.  Mr. A. Smith is

a qualified person with a disability within the meaning of Title II of the ADA and Section 504.

He has experienced the violations described herein.

23.     Plaintiff DARRELL SMITH, JR. is a 40-year-old man incarcerated at CSP.  Mr.

D. Smith has been incarcerated since 2010.  Mr. D. Smith has previously been incarcerated at

GDCP and Hancock State Prison, and has been to ASMP on numerous occasions.  Mr. D. Smith

is Deaf and communicates using ASL.  Mr. D. Smith does not use or understand English.  Mr. D.

Smith also has significantly impaired vision in one eye.  He does not fully understand his eye

condition, but he believes he may lose all vision in that eye.  Mr. D. Smith also experiences

significant ankle pain and cannot stand for long periods of time.  Mr. D. Smith is a qualified

person with a disability within the meaning of Title II of the ADA and Section 504.  He has

---

[3] Speech-reading, sometimes referred to as "lip-reading," is the practice of detecting words on a speaker's mouth based on facial and mouth movements.  This is almost never an effective means of communication for people who are deaf or hard of hearing.  Only about 30% of all speech is visible on the lips.  Georgia Tech Research Institute, Deafness and Hardness of Hearing Fact Sheet,
https://accessibility.gtri.gatech.edu/assistant/acc_info/factsheet_deaf_hoh.php.  Moreover, speech-reading demands fluent comprehension of English and is highly dependent on, *inter alia*, the proximity and eye contact between the speaker and the speech-reader, a quiet and well-lit environment, the speaker's ability to articulate or their accent, and presence of facial hair or masks that block the speaker's lips.

experienced the violations described herein.

24.     Plaintiff JORAE SMITH is a 23-year-old man incarcerated at CSP.  Mr. J. Smith has been incarcerated since 2016.  Mr. J. Smith has previously been incarcerated at GDCP, Coastal State Prison, Valdosta State Prison in Valdosta, Georgia, and ASMP.  Mr. J. Smith is Deaf and communicates using ASL.  Mr. J. Smith can use and understand only simple written English.  Mr. J. Smith also has a psychiatric disability.  Mr. J. Smith is a qualified person with a disability within the meaning of Title II of the ADA and Section 504.  He has experienced the violations described herein.

**Defendants**

*State Agency Defendants*

25.     Defendant GDOC is the Georgia state agency responsible for the operation of nearly 100 facilities confining more than 56,000 individuals sentenced to state incarceration. Defendant GDOC operates and oversees state prisons, private prisons, county prisons, "transition centers," substance abuse centers, and probation detention centers.  Defendant GDOC is legally responsible for ensuring compliance with federal disability nondiscrimination laws and the U.S. Constitution at all Georgia prisons.  Defendant GDOC is a public entity within the meaning of Title II of the ADA.  Defendant GDOC receives federal financial assistance and is covered by Section 504.  Defendant GDOC's mission statement is to "protect[] the public by operating secure and safe facilities while reducing recidivism through effective programming, education, and healthcare."[4]

26.     Defendant GBOP is an executive branch agency of the State of Georgia. Defendant GBOP is authorized to grant paroles, pardons, reprieves, remissions, and

_____
[4] Georgia Department of Corrections, "Mission, Vision, and Core Values," http://www.dcor.state.ga.us/AboutGDC/Mission.

commutations, and restore civil and political rights.  The agency is legally responsible for ensuring compliance with federal disability nondiscrimination laws and the U.S. Constitution in the parole and pardon process.  Defendant GBOP is a public entity within the meaning of Title II of the ADA.  Defendant GBOP receives federal financial assistance and is covered by Section 504.  Defendant GBOP's mission statement is "[t]o serve the citizens of Georgia by exercising the constitutional authority of executive clemency through informed decision-making, thereby ensuring public safety, protecting victims' rights, and providing offenders with opportunities for positive change."[5]

***Individual Defendants***

27.     Defendant GREGORY C. DOZIER is the Commissioner of GDOC and is responsible for oversight of GDOC, including its day-to-day operations.  Defendant Dozier is responsible for ensuring compliance with federal disability nondiscrimination laws and the U.S. Constitution at all state prisons.  Defendant Dozier is legally responsible for the unlawful policies, practices, and procedures challenged herein, and has the authority and legal obligation to eliminate and remedy these policies, practices, and procedures.  Defendant Dozier is sued in his official capacity.

28.     Defendant TERRY BARNARD is the Chairman of GBOP.  Defendant Barnard is responsible for ensuring compliance with federal disability nondiscrimination laws and the U.S. Constitution in the programs, services, and activities of GBOP.  Defendant Barnard is legally responsible for the unlawful policies, practices, and procedures challenged herein, and has the authority and legal obligation to eliminate and remedy these policies, practices, and procedures.  Defendant Barnard is sued in his official capacity.

---

[5] Georgia State Board of Pardons and Paroles, "About," https://pap.georgia.gov/about.

29.     Defendant TIMOTHY C. WARD is the Chief of Staff of GDOC and is responsible for overseeing all divisions and departmental operations of the state prison system. Defendant Ward is legally responsible for the unlawful policies, practices, and procedures challenged herein, and has the authority and legal obligation to eliminate disability discrimination and unconstitutional practices in the operations of the state prison system. Defendant Ward is sued in his official capacity.

30.     Defendant CLAY NIX is the Director of the Office of Professional Standards of GDOC and is responsible for "gathering information, examining operations, enforcing departmental standards and laws through audits and investigations and recommending solutions."[6] Defendant Nix oversees compliance with the ADA and offender grievance policies and practices. Defendant Nix is legally responsible for the unlawful policies, practices, and procedures challenged herein and has the authority and obligation to eliminate disability discrimination and unconstitutional practices in the operations of the state prison system. Defendant Nix is sued in his official capacity.

31.     Defendant RICKY MYRICK is the Assistant Commissioner of the Facilities Division of GDOC. Defendant Myrick oversees all state prisons, private prisons, and other GDOC detention facilities including transition centers, and probation detention centers. Defendant Myrick oversees staff at these institutions and monitors the overall supervision and safety of more than 56,000 prisoners. Defendant Myrick is legally responsible for the unlawful policies, practices, and procedures challenged herein, and has the authority and obligation to eliminate disability discrimination and unconstitutional practices in the operations of all GDOC incarceration facilities. Defendant Myrick is sued in his official capacity.

---

[6] Georgia Department of Corrections, "Office of Professional Standards," http://www.dcor.state.ga.us/Divisions/ExecutiveOperations/OPS.

32.      Defendant JACK "RANDY" SAULS is the Assistant Commissioner of Health

Services of GDOC.  Defendant Sauls oversees the physical, mental, and dental health of GDOC

inmates, which includes providing services to inmates to treat medically necessary conditions.

Defendant Sauls is legally responsible for the unlawful policies, practices, and procedures related

to medical, mental health, and dental care challenged herein.  Defendant Sauls has the legal

authority and obligation to eliminate disability discrimination and unconstitutional conduct in the

medical, dental, and mental health care operations of the state prisons.  Defendant Sauls is sued

in his official capacity.

33.      Defendant JAY SANDERS is the Assistant Commissioner of Inmate Services of

GDOC.  Defendant Sanders is responsible for overseeing GDOC's academic education,

vocational training, chaplaincy and risk reduction services, Residential Substance Abuse

Treatment Centers, and transitional services and reentry.  Defendant Sanders has the legal

authority and obligation to eliminate disability discrimination and unconstitutional conduct in the

education, transition, chaplaincy, and reentry planning operations in state prisons.  Defendant

Sanders is sued in his official capacity.

34.      Defendant TOMMY BOWEN is the Warden at CSP.  As Warden, Defendant

Bowen is the legal custodian of individuals in CSP custody and control and is responsible for

their safe, secure, and humane treatment.  Defendant Bowen is responsible for the administration

of programs, services, and activities offered to incarcerated people at CSP, and is in charge of

supervision and discipline of all correctional officers and employees at CSP.  On information and

belief, Defendant Bowen is aware of GDOC's policies and practices regarding deaf and hard of

hearing individuals, and he is aware of specific written complaints by deaf and hard of hearing

inmates at CSP, including Plaintiffs, regarding violations of their rights.  Defendant Bowen is

sued in his official capacity.

35.     Defendant TED PHILBIN is the Warden at ASMP.  As Warden, Defendant Philbin is the legal custodian of individuals in ASMP custody and control and is responsible for their safe, secure, and humane treatment.  Defendant Philbin is responsible for the administration of programs, services, and activities offered to inmates at ASMP, and is in charge of supervision and discipline of all correctional officers and employees at ASMP. On information and belief, Defendant Philbin is aware of GDOC's policies and practices regarding deaf and hard of hearing individuals, and he is aware of specific written complaints by deaf and hard of hearing inmates at ASMP, including Plaintiffs, regarding violations of their rights.  Defendant Philbin is sued in his official capacity.

36.     Defendant ANTOINE CALDWELL is the Warden at JSP.  As Warden, Defendant Caldwell is the legal custodian of individuals in JSP custody and control and is responsible for their safe, secure, and humane treatment.  Defendant Caldwell is responsible for the administration of programs, services, and activities offered to inmates at JSP, and is in charge of supervision and discipline of all correctional officers and employees at JSP.  On information and belief, Defendant Caldwell is aware of GDOC's policies and practices regarding deaf and hard of hearing individuals.  Defendant Caldwell is sued in his official capacity.

## FACTS

37.     Defendants have violated, and continue to violate, federal laws protecting persons with disabilities in Georgia Department of Corrections ("GDOC") custody, and subject to Georgia Board of Pardons and Paroles ("GBOP") authority.  Defendants' conduct violates the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), and the Eighth and Fourteenth Amendments of the U.S. Constitution.  Violations of law

include:

(A)      **Failure to provide equally effective communication (including qualified interpreters, captioning, and other communication access) within the prisons and in communications with GBOP**, including but not limited to the following important programs and activities: classification; orientation; disciplinary proceedings; vocational, educational, and religious programs; meetings with prison counselors and staff; reentry planning meetings; information relayed orally to all inmates, such as pill call, meal times, and meetings; important letters, memos, and documents provided by Defendants to Plaintiffs that cannot be understood by Plaintiffs because of their disabilities;

(B)      **Failure to provide equally effective communication at medical, mental health, and dental appointments**, and failure to provide constitutionally minimum standards of medical, dental, and mental health treatment;

(C)      **Failure to provide equally effective telecommunication with family, friends, and attorneys outside of the prison**, including videophones, captioned telephones, and amplified telephones;

(D)      **Unreasonable use of, and failure to modify, solitary confinement and/or administrative isolation** for incarcerated people who are deaf and hard of hearing and for whom the isolation and deleterious effects of solitary are magnified;

(E)      **Unreasonable use and placement of handcuffs** without regard to the needs of deaf and hard of hearing incarcerated people to use their hands to communicate in American Sign Language ("ASL") and through gesturing or writing notes;

(F)      **Failure to include deaf and hard of hearing individuals in emergency planning** by failing to ensure visual alarms, vibrating alarms, and accessible evacuation

planning; and

(G)     **Failure to maintain an accessible, adequate administrative exhaustion process**, including by: maintaining a grievance system that is inaccessible to Deaf inmates who cannot read and write English; refusing to provide grievance forms to incarcerated people; refusing to accept completed grievances; refusing to provide incarcerated people with copies of submitted grievances, responses, appeal forms, or grievance numbers; threatening retaliation against incarcerated people who file grievances; and interfering with the exhaustion process by providing falsely back-dated, untimely responses to grievances and falsely back-dated, untimely extensions to the 40 days in which the prison is required to respond to grievances.

A.     **Failure To Provide Equally Effective Communication (Including Qualified Interpreters, Captioning, And Other Communication Access)**

38.     Effective communication with officers, counselors, wardens, and other prison staff is essential for incarcerated people.  People in the custody of GDOC are wholly dependent on GDOC for medical, dental, educational, mental health, employment, and religious needs, among other services.  Individuals in the custody of GDOC are also dependent on GDOC and its staff for all of their basic daily needs, including food, exercise, and safety.

39.     People who are deaf at birth or who become deaf early in life and who learn ASL as their first language typically use ASL as their primary or only language.  American Sign Language is a complete and complex language distinct from English – it is not simply English in hand signals – with its own vocabulary and rules for grammar and syntax.  Many Deaf individuals who use ASL as their primary language have extremely limited written English.  For these Deaf individuals, qualified ASL interpreters are necessary to ensure effective

communication with an individual who is not proficient in ASL.[7]  Speech-reading,

fingerspelling, or *ad hoc* gestures are not effective communication for people who communicate

in ASL.  Notes and other writings are almost never an effective communication tool for Deaf

individuals, particularly for complex and important topics such as medical care, mental health

care, prison rules and requirements, disciplinary hearings, or parole requirements.

40.     For deaf and hard of hearing individuals who are fluent in English – often those

who lose their hearing later in life – written communication in English may be an effective

communication tool.  Some late-deafened individuals are not proficient in ASL and prefer to

communicate in writing.  For these people, *all* information must be conveyed clearly in writing

for communication to be effective.  A scribbled note with only a few words summarizing the

content of an important medical encounter, for example, is not effective communication.

Effective communication for deaf and hard of hearing individuals who are fluent in written

English includes Communication Access Realtime Translation ("CART").  CART provides real-

time typed transcriptions of spoken communication, similar to the technology used by court

reporters.

41.     For deaf and hard of hearing individuals who are fluent in both ASL and English,

written notes may sometimes be effective for simple interactions.  But most deaf and hard of

hearing people who are bilingual in ASL and English still require ASL interpreters for complex

or important interactions.

42.     Speech-reading is virtually never an effective communication method for a deaf

---

[7] A qualified interpreter is one who is able to communicate effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary.  For some Deaf individuals, qualified interpretation requires a team of interpreters, including both an ASL interpreter (who is hearing and who can interpret from English to ASL), and a Certified Deaf Interpreter ("CDI").  A CDI is a Deaf person who works with the ASL interpreter to facilitate effective communication.

or hard of hearing individual.  Fewer than 30% of English words can be distinguished reliably by speech-reading.

43.     Defendants, through their policies and practices, fail to provide communication access for deaf and hard of hearing individuals in Defendants' custody and control.  Defendants routinely fail to provide qualified interpreters, CART, and other auxiliary aids and services for deaf and hard of hearing people in GDOC custody and subject to GBOP's parole power.

44.     Defendants' failures to ensure communication access deprive deaf and hard of hearing people under Defendants' control of effective communication in critical situations, including medical and mental health appointments, administrative hearings, classification reviews, and accessing parole.  Defendants also deprive deaf and hard of hearing inmates in GDOC custody of necessary auxiliary aids and services, such as qualified interpreters and CART, during important prison programs, such as educational classes, rehabilitative courses, and religious services – some of which are prerequisites to early release.

### *Classification*

45.     On entry into GDOC custody, incarcerated people are sent to GDCP.  While there, Defendants conduct "diagnostic processing" for inmates.  On information and belief, incarcerated people at GDCP are assessed to determine what security level and prison they will be assigned.  On information and belief, an incarcerated person's security classification is considered by GBOP in determining whether to grant parole to an individual.  On information and belief, inmates at GDCP are assessed to determine what classes, jobs, or programming they must complete to be eligible for early release.  On information and belief, GBOP almost always denies early release if an incarcerated person does not complete the programming identified at classification by GDCP.

46.     Communication is crucial at the classification stage to determine what programs, medical care, services, or facilities an individual will need.  But Defendants fail to provide communication access for deaf and hard of hearing inmates at GDCP, preventing them from expressing their preferences, explaining their needs, understanding their program plan, or ensuring that they are classified in the least restrictive setting that is appropriate.

47.     All Plaintiffs have experienced lack of communication access at classification.

### *Orientation*

48.     On arrival at a new prison, Defendants provide orientation information to explain the rules, policies, procedures, and opportunities (including jobs, classes, and religious programs) available at the prison.  Communication is critical at this stage so that incarcerated people understand information relevant for classification, including needs, skills, and interests, and for prison staff to communicate the rules, expectations, and requirements of prison.  Without this information, inmates cannot know how to follow the rules, avoid disciplinary sanctions, and participate in the programs they need to access parole and to succeed in the community upon their release.  But the content of orientation is not effectively communicated to Plaintiffs and other similarly situated deaf and hard of hearing incarcerated people.  The content of orientation is conveyed either orally or in writing.  On information and belief, there have never been interpreters at any prison orientation in GDOC, with the exception of orientation at Central State Prison ("CSP") following the mass transfer of deaf and hard of hearing inmates – including several Plaintiffs – in 2018.

49.     All Plaintiffs have experienced lack of communication access at numerous prison orientations.

### *Disciplinary Proceedings*

50.     Defendants impose disciplinary measures, including solitary confinement and visitation and commissary restrictions, on incarcerated people in their custody.  On information and belief, an incarcerated person's disciplinary history is a factor taken into account by GBOP in determining whether an individual will be released on parole.  On information and belief, an incarcerated person's disciplinary history is also considered if he may be eligible for transfer to a lower-security facility.

51.     On information and belief, the disciplinary process begins with a conversation between an officer who believes there has been an infraction and the incarcerated person believed to have broken a rule.  After this, the officer may "write up" a disciplinary report ("DR") on the inmate who the officer believes violated a prison rule.  The write-up sometimes leads to a DR hearing, where the incarcerated person and the complaining officer each have an opportunity explain their side of the situation.  The prison officials overseeing the DR hearing can impose sanctions including solitary confinement, official reports in the inmate's file, commissary and visitation restrictions, and other punishments.

52.     On information and belief, officers who believe an incarcerated person has violated a rule typically discuss the incident with the incarcerated person and anyone else who may have witnessed the incident before writing a DR.  But because Defendants fail to provide interpreters and other communication access, Plaintiffs and other similarly situated deaf and hard of hearing inmates are not able to resolve issues informally through conversation.  If the officer does write a DR, the written report describes the incident, and the incarcerated person must sign the report.  The DR form includes a space for the incarcerated person to explain their defenses or why the accusation is incorrect.  But Defendants fail to provide interpreters to explain these documents to incarcerated people who are Deaf and not proficient in written English.  Deaf and

hard of hearing inmates are therefore unable to understand the accusations against them or explain in writing any response, denial, or explanation of the incident.

53.     If the incident is escalated to a DR hearing, the incarcerated person is routinely handcuffed during the proceedings, and cannot sign, gesture, or write notes.  Interpreters, CART, and other communication aids are not provided during the hearings.  As a result, deaf and hard of hearing inmates are unable to understand the charged rule violations or effectively participate by explaining their side of the story.

54.     For example, in November 2017, Warden Clinton Perry, Jr. called Mr. Green into his office for a meeting.  Mr. Green was handcuffed behind his back for the duration of the meeting.  There were no ASL interpreters present.  Warden Perry wrote a note accusing Mr. Green of violating prison rules.  With his hands cuffed behind his back, Mr. Green could not communicate with even rudimentary notes or hand gestures to defend himself.

55.     For example, in September 2017, Mr. Moore was charged with "failure to follow instructions" and a violation of rules.  He was handcuffed behind his back for the duration of the DR hearing.  There were no ASL interpreters present. Mr. Moore was completely unable to communicate at the hearing.  With his hands cuffed behind his back, he could not even communicate through simple written notes or hand gestures.  Mr. Moore was not able to explain that he was wrongly charged and that the prison guard had mixed him up with another bald man.  During the hearing, officers laughed at Mr. Moore's inability to communicate.  Mr. Moore was punished with a 90-day suspension of store access, and the disciplinary incident remains on his record.

56.     Plaintiffs Green, Moore, Cobb, Henderson, A. Smith, and J. Smith have experienced lack of communication access at disciplinary proceedings.

*Educational, Vocational, And Religious Programs*

57.     Defendants provide educational, vocational, counseling, and religious programs for individuals in GDOC custody.  Incarcerated people who participate in educational, vocational, and counseling programs earn Performance Incentive Credits ("PIC Points"), which can reduce prison terms by up to 12 months.[8]  On information and belief, some incarcerated people are required to attend specific classes, such as substance abuse, anger management, and other "risk reduction" courses and programs as a condition of parole.  Defendant GDOC states that its programs "are critical to Governor Nathan Deal's criminal justice reform and the prison reentry initiative," and that in-custody educational, religious, vocational, and risk reduction programs are designed to "prepar[e] offenders for their return to society as productive citizens."[9] But Defendants repeatedly and knowingly fail to provide communication access, including interpreters and CART, to allow individuals who are deaf and hard of hearing to participate in these important programs.

58.     For example, Mr. D. Smith attempted to take a GED class for years at CSP but was repeatedly denied because there was no interpreter for the class.  He was repeatedly told that he could not attend because there were no interpreters.

59.     For example, Mr. A. Smith also attempted to attend a GED class numerous times in recent years.  After Mr. A. Smith filed grievances with the support of Plaintiffs' attorneys, Augusta State Medical Prison ("ASMP") provided an ASL interpreter for the first few classes, but then the interpreter stopped attending classes.  Mr. A. Smith does not know why the interpreter stopped coming to classes.  He was no longer able to participate in the GED class at

---

[8] Georgia Department of Corrections, "2017 Performance Incentive Credit Fact Sheet," http://www.dcor.state.ga.us/sites/default/files/PIC%202017.pdf.
[9] Georgia Department of Corrections, "Education and Programs," http://www.dcor.state.ga.us/sites/all/files/pdf/Research/Fact_Sheets/Info_Sheets_Education_Programs.pdf.

ASMP after the interpreter stopped attending.

60.     For example, Mr. Cobb is eligible for parole in 2019.  At his sentencing, he was

told that he would have to participate in specific classes during incarceration, including a

Residential Substance Abuse Training ("RSAT") program, for parole eligibility.  There were no

interpreters for any classes at ASMP.  The GDOC ADA Coordinator told Mr. Cobb that he did

not need to take the classes because they were not available to him because he is Deaf.  But Mr.

Cobb's counselor told him he *did* need to take these classes.  In March 2018, Mr. Cobb was

transferred to Johnson State Prison ("JSP") to participate in the RSAT program.  Mr. Cobb spent

five weeks at JSP waiting for an interpreter.  He did not participate in any classes during this

time.  After five weeks without an interpreter, Mr. Cobb was transferred back to CSP.  He still

does not know whether the RSAT class is required, why he was transferred from JSP back to

CSP, or if he will be denied parole because of GDOC's failure to provide interpreters.

61.     For example, Mr. Harris wishes to attend religious services.  But GDOC officials

frequently refuse to allow Mr. Harris to even *go* to the chapel.  Officers pretended not to

understand Mr. Harris when he put his hands in a prayer gesture in an attempt to communicate

his desire to go to church.  When Mr. Harris was permitted to go to the chapel at ASMP, GDOC

did not provide qualified interpreters for any religious programs.

62.     All Plaintiffs have experienced lack of communication access at vocational,

educational, religious, and other programming.

### *Meetings And Conversations With Counselors And Staff*

63.     Incarcerated people need to share and receive information frequently with prison

staff, including counselors and correctional officers, for a wide range of reasons, including: to

request enrollment in work, classes, or religious programs; to report abuse; to seek information

about prison rules or regulations; to seek medical or mental health care; and to learn of family emergencies or other critical information from family outside the prison.

64.     Defendants consistently fail to provide interpreters or other auxiliary aids or services such as CART or amplification for meetings between prison employees and deaf and hard of hearing inmates.  This causes communication failures on a daily basis for virtually every Plaintiff.

65.     For example, Mr. Moore has had numerous meetings with counselors without ASL interpretation.  He believes that his sentence computation is incorrect and that he is serving longer than he should be because of this error.  Although he has requested interpretation at numerous meetings, the prison has repeatedly refused to provide interpreters.  Mr. Moore cannot communicate effectively with his counselors or prison staff to explain the errors in his sentence, or if he has questions, if there are emergencies, or if the staff needs to share important information with him.

66.     For example, Mr. Harris was transferred from ASMP to CSP in February 2018. He had an interpreter at his first meeting with his new counselor, and at a brief meeting in May 2018.  But his counselor, Counselor Chambers, has refused to provide interpreters at numerous other meetings, forcing Mr. Harris to attempt to communicate by written notes.  Mr. Harris has extremely limited English.  He wants to get a job, but he cannot communicate effectively with his counselor to learn what jobs are available or sign up for a job.

67.     All Plaintiffs have experienced lack of communication access in meetings with counselors, officers, and other prison staff.

***Employment***

68.     Communication barriers also interfere with the ability of Plaintiffs to participate

on an equal basis in employment.  On information and belief, work details can earn incarcerated people PIC Points, and an inmate's work history is considered by GBOP.  Defendants fail to provide communication access for Plaintiffs to learn their jobs and communicate effectively with their supervisors.  Some Plaintiffs do not have work because of these communication barriers.

69.     For example, Mr. D. Smith worked in the kitchen at CSP on the serving line.  Mr. D. Smith had no way to communicate with his supervisors in the kitchen.  He was blamed for misunderstandings and for the conduct of other, hearing, incarcerated people.  Mr. D. Smith could not communicate with prison staff to explain any misunderstandings, ask questions, or receive information about his work.  In December 2017, Mr. D. Smith wrote a grievance requesting interpreters so that he could communicate with prison staff at his job.  In response to his grievance, prison staff met with Mr. D. Smith, with an interpreter, and explained to him that he would be moving from working on the line to scrubbing pots and pans because there was less communication needed in that position.

70.     For example, Mr. Green works five days a week in the kitchen.  Mr. Green has no way to communicate with his supervisors, and they have no way to communicate with him.  On many occasions, prison staff have yelled at Mr. Green and threatened him with disciplinary action, apparently because he does not follow their spoken orders, which he cannot hear.  He has also been blamed for problems at work, and he has no way to communicate his side of the story.

71.     All Plaintiffs have experienced lack of communication access in job-seeking or at work.

### *Parole And Reentry Planning*

72.     Defendant GDOC provides a variety of resources, courses, tools, and information to help incarcerated people prepare for successful release and reentry into the community.

Defendant GDOC recognizes the importance of reentry programs, which are designed to "provide[] effective opportunities for offenders to achieve positive change and to be a more pro-social contributor to society."[10]  Reentry planning includes: The Offender Parolee Probationer State Training Employee Program ("TOPPSTEP") to assist inmates in getting important documents like identification and birth certificates before release; assistance with Social Security Administration Pre-Release procedures to apply for or to renew Supplemental Security Income ("SSI") or Social Security Disability Insurance ("SSDI") benefits; and meetings with GDOC staff to understand the conditions and requirements of release, including probation, parole, or sex offender status.

73.     Defendants fail to ensure effective communication of critical pre-release information for deaf and hard of hearing inmates.  Defendants do not provide interpreters or other auxiliary aids and services to understand written information from GBOP about parole eligibility, parole determinations, or during meetings with GDOC counselors before release. Defendants fail to provide other reasonable accommodations (such as modification of prerequisites) necessary to ensure that incarcerated individuals have a fair and equal chance to achieve parole.

74.     For example, Mr. Green has been incarcerated for more than 20 years.  During this time, he has had virtually no way to communicate with prison staff.  Mr. Green believes he is eligible for parole, but because there is no effective communication in CSP, and because his sentence and conditions are only available in written form, he has no way to confirm whether or when he may be eligible.  He has no idea how the parole process works or how to participate effectively.  He received a letter from GBOP during his incarceration, but he does not understand

---

[10] Georgia Department of Corrections, "Transitional Services,"
http://www.dcor.state.ga.us/Divisions/InmateServices/Reentry/Reentry.

English and does not know what this letter said.  Defendants have not provided ASL interpreters to Mr. Green to allow him to understand the documents he has received about his incarceration, his sentence, and the parole process.  Mr. Green does not know when he could be eligible for parole.  Mr. Green does not know what he needs to do to maximize his chances of parole.  Mr. Green does not know whether he has already been considered for parole in the 21 years he has already served in prison.

75.     Defendants' failure to ensure communication access in parole and reentry planning makes it more likely that deaf and hard of hearing people will serve longer sentences because they lack access to the parole process, and face re-incarceration because Defendants failed to plan for reentry and to prepare inmates with tools they need to succeed after release.

76.     All Plaintiffs have experienced lack of communication access related to parole, probation, and reentry planning.

### *Information Communicated Orally To All Incarcerated People In Prison*

77.     Every day, prison staff share information with all incarcerated people orally, announcing mealtimes, pill calls, the beginning and end of work shifts, the beginning and end of daily count, laundry calls, inspections, and shakedowns.  This information is conveyed almost exclusively through speech and auditory cues.  Deaf and hard of hearing inmates almost never receive this information.  As a result, they miss meals, medication, appointments, laundry, and work.  Hearing incarcerated people have audio alarms to wake them up in the morning, but the prisons refuse to provide visual or vibrating alarms for deaf and hard of hearing inmates.  Deaf and hard of hearing incarcerated people are sometimes woken up by their cellmates or guards banging on the beds, or sometimes they are not woken up and miss breakfast or work.

78.     For example, in April 2018, Mr. Cobb, Mr. Harris, and another Deaf incarcerated

person were in their dorm at CSP when prison staff announced an inspection of the dorm.  There was no visual or tactile notification of this information, so Mr. Cobb and Mr. Harris were unaware of the inspection.  When Warden Perry arrived for the inspection, he yelled at Mr. Cobb and Mr. Harris for failing to prepare for the inspection.  The Warden punished Mr. Cobb and Mr. Harris for failing to respond to information that was conveyed only orally – and was thus completely inaccessible to both men – by ordering them to wash windows.

79.     For example, Mr. Cobb was unable to change his bedsheets for months because he could not hear when officials at ASMP announced that inmates should bring their dirty sheets to the laundry and get clean sheets.

80.     For example, Mr. A. Smith works in the early morning shift but frequently misses meals or arrives late because he does not wake up on time.  He does not have a vibrating or flashing visual alarm, so he only wakes up if another inmate shakes his bed to wake him.

81.     All Plaintiffs have experienced lack of communication access to information conveyed orally to incarcerated people.

### *Information Conveyed In Writing*

82.     Defendants provide a wide range of information to incarcerated people in writing. This information is inaccessible to most Deaf Plaintiffs, and other similarly situated Deaf people, who communicate primarily in sign and who do not use or understand English. This written information is also inaccessible to those deaf and hard of hearing individuals who have limited literacy for other reasons, but who cannot ask clarifying questions of prison staff because of the lack of reasonable accommodations.

83.     For example, Mr. J. Smith was held in protective isolation for nine months at ASMP.  During this time, he attempted to request transfers to other facilities, where he could be

safely in the general population.  The transfer request process was only available in writing.  Mr. J. Smith has very limited written English, but he attempted to fill out the paperwork as well as he could.  ASMP failed to provide an interpreter to help Mr. J. Smith fill out this document.  Mr. J. Smith received a letter with information about his transfer request and instructions about what he needed to do to pursue this request.  But since he could not read the English in the letter, he did not understand this information and could not continue to pursue his transfer request.

84.      For example, Mr. Henderson has limited literacy and has difficulty reading complex English.  Although Mr. Henderson's first language is English, he cannot read complex or lengthy documents without assistance.  But while hearing incarcerated people can ask for clarification or explanations from prison staff, Mr. Henderson cannot effectively communicate with prison staff to receive such clarifications because GDOC facilities refuse to provide amplification devices or other auxiliary aids and services.

85.      All Plaintiffs have experienced lack of access to information conveyed in writing.

**B.      Failure To Provide Effective Communication And To Meet Minimum Constitutional Requirements In Medical, Dental, And Mental Health Care**

86.      Defendants are responsible for the medical, dental, and mental health care of all individuals incarcerated by GDOC.

87.      Deaf and hard of hearing inmates who use ASL require qualified interpreters to communicate effectively with healthcare staff in custody.  Deaf and hard of hearing inmates who rely on written English communication require CART to communicate effectively with healthcare staff in custody.  But GDOC repeatedly fails to provide interpreters, CART, or other auxiliary aids and services at healthcare appointments.

88.      Further, Defendants have failed to provide hearing-related medical care, such as appointments with hearing specialists and appointments related to hearing aids and cochlear

implants.

89.    For example, Mr. Green has endured numerous medical encounters without effective and meaningful communication access.  He has never had an ASL interpreter at any medical appointment over 21 years.  He has had major medical interventions, including knee surgery and a procedure in which a small camera was inserted into his groin, all without interpreters.  He never learned why the painful procedure in which the camera was inserted into his groin was performed.  He vomited and then passed out during this procedure.

90.    For example, Mr. Moore used a cochlear implant before he was incarcerated. When the cochlear implant is functioning, Mr. Moore's hearing is improved.  But he is not allowed to use it in CSP.  Instead, he is forced to use a hearing aid.  The hearing aid helps a little, when it is working.  But officers broke Mr. Moore's hearing aid during a shakedown of his cell. The prison has refused to fix Mr. Moore's hearing aid, or to permit him to use his cochlear implant.  Mr. Moore has been left with no hearing assistance.

91.    For example, Mr. D. Smith began experiencing significant vision loss in one eye during his incarceration.  He also has significant ankle pain that makes it difficult and painful to stand and walk.  Mr. D. Smith has had numerous medical appointments without the assistance of an interpreter, at both CSP and ASMP, to assess his vision loss and ankle pain.  In February 2018, Mr. D. Smith was transported from CSP to ASMP for a medical appointment, but when he arrived at ASMP, he learned that there was no interpreter available and was transported back to CSP the same day without seeing a doctor.  In March 2018, Mr. D Smith was again transported to ASMP for an appointment related to his vision loss and upcoming eye surgery.  Upon arrival at ASMP, he was again informed that there was no interpreter available.  Despite Defendants' failure to provide effective communication access, and Defendants' recognition that Mr. D.

Smith requires an ASL interpreter to communicate, medical staff at ASMP proceeded with Mr. D. Smith's March 2018 medical appointment without an interpreter. Mr. D. Smith does not understand the medical plan, prognosis, or next steps related to his vision loss because of Defendants' failure to provide communication access.

92.     On May 21, 2018, Mr. J. Smith had a scheduled mental health appointment. This was his first appointment with a counselor after three months at CSP, although he is supposed to see a counselor every other week. Several meetings had been cancelled because there was no interpreter. On May 21, 2018, CSP again failed to provide an interpreter for Mr. J. Smith's appointment. As of August 2018, CSP had never provided an interpreter at a single mental health appointment for Mr. J. Smith.

93.     In June 2018, Mr. Shields was transported to GDCP for a kidney test. He believes the test was related to diabetes. But GDCP refused to provide an interpreter at this appointment. Mr. Shields was not able to communicate effectively, and the appointment was confusing. CSP failed to provide an interpreter at a scheduled follow-up appointment, where Mr. Shields expected to learn the results of this kidney test. The appointment was cancelled and Mr. Shields does not know the results of this test.

94.     Mr. Henderson takes psychotropic medications in prison. He meets with a psychiatrist every month to discuss his medications and mental health. He has never received CART interpretation or audio amplification devices to ensure effective communication at these important meetings.

95.     Mr. A. Smith has a prosthetic leg. His prosthetic requires regular adjustments to avoid pain, abrasions, or infections. But Mr. A. Smith has never had interpreters at his appointments to assess his prosthetic. He has also been denied regular appointments for

prosthetic maintenance, causing pain, loss of balance, and increased falls.

96.     All Plaintiffs have experienced lack of effective communication at medical,

mental health, or dental appointments.

     C.     **Unequal Access To Telecommunications**

97.     Access to telecommunications is extremely important to incarcerated individuals.

As the federal government has recognized, "Telephone privileges are a supplemental means of

maintaining community and family ties that will contribute to an inmate's personal

development."  28 C.F.R. § 540.100.  Most incarcerated people only have a chance at parole if

they have access to telecommunications, as parole eligibility requires that an incarcerated person

provide an address of where they can live upon release.  Staying connected to the outside world

is also imperative in preparing incarcerated people to make a positive transition back to the

outside world once their sentences are complete.

98.     Defendant GDOC provides hearing individuals in its custody regular access to

telephones to communicate with family, friends, attorneys, and other individuals outside of

prison.  On information and belief, hearing inmates can use telephones on a daily basis.

99.     Because of their disabilities, most deaf and hard of hearing individuals in

GDOC's custody cannot use standard telephones to communicate with individuals outside of

prison.

100.     Defendant GDOC possesses teletypewriters ("TTY") at some of its prisons.  TTY

is an outdated technology that does not provide equally effective communication for most deaf

and hard of hearing people.  TTY is a device equipped with a keyboard and display screen to

enable deaf and hard of hearing individuals to make and receive text-based telecommunication

via telephone lines.  TTY requires the deaf user to type messages in English.  But most Deaf and

many additional deaf and hard of hearing people are not proficient in English, so even if they are

physically able to type they cannot communicate meaningfully with this device.  ASL is a complete language entirely different from English and it has no written component. People whose first language is ASL, including many Plaintiffs, are often not proficient in written English.  TTY is not accessible for people, like many Plaintiffs, who have extremely limited use of English.  Moreover, TTY is ineffective even when used by an individual fluent in English. Typed TTY conversations necessarily take much more time than traditional voice calls or video calls; TTY communications do not include important linguistic information such as emotion, tone, or inflection, which can affect meaning and message significantly; TTY messages are often garbled or indecipherable; and TTY users cannot interrupt each other as typical in a natural, free-flowing conversation.

101.    Moreover, the TTY machines at several GDOC prisons are not meaningfully available.  On information and belief, the TTY machine at CSP has been broken for at least 10 years.  The TTY machine at ASMP sometimes works, but the machine is located in a counselor's office, and incarcerated people can only access it when that counselor happens to be in her office and agrees to allow TTY access.  TTYs at GDOC facilities are generally available on a significantly more restricted basis than are traditional telephones despite the fact that conversations on TTYs are necessarily slower given the drawbacks of the technology.  TTY calls also result in higher charges for prisoners' families.

102.    For the most part, deaf and hard of hearing individuals in the United States have abandoned the outdated and ineffective TTY.  Instead, deaf and hard of hearing people generally use videophones and captioned telephones.  As of 2012, only 12% of relay calls in the United

States came from TTY devices.[11]

103.    Videophones allow deaf individuals to communicate with one another directly (and in real time) in ASL, or to communicate with hearing people using a free video-relay operator who translates English into sign language and vice versa.  The deaf or hard of hearing user does not need to use any written English to communicate via videophone.  Video-relay operators are paid with tax dollars, and their services are not charged to users or prisons.

104.    Deaf or hard of hearing people who speak and read English – often people who lose some or all of their hearing later in life – use captioned telephones or other reliable internet-based relay services to communicate.  Captioned telephones allow deaf or hard of hearing users to speak directly into the captioned telephone.  A relay operator converts the other party's spoken words into written captions that appear in real time on the captioned telephone.  If the deaf or hard of hearing user has some residual hearing, they can listen to the spoken message on the receiver while simultaneously reading the captioned message.  Captioned-telephone operators are paid with tax dollars, and their services are not charged to users or prisons.

105.    On information and belief, GDOC fails to provide any access to videophones or captioned telephones at any of its facilities across the state.  Plaintiffs and other similarly situated deaf and hard of hearing incarcerated people are deprived of crucial communication access with the outside world.  On information and belief, CSP possesses the hardware for videophone service, and began the process of installing videophones, but has since removed videophones from living areas and provides no access to videophone for Plaintiffs and similarly situated deaf and hard of hearing inmates.

---

[11] FCC, "Emergency Access Advisory Committee Report on TTY Transition, https://webcache.googleusercontent.com/search?q=cache:UlQEr_Uo9h0J:https://docs.fcc.gov/public/attachments/DOC-319386A1.pdf+&cd=1&hl=en&ct=clnk&gl=us at p. 13.

106.    For example, Mr. Cobb is appealing his conviction with the help of a lawyer

unaffiliated with this action.  Mr. Cobb cannot use a standard telephone and does not understand

English well enough to communicate effectively with written letters or by TTY.  Because there

are no videophones at any of the prisons where he has been incarcerated, Mr. Cobb cannot

communicate at all with his attorney unless the attorney drives to the prison to meet in person.

The public defender assigned to his appeal has never been able to visit Mr. Cobb in person.  Mr.

Cobb has no information on the status of his appeal, whether it was filed, whether it will be

argued, or whether it has been decided.

107.    For example, Mr. Shields is seeking a new trial based on errors in his criminal

trial, including introduction of evidence of a contested "confession" that Mr. Shields supposedly

expressed to a hearing individual without an interpreter present.  Because there are no

videophones in GDOC prisons, Mr. Shields cannot communicate with his attorney.  He can only

communicate with his public defender if the public defender – who lives nearly three hours from

CSP – visits Mr. Shields in person, significantly curtailing his access to his attorney.  The public

defender assigned to Mr. Shields' case has never been able to visit him in person.

108.    For example, Mr. Green has virtually no communication with the outside world

because of GDOC's failure to provide videophones.  Mr. Green cannot read or write in English.

His family lives far away and cannot afford to visit him.  Mr. Green would communicate with his

family if he had access to a videophone.

109.    For example, Mr. Moore, like other incarcerated people, wants to communicate

with friends and family by phone.  Mr. Moore cannot communicate using a standard telephone.

He can write and understand simple information in English.  If there were a functioning TTY

available, he might be able to use it for some basic communication with people outside the

prison (although it would not be equal to the communication access that hearing inmates enjoy). There is a TTY at CSP, but it has never functioned in the seven years Mr. Moore has been incarcerated there.  He has never sent or received a message via TTY.  For Mr. Moore to effectively and equally communicate with his family, friends, and lawyers outside the prison, he needs a videophone and video relay services.  CSP has never provided a videophone for Mr. Moore to contact people outside the prison.

110.    For example, Mr. Henderson communicates by writing, speech, and residual hearing.  He cannot effectively communicate with a standard telephone.  His preferred communication method is an amplified telephone with captioning.  If GDOC provided telecommunications accessible to Mr. Henderson, he would be able to communicate reliably with his family who live more than three hours away from JSP.

111.    All Plaintiffs would use accessible telecommunications if available, but all Plaintiffs are now either largely or completely unable to communicate through telecommunications with loved ones and attorneys outside the prison.  Without access to their attorneys, Plaintiffs cannot participate and assist their attorneys in the appeal of wrongful convictions.  Without communication with their families, incarcerated people cannot confirm addresses for parole eligibility, and are denied parole and early release.  Furthermore, research shows that incarcerated people who maintain contact with family outside of prison have lower rates of recidivism after release.  Plaintiffs are denied this contact with their attorneys and families because GDOC fails to provide telecommunications access for deaf and hard of hearing inmates.

112.    All Plaintiffs have experienced unequal access to telecommunications.

**D.      <u>Unreasonable Use Of, and Failure to Modify, Administrative Isolation</u>**

113.    Deaf and hard of hearing inmates are particularly affected by the sensory

deprivations of solitary confinement, administrative segregation, protective custody, and other forms of prolonged isolation.  Isolation has devastating effects on all incarcerated people and is considered a form of torture in many parts of the world.  But for people who are deaf and hard of hearing, the devastating effects of isolation are further magnified.  While hearing inmates can shout to communicate to others in isolation or to get the attention of passing guards, deaf and hard of hearing inmates generally cannot share information through speech.  While hearing inmates can learn information by listening to other inmates and guards, deaf and hard of hearing inmates have no such access to information.

114.    Deaf and hard of hearing people in isolation miss meals, showers, appointments, and medication because these are announced using only auditory cues.

115.    On information and belief, people in isolation can communicate with medical staff and request appointments through written notes.  But most Deaf inmates have extremely limited English and cannot express important information, like a physical or mental health crisis, that may occur while being held in isolation.  People in isolation are generally permitted books as a form of stimulation and to mitigate the sensory and social isolations of segregation.  But most incarcerated Deaf people cannot enjoy these books (when provided) because they do not understand written English.

116.    For example, Mr. J. Smith was held in protective custody for nine months at ASMP.  During this time, Mr. J. Smith missed information and meals.  He also experienced severe effects of sensory and social isolation, including depression, anxiety, and disorientation. While other people in segregation could use the phones nearly every day, Mr. J. Smith could only use the TTY once in a while.  TTY is not an effective form of communication for Mr. J. Smith, who has very limited English.  Mr. J. Smith sometimes had to choose between taking a

shower and using the TTY to communicate simple information to his mother.

117.    Plaintiffs Henderson, Moore, and J. Smith have experienced the unreasonable use of, and failure to modify, administrative isolation.

       **E.**    **Use And Placement Of Handcuffs Without Regard To Communication**

118.    Many Plaintiffs and similarly situated deaf and hard of hearing people communicate primarily or exclusively with their hands, including through ASL, gesturing, and writing notes.  For Plaintiffs and similarly situated people, having their hands cuffed behind their backs completely prevents any communication.

119.    Defendant GDOC routinely handcuffs inmates, including Plaintiffs and similarly situated deaf and hard of hearing inmates, behind their backs without regard to the communicative isolation this creates.  Defendant GDOC makes no assessment of the specific harm or need for behind-the-back handcuffing of Plaintiffs.

120.    For example, Mr. Moore was handcuffed at a disciplinary hearing.  Even though the purpose of the hearing was to determine what happened, Mr. Moore was handcuffed with his hands behind his back for the duration of the hearing, leaving him with no way to communicate any information at all.

121.    For example, Mr. J. Smith was handcuffed behind his back whenever he left his segregation cell in ASMP.  Mr. J. Smith was in segregation for his own protection, not for punishment.  On information and belief, hearing inmates in segregation can speak to one another while they are being escorted through the prison, but no communication was available to Mr. J. Smith.

122.    Plaintiffs Green, Moore, A. Smith, and J. Smith have experienced the use and placement of handcuffs without regard to communication access.

**F.**   **Failure To Include Deaf And Hard of Hearing Individuals In Emergency Planning**

123.   GDOC facilities have emergency plans and emergency equipment to protect incarcerated people in case of emergency.  But these protections are not available to Plaintiffs and other similarly situated deaf and hard of hearing inmates.

124.   On information and belief, fire alarms in GDOC facilities do not all have visual components, such as flashing lights.  GDOC facilities also do not provide visual or tactile notifications to inform inmates of emergencies and evacuations.  On information and belief, GDOC facilities have loudspeakers to make announcements, including emergency announcements and notifications, but this information is not communicated through other means accessible to Plaintiffs and similarly situated inmates.  There is no adequate visual or tactile warning or information system, such as bed-shakers, flashing alarms, or written notification of announcements in case of emergency.

125.   All Plaintiffs have experienced the failure to include deaf and hard of hearing people in emergency planning.

**G.**   **Failure To Maintain An Accessible, Adequate Administrative Exhaustion Process**

126.   Defendant GDOC's written policy is "to maintain a grievance procedure available to all offenders, which provides an open and meaningful forum for their complaints, [and] the resolution of these complaints."  GDOC Standard Operating Procedure IIB05-0001, § I ("Grievance Procedure").  Grievance procedures are important mechanisms for bringing concerns to the attention of a prison and seeking resolution of these complaints.  Exhaustion of the administrative grievance process is generally required before an incarcerated person can file a lawsuit in federal court.  For purposes of due process, access to justice, and protection of rights while incarcerated, a functioning grievance procedure is critical for all incarcerated people.

Incarcerated people who cannot access the grievance process are excluded from access to the courts to enforce their rights.

127.     For people in GDOC custody, successful administrative exhaustion requires proficiency in written English and careful compliance with short deadlines and precise technical requirements.  It is, at every step of the way, inaccessible to deaf and hard of hearing inmates.

128.     Most deaf and hard of hearing inmates do not know anything about how the grievance process works.  Information about the grievance system is conveyed orally and in written handbooks with incarcerated people.  But for most deaf and hard of hearing individuals, neither spoken nor written explanations are effective forms of communication.  Most Plaintiffs had no idea how the grievance process worked before Plaintiffs' attorneys began visiting them and explaining the purpose and process of grievances using ASL interpreters, ASL-fluent attorneys, and amplification devices.

129.     In 2018, GDOC promulgated a new Standard Operating Procedure, outlining a new policy for grievances related to ADA violations.  On information and belief, this policy requires incarcerated people to submit appeals via U.S. mail, rather than handing them directly to a counselor.  This excludes incarcerated people who do not possess envelopes or stamps.  This process was never explained to deaf and hard of hearing inmates.  In September 2018, CSP posted signs explaining the new grievance procedure specifically for ADA complaints.  This information was presented in formal, complex writing that was not accessible to many deaf and hard of hearing inmates (or incarcerated people with other types of disabilities, including blind people, and people with cognitive disabilities).

130.     Even if Plaintiffs and similarly situated deaf and hard of hearing incarcerated people understand the grievance process in theory, it remains inaccessible in practice.  Grievance

Forms must be written in English, so anyone who is not literate in English because of a disability, like many Plaintiffs, cannot access the process or file grievances.  Grievance responses – if provided – are written in English, and so most Plaintiffs cannot understand them.  Grievance Appeals must also be written in English.

131.    Moreover, GDOC staff routinely interfere with the grievance process, creating additional barriers to successful administrative exhaustion beyond the barriers inherent in the process.

132.    For example, Mr. Green had been incarcerated for 20 years before Plaintiffs' attorneys explained the grievance process to him for the first time.  Until then, he had no idea that grievances were a tool that he could use to complain about problems in the prison.

133.    Mr. D. Smith filed grievances with the help of another Deaf incarcerated person who was more literate in English than he was.  But after that person left the prison, Mr. D. Smith had no way to write any additional grievances because he cannot write his concerns in English.  While he understood the grievance process, thanks to assistance from another inmate, he did not have actual access to it.

134.    A counselor at CSP refused to accept grievances from Mr. Green because Plaintiffs' attorneys had written Mr. Green's name and ID number – correctly – at the top of the Grievance Form.  Because these sections were supposed to be filled out only by prison staff, the counselor denied Mr. Green's attempt to submit his grievances.  Because CSP refuses to provide interpreters for its meetings with deaf and hard of hearing inmates, the counselor could not communicate the "problem" to Mr. Green.

135.    After ASMP failed to respond to Mr. Cobb's grievances in the required 40 days, ASMP attempted to give itself an untimely 10-day extension of its response deadline by sending

Mr. Cobb a back-dated letter.

136.    Mr. Cobb attempted to appeal the lack of a response to his grievance after more than 40 days had passed, as authorized under the Grievance Procedure.  But Mr. Cobb's counselor refused to accept his appeal, telling him he had to wait for his grievance response.

137.    GDOC officers also threaten retaliation against inmates who attempt to file grievances.

138.    For example, in February 2018, prison officials at ASMP met with most of the deaf and hard of hearing inmates at ASMP, including several Plaintiffs.  Prison staff stated at this meeting that there were too many grievances being filed, and that all deaf and hard of hearing inmates would be transferred to CSP.  At 2 a.m. the next day, Messrs. Cobb, Harris, A. Smith, and J. Smith were transferred to CSP.

139.    All Plaintiffs have experienced the failure to provide a fair, accessible grievance procedure.

## ADMINISTRATIVE EXHAUSTION

140.    Plaintiffs have complied with GDOC's administrative remedies pursuant to Section 1997e(a) of the Prison Litigation Reform Act.  At the time Plaintiffs exhausted their administrative remedies, the two-step process was set forth in GDOC Standard Operating Procedure IIB05-0001 ("Grievance Procedure").

141.    The first step to seek administrative remedies is writing and submitting a grievance to a counselor in the prison.  An incarcerated person must write his complaint on a specific form ("Grievance Form"), and give this form to a counselor.  The grievance must be submitted within 10 calendar days of the date the incarcerated person "knew, or should have known, of the facts giving rise to the grievance."  Grievance Proc. § VI(D)(4).  The Warden is

required to respond to the grievance within 40 calendar days from the date the incarcerated person gave the Grievance Form to a counselor.  *Id.* § VI(D)(7).  The prison may take a "onetime 10 [c]alendar day extension," giving itself 50 days to respond to a grievance, as long as the incarcerated person is "advised, in writing, of the extension prior to the expiration of the original 40 calendar days."  *Id.*

142.    The second step of the exhaustion process is the filing of a Central Office Appeal. An incarcerated person may appeal a grievance response, or he may appeal the prison's failure to respond to his grievance within the time allotted.  Appeals must be written on a specific appeal form ("Grievance Appeal"). *Id.* § VI(E)(1).  The incarcerated person must give Grievance Appeals to a counselor, who "must sign and date the Central Office Appeal Form and give a copy of the completed Form to the offender as a receipt."  *Id.* § VI(E)(5).  The GDOC Commissioner or his designee must deliver a response to the Grievance Appeal to the incarcerated person within 100 calendar days after the Grievance Appeal was received by the counselor.  *Id.* § VI(E)(7).

143.    The Grievance Procedure states that "[n]o inmate may be denied access to" the grievance procedure, *id.* § VI(A)(2), and that "[r]etaliation against an offender for filing a grievance is strictly prohibited," *id.* § VI(A)(3).

144.    Compliance with the grievance process is exceptionally difficult for Deaf inmates, including Plaintiffs, who typically do not understand English and therefore cannot read or fill out documents without assistance.  As discussed below, GDOC has failed to provide assistance or interpreters to deaf or hard of hearing inmates to help them understand the process or file grievances, rendering the grievance procedure inaccessible and unavailable to them.  Defendants also interfered with and failed to comply with the Grievance Procedure, making the already-

complex procedure virtually incomprehensible.

**_Ricardo Harris_**

145.    Prior to August 2017, Mr. Harris did not understand how the administrative grievance process worked.  None of the prisons in which Mr. Harris had been incarcerated provided interpreters at their orientations when the grievance process may have been explained orally.  Mr. Harris has extremely limited written English, so he could not understand the contents of any prison's Offender Handbook, which are written in English and are not accessible to Mr. Harris.

146.    On December 19, 2017, with the help of Plaintiffs' attorneys and accompanying interpreters, Mr. Harris submitted two Grievance Forms to his counselor at ASMP.  One grievance explained that, four days prior, Mr. Harris had had a medical emergency, requiring a trip to the hospital, but that ASMP had not provided interpreters at any point during this emergency.  Mr. Harris stated that he had been unable to effectively communicate his symptoms, and that he still did not understand his diagnosis, prognosis, or treatment.  The second grievance explained that Mr. Harris missed work and other scheduled activities because ASMP refused to provide visual or tactile alarms for him and other deaf and hard of hearing inmates.

147.    Under the Grievance Procedure, ASMP had 40 calendar days – until January 28, 2018 – to respond to Mr. Harris's grievances.  Shortly before the 40 days had passed, Mr. Harris learned that his counselor had stated that Mr. Harris was "on thin ice"; that the counselor "d[id]n't want to hear you asking for alarms or notifications"; that writing grievances "makes you look like a troublemaker"; and that Mr. Harris "shouldn't be writing grievances in the first place."

148.    Mr. Harris never received responses to his grievances.  Due to the express threats

of retaliation in response to his grievances, the administrative exhaustion process was unavailable to Mr. Harris.

### ***Brandon Cobb***

149.    In late 2017, Plaintiffs' attorneys began meeting with Mr. Cobb.  All attorneys were either fluent in ASL or accompanied by qualified ASL interpreters.  With effective communication with Plaintiffs' attorneys through ASL, Mr. Cobb learned for the first time how the grievance process works.  Plaintiffs' attorneys and interpreters translated Mr. Cobb's concerns into English.  With the help of interpreters, Mr. Cobb wrote grievances challenging the lack of communication access, interpreters, and videophones.  Mr. Cobb could only write these grievances after Plaintiffs' attorneys began visiting because interpreters had never explained the grievance process to him, and because he could not fill out grievance forms in English without assistance from a qualified interpreter.

150.    Mr. Cobb submitted his grievances on December 19, 2017, while incarcerated at ASMP.  Under the Grievance Procedure, ASMP had 40 calendar days – until January 28, 2018 – to respond to his grievances.  Under section VI(D)(7) of the Grievance Procedure, the prison may take one 10-day extension of its deadline to respond to a grievance, "however, the offender must be advised, in writing, of the extension prior to the expiration of the original 40 calendar days."  On January 31, 2018, Mr. Cobb received two letters from the prison, stating that both of his grievances had been granted 10-day extensions.  Both letters were dated January 25, 2018, but Mr. Cobb did not receive them until January 31, 2018, more than 40 days after the original grievances were filed.  These extensions were improperly granted and impermissibly back-dated.

151.    On February 1, 2018, Mr. Cobb filed appeals with the assistance of ASL interpreters and Plaintiffs' attorneys.  He appealed the lack of a timely response to his grievance

and explained why the prison's 10-day extension was improper.

152.   Under the Grievance Procedure, the Central Office Commissioner had 100 days to respond to Mr. Cobb's appeals, which were filed on February 1, 2018. The Commissioner's response was due on May 12, 2018.  Mr. Cobb did not receive a response to his appeals from the Central Office Commissioner.  Mr. Cobb has exhausted his administrative remedies.

### *Tommy Green*

153.   Prior to August 2017, Mr. Green had no idea how the administrative grievance process worked.  Mr. Green has been incarcerated for more than two decades at numerous GDOC prisons.  None of these prisons provided interpreters at their orientations, when the grievance process may have been explained orally.  Mr. Green never had interpreters to communicate with prison counselors, so he could not ask about how the grievance process worked or receive assistance in reading or filling out Grievance Forms.  Although each prison is required to provide inmates with an "Offender Handbook," these documents are written in English and are not accessible to Mr. Green.  Mr. Green has never had interpreters to explain the contents of any prison's "Offender Handbook."

154.   Plaintiffs' attorneys began visiting and meeting with Mr. Green in August 2017. All attorneys were either fluent in ASL or accompanied by qualified ASL interpreters.  With this effective communication, Mr. Green was able to understand the grievance process for the first time.  Mr. Green decided to file grievances about his need for videophones, and his need for interpreters to understand parole and the papers he received about parole.

155.   Under the Grievance Procedure, grievances must be submitted in writing. Because Mr. Green is not proficient in English, he requires assistance to translate his concerns from ASL into written English on a Grievance Form.  GDOC prisons do not provide this

assistance. Mr. Green was only able to fill out grievances with the assistance of Plaintiffs'
attorneys.

156.    On December 13, 2017, Plaintiffs' attorneys helped Mr. Green write two
grievances, one about videophone access and the other about communication needs to
understand parole. Plaintiffs' attorneys spoke to Mr. Green about his needs, translated his
concerns into English, wrote these concerns onto Grievance Forms, and then discussed them
with Mr. Green via ASL to ensure everything was accurate and clear. Mr. Green signed both
grievances. At the top of the Grievance Form, where there is a line next to "OFFENDER
NAME" and a line next to "OFFENDER NUMBER," Plaintiffs' attorneys wrote Mr. Green's
full name and GDOC identification number.

157.    On December 13, 2017, Mr. Green attempted to give both Grievance Forms to his
counselor. His counselor refused to accept the grievances. There was no interpreter to assist Mr.
Green in understanding why the counselor would not accept the grievances. The counselor
gestured to the top of the Grievance Forms, where Mr. Green's name and identification number
were written on the lines for "OFFENDER NAME" and "OFFENDER NUMBER," respectively.
The counselor turned Mr. Green away without accepting his Grievance Forms. Mr. Green had
no idea what the problem was.

158.    By chance, another Deaf incarcerated person happened to be nearby, and
recognized that the counselor rejected the grievances because the counselor – not the inmate – is
supposed to write the inmate's name and identification number on the Grievance Form. With
further assistance from Plaintiffs' attorneys, Mr. Green re-submitted identical grievances, leaving
the spaces for name and identification number blank, the next day. These grievances were
accepted on December 14, 2017.

159.   Under the Grievance Procedure, CSP had 40 calendar days – until January 23, 2018 – to respond to Mr. Green's grievances.   On January 24, 2018, after 41 days had passed with no response from CSP, Plaintiffs' attorneys helped Mr. Green write two appeals challenging the lack of a response to his two grievances, as authorized by the Grievance Procedure.   Mr. Green gave these appeals to a counselor on January 24, 2018 and received receipts confirming acceptance and receipt of the Grievance Appeals.

160.   On February 6, 2018, 52 days after Mr. Green submitted his grievances and 11 days after he submitted his appeals, Mr. Green's counselor, Counselor Chambers, called Mr. Green into her office.   An interpreter was present at this meeting. Counselor Chambers purported to respond to Mr. Green's December grievances at this meeting (even though a counselor had already accepted and submitted Mr. Green's Grievance Appeals to the Central Office).   With respect to videophones, Counselor Chambers stated that she was denying Mr. Green's grievance on the grounds that there was a TTY machine available.[12]   With respect to accessible parole information, Counselor Chambers stated that VRI would be available to discuss parole in the future.[13]   Counselor Chambers required Mr. Green to sign papers apparently related to these responses.   Counselor Chambers refused to give Mr. Green copies of these papers.

---

[12]  TTY is an outdated technology through which users communicate in written English across telephone lines. TTY is inaccessible for people, like Mr. Green, who cannot read or write in English.  It is infrequently used by deaf and hard of hearing people today. *See supra*, para. 100.

[13] Qualified sign language interpreters may communicate either through in-person interactions (live interpretation) or through VRI.  With VRI, a remote interpreter uses videoconferencing technology on a computer to interpret in real-time a conversation between a deaf and a hearing individual.  For example, at a doctor's appointment, a hearing doctor may communicate with a deaf patient using an off-site remote interpreter and VRI technology.  To be effective, VRI requires a reliable, high-speed internet connection with sufficient bandwidth and dependable access. If the internet speed is too slow, the VRI image may be pixelated, jumpy, or may freeze altogether, preventing effective visual communication between the interpreter and the deaf individual.  Most deaf people who use sign language prefer to communicate via in-person interpreters rather than VRI, particularly for complex communications.  Use of VRI is not appropriate in some circumstances including if the deaf or hard of hearing individual cannot see or cannot be seen by the VRI due to mobility restrictions; is heavily medicated, intoxicated, or in a lot of pain; is highly emotional or presents with violent tendencies; has cognitive disabilities and/or other secondary disability such as low vision.

161.    On February 7, 2018, Mr. Green, with help from Plaintiffs' attorneys, wrote two Grievance Appeals to challenge Counselor Chambers' responses at the February 6, 2018 meeting.  Mr. Green attempted to give these appeals to Counselor Chambers on February 7, 2018, but Counselor Chambers shooed Mr. Green away and refused to accept his appeals.  On February 8, 2018, Mr. Green again attempted to give his Grievance Appeals to Counselor Chambers, along with a note written by an attorney requesting a copy of the documents he had signed on February 6, 2018.  Counselor Chambers accepted the appeals, but still refused to provide copies of documents Mr. Green signed.

162.    Under the Grievance Procedure, the Central Office Commissioner had 100 days to respond to Mr. Green's appeals, which were first filed on January 24, 2018.  On April 30, 2018, the Central Office Commissioner responded to both of Mr. Green's Grievance Appeals.  The Central Office Commissioner denied Mr. Green's Grievance Appeal seeking videophones, stating that "you are being provided contract services to include the TTY device and access to VRI . . . and Central State Prison is reviewing the possibility of implementing video relay services."  VRI is used only when a deaf person and a hearing person are in the same room: it is not a method of communicating with family or friends outside the prison.  The TTY machine remains inaccessible to Mr. Green, as he does not use or understand written English.  The Commissioner "partially granted" Mr. Green's request for accessible information about parole, stating that a "prison official met with you on December 14, 2017 and discussed your parole issues using the services of an interpreter."  Mr. Green did have a single meeting with a VRI interpreter in December 2017, but the VRI screen was freezing, pixelated, and choppy, so Mr. Green did not learn about his parole eligibility at this meeting.  Mr. Green has exhausted his administrative remedies.

***Leroy Henderson***

163.    Mr. Henderson is late-deafened and does not communicate using sign language. He communicates through speech and residual hearing.  He had limited education and is not literate in complex written English.  Mr. Henderson also has psychiatric disabilities, and fears that prison staff and other inmates are trying to kill him.

164.    None of the prisons where Mr. Henderson has been incarcerated have provided amplification devices to Mr. Henderson.  Mr. Henderson has frequently gone months without access to functioning hearing aids.  Without sound amplification, it is very difficult for Mr. Henderson to understand speech.  His comprehension is further diminished by prisons' ubiquitous background noise.  During visits with Mr. Henderson, Plaintiffs' attorneys use a simple sound amplification headset that allowed easy and clear communication with Mr. Henderson, but no such accommodations have been provided by GDOC.

165.    The prisons in which Mr. Henderson has been incarcerated have failed to provide accommodations or modifications to support any of Mr. Henderson's disabilities.  They have failed to provide amplification to allow meaningful communication.  They have failed to provide assistance in understanding written documents.  They have failed to provide therapeutic support that is accessible in light of Mr. Henderson's limited hearing.  Without the amplification needed to understand what prison staff and medical personnel are saying, Mr. Henderson cannot communicate effectively or build any trust with those around him.  The combination of his paranoid fears, lack of communication, lack of trust, and limited literacy make the complex, technical, all-written grievance process unavailable to Mr. Henderson.

***Tony Moore, Jr.***

166.    Prior to August 2017, Mr. Moore did not fully understand the grievance process.

None of the prisons in which Mr. Moore has been incarcerated provided interpreters at their orientations when the grievance process may have been explained orally.  He never had interpreters to explain the contents of the prisons' Offender Handbooks, which are written in English and are not accessible to Mr. Moore.

167.    Plaintiffs' attorneys began visiting and meeting with Mr. Moore in August 2017.  All attorneys were either fluent in ASL or accompanied by qualified ASL interpreters.  With this effective communication, Mr. Moore was able to fully understand the grievance process, including its purpose, process, and technical requirements, for the first time.  Mr. Moore decided to file a grievance about the complete lack of communication at a recent disciplinary hearing, during which Mr. Moore was handcuffed behind his back.  Plaintiffs' attorneys assisted Mr. Moore in translating his concerns from ASL into English and writing his grievance.

168.    Mr. Moore attempted to file this grievance about the lack of communication access, including unnecessary handcuffing and lack of interpreters, on December 16, 2017.  He gave the Grievance Form to his counselor, as provided for in the Grievance Procedure.  Mr. Moore's counselor, Counselor Chambers, refused to accept the grievance, and asked Mr. Moore why he was filling out grievances.  On December 18, 2017, another counselor accepted and signed Mr. Moore's grievance.

169.    Under the Grievance Procedure, CSP had 40 calendar days – until January 27, 2018 – to respond to Mr. Moore's grievance. On January 31, 2018, 44 days after his grievance was accepted and having received no response from the prison, Mr. Moore appealed the lack of response, as authorized under the Grievance Procedure.  On February 6, 2018, 50 days after his grievance was accepted, Mr. Moore's counselor handed him an untimely response to his grievance.  The counselor demanded that Mr. Moore sign the form, but she refused to provide

Mr. Moore with a copy of the form.  There was no ASL interpreter present to explain what the form said.  Because Mr. Moore has limited understanding of English, he does not know what the prison's grievance response said.

170.    Under the Grievance Procedure, the Central Office Commissioner had 100 days to respond to Mr. Moore's appeal, which was filed on January 31, 2018.  The Commissioner's response was due on May 11, 2018.  Mr. Moore did not receive a response from the Central Office Commissioner.  Mr. Moore has exhausted his administrative remedies.

### *Christopher Shields*

171.    During his incarceration, Mr. Shields attempted to use the grievance system based on his limited, self-taught understanding of the process.  Because Mr. Shields can read some English, he was able to understand the procedure to some extent on his own.  No prison officials ever explained the grievance process to Mr. Shields in an accessible way.

172.    On November 27, 2017, Mr. Shields filed a Grievance Form complaining that the prison was providing faulty batteries for his hearing aids, and that these batteries were not reliable and made it more difficult for him to hear.

173.    Under the Grievance Procedure, CSP had 40 calendar days – until January 6, 2018 – to respond to Mr. Shields' grievance.  Mr. Shields received no response from the prison within 40 days.  On January 7, 2018, 41 days after his grievance was accepted and having received no response from the prison, Mr. Shields requested a Grievance Appeal from his counselor to appeal the lack of a timely response, as authorized by the Grievance Procedure.  Mr. Shields' counselor, Counselor Chambers, refused to provide a Grievance Appeal to Mr. Shields. Counselor Chambers stated, in direct contradiction to the Grievance Procedure, that Mr. Shields could not submit a Grievance Appeal until he received a response to his Grievance Form.

174.    On January 10, 2018, 44 days after he submitted his grievance, Mr. Shields received an untimely response to his grievance and was finally given a copy of a Grievance Appeal.  On January 11, 2018, Mr. Shields submitted an appeal.  His counselor refused to provide Mr. Shields with a copy of the appeal, in direct contradiction to the Grievance Procedure.  On April 5, 2018, Mr. Shields received an appeal response purporting to grant Mr. Shields' Grievance Appeal, stating that "appropriate action will be taken."  As of August 2018, Mr. Shields still had not received the correct hearing aid batteries and CSP had taken no action to resolve this issue, despite promises by the Central Office Commissioner.  Mr. Shields has exhausted his administrative remedies.

175.    On February 1, 2018, Mr. Shields submitted a Grievance Form requesting access to visual and tactile notifications and alarms.  On February 13, 2018, Mr. Shields had a meeting with Counselor Chambers.  There was an interpreter present.  Counselor Chambers stated that she would have a meeting informing prison staff to hold up notification signs announcing meals, sick call, pill call, count, and the beginning of each time block (when work shifts and other daily activities begin).  Counselor Chambers also stated that she would try to get a vibrating watch for Mr. Shields.  Counselor Chambers then asked Mr. Shields to sign a form stating that the grievance was "satisfied".  Mr. Shields signed the form.  Counselor Chambers refused to provide Mr. Shields with a copy of the form he signed.  Mr. Shields did not understand why he did not receive a copy after signing the form, or why he did not receive a response from the prison Warden.  Counselor Chambers interfered with the grievance process by pressuring Mr. Shields to sign a form that he did not understand, a form that apparently stated that the grievance was "satisfied" when it plainly was not.  As of August 2018, Mr. Shields still did not have a vibrating alarm, watch, or reliable visual or tactile notifications.  The remainder of the administrative

exhaustion procedure was unavailable to Mr. Shields.

*Andrew Smith*

176.    On December 21, 2017, Mr. A. Smith submitted a grievance explaining that the prison was not adequately accommodating his physical disability, including by forcing him to use stairs rather than the elevator, causing pain where his amputated leg meets his prosthetic. The prison had 40 calendar days – until January 30, 2018 – to respond to this grievance.

177.    On February 4, 2018, 45 days after he submitted the grievance and having received no response from the prison, Mr. A. Smith attempted to appeal the lack of a timely response, as authorized by the Grievance Procedure.  Mr. A. Smith's counselor at ASMP refused to accept his Grievance Appeal, stating – in direct contradiction to the Grievance Procedure – that Mr. A. Smith had to wait until he received a response to his grievance the Warden before he could submit an appeal.

178.    On February 5, 2018, 46 days after he submitted the grievance and still having received no response from the prison, Mr. A. Smith again attempted to appeal the lack of a timely response.  This time, his Grievance Appeal was accepted.

179.    In late February 2018, Mr. A. Smith received an untimely response to his grievance, and, on March 7, 2018, Mr. A. Smith submitted a second appeal to the prison's response, clarifying that he is not permitted to use the elevator at CSP, where he had recently been transferred.

180.    In early April 2018, Mr. A. Smith was called to a meeting to "investigate" his appeal.  There was an interpreter present. Prison officials informed Mr. A. Smith that if he wanted to stay at CSP, he would have to "drop" his grievance.  If he did not drop his grievance, he was informed that he would be sent back to ASMP.  Because Mr. A. Smith knew that there

are *never* interpreters at ASMP, while there are *occasionally* interpreters at CSP, he opted to sign the paper "dropping" his Grievance Appeal to avoid a retaliatory transfer that would cut off all communication access.

181.    Mr. A. Smith requested a copy of the form he signed, but prison staff refused to provide him with a copy of this form.  Mr. A. Smith exhausted his administrative remedies by submitting an appeal.  Moreover, the prison's "investigation interview" threatening retaliation against Mr. A. Smith rendered any additional exhaustion of administrative remedies unavailable.

### *Darrell Smith, Jr.*

182.    Prior to August 2017, Mr. D. Smith did not fully understand the grievance process.  None of the prisons in which Mr. D. Smith has been incarcerated provided interpreters at their orientations when the grievance process may have been explained orally.  He never had interpreters to explain the contents of the prisons' Offender Handbooks, which are written in English and are not accessible to Mr. D. Smith.

183.    In September 2016, Mr. D. Smith, with the help of another Deaf incarcerated person who has some English literacy, submitted a grievance explaining that he needed interpreters at classes to understand the material.  On October 12, 2016, the prison responded to Mr. D. Smith's grievance.  Mr. D. Smith promptly submitted a Grievance Appeal, again with the assistance of another inmate.  The Central Office Commissioner responded on December 30, 2016.  Although CSP was still refusing to provide interpreters in classes, the Commissioner stated that "[n]o further action" was required because CSP "has made an effort to hire an instructor to address this issue."  Mr. D. Smith has exhausted his administrative remedies.

184.    Plaintiffs' attorneys began visiting and meeting with Mr. D. Smith starting in August 2017.  All attorneys were either fluent in ASL or accompanied by qualified ASL

interpreters.  With this effective communication, Mr. D. Smith was able to fully understand the

grievance process for the first time, including its purpose, process, and technical requirements.

Mr. D. Smith decided to file another grievance about the ongoing need for interpreters at classes,

and to file a grievance about his need for interpreters at work.  Plaintiffs' attorneys translated Mr.

D. Smith's concerns from ASL into English onto the Grievance Form.

185.    On December 14, 2017, Mr. D. Smith submitted his grievance to a counselor.  In

early January 2018, Mr. Smith's counselor, Counselor Chambers, called Mr. D. Smith and

another Deaf incarcerated person into a meeting.  There was an interpreter present.  Counselor

Chambers asked questions about Mr. D. Smith's communication problems at work.  Rather than

providing interpreters to provide equal access to his job, Counselor Chambers instead transferred

Mr. D. Smith from serving food in the kitchen to washing dishes, because there was less

communication required.  Mr. D. Smith preferred the job serving food on the line.  Even after his

transfer, there were still no interpreters provided for any part of Mr. D. Smith's job.

186.    Under the Grievance Procedure, CSP had 40 calendar days – until January 23,

2018 – to respond to Mr. D. Smith's grievance.  On January 24, 2018, 41 days after his grievance

was submitted and having received no response from the prison, Mr. D. Smith appealed the lack

of a response, as authorized under the Grievance Procedure.

187.    The same day, January 24, 2018, Counselor Chambers also stated that the prison

had taken an extra 10 days to respond to Mr. D. Smith's grievance.  Under section VI(D)(7) of

the Grievance Procedure, such an extension is permissible only if the incarcerated person is

"advised, in writing, of the extension prior to the expiration of the original 40 calendar days."

Mr. D. Smith was not advised of the extension until the original 40 days had expired, and thus

the extension was impermissible.  Two prison officials, Counselors Chambers and Thorpe,

demanded that Mr. D. Smith sign a form about the 10-day extension.  Mr. D. Smith requested a copy of this document, but both counselors refused to provide him with a copy.  There was no interpreter present.

188.     On February 6, 2018, 54 days after Mr. D. Smith submitted his grievances, the prison provided untimely responses to both grievances, even though Counselor Chambers had already accepted his appeals.  Moreover, these responses would have been untimely even if the prison's 10-day extension had been properly taken.

189.     Under the Grievance Procedure, the Central Office Commissioner had 100 days to respond to Mr. D. Smith's appeal, which was filed on January 24, 2018.  On April 30, 2018, Mr. D. Smith received responses from the Central Office Commissioner to both of his Grievance Appeals.  With respect to interpreters at classes, the Central Office Commissioner conceded that interpreters were not available for all of Mr. D. Smith's scheduled classes, but that "[a]ttempts are being made to assist you every day of the week," and therefore "[n]o further action is required."  With respect to communication at work, the Central Office Commissioner stated that "[n]o further action is required," describing the meeting at which Counselor Chambers demoted Mr. D. Smith from the serving line to scrubbing pots as "a meeting with a Food Service worker, a counselor, and an interpreter, to advise you of the expectations related to your work detail." Mr. D. Smith has exhausted his administrative remedies.

### *Jorae Smith*

190.     Prior to January 2018, Mr. J. Smith did not understand the grievance process. None of the prisons in which Mr. J. Smith has been incarcerated provided interpreters at their orientations when the grievance process may have been explained orally.  He has never had interpreters to explain the contents of the prisons' Offender Handbooks, which are written in

English and are not accessible to Mr. J. Smith.

191.    For nine months, from June 2017 until February 2018, Mr. J. Smith was held in solitary confinement as "protective custody."  During this time, he was completely isolated from other incarcerated people, meaning that he could not get any information from more literate deaf incarcerated people or others in the general population who might provide some assistance to deaf and hard of hearing people.  As a Deaf person, the extreme isolation of solitary was magnified for Mr. J. Smith, who had virtually no sensory stimulation during this time.

192.    In January 2018, Plaintiffs' attorneys began visiting and meeting with Mr. J. Smith.  All attorneys were either fluent in ASL or accompanied by qualified ASL interpreters. With this effective communication, Mr. J. Smith was able to understand the grievance process. Mr. J. Smith decided to file grievances about the disproportionate isolation and harm of solitary confinement for deaf and hard of hearing people, and about the unequal communication access with the outside world he faced as a Deaf person held in isolation.

193.    Because Mr. J. Smith has limited in English, he required assistance from Plaintiffs' attorneys to translate his concerns from ASL into English to submit his grievances. While in protective custody, ASMP refused to allow Plaintiffs' attorneys to have "contact visits" with Mr. J. Smith; ASMP required that a plexiglass wall separate attorneys from Mr. J. Smith at all times.  During these no-contact visits, it was impossible for attorneys to share paperwork or documents with Mr. J. Smith.  Attorneys had to translate Mr. J. Smith's concerns onto grievances and then mail these documents to Mr. J. Smith so he could submit them to his counselor at ASMP.

194.    On January 24, 2018, Mr. J. Smith submitted two Grievance Forms.  The prison had 40 calendar days – until March 5, 2018 – to respond to his grievances.  On March 8, 2018,

43 days after he submitted his grievances and having received no response, Mr. J. Smith appealed the lack of a response to his grievances.

195.    On March 13, 2018, 48 days after Mr. J. Smith submitted his grievances and, five days after the prison had accepted appeals, Mr. J. Smith received untimely responses to both grievances.  The responses erroneously stated that Mr. J. Smith had "equal access to telephone services as hearing offenders," and that he had been "transferred to another facility that can accommodate your ADA needs."

196.    Under the Grievance Procedure, the Central Office Commissioner had 100 days to respond to Mr. J. Smith's appeals, which were first filed on March 8, 2018.  The Commissioner's response was due June 16, 2018.  Mr. J. Smith did not receive responses to his appeals.  Mr. J. Smith has exhausted his administrative remedies.

## CLASS ALLEGATIONS

197.    Plaintiffs bring this action on behalf of themselves and on behalf of a class of all those similarly situated pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

198.    Plaintiffs seek to represent a class of all present and future deaf or hard of hearing incarcerated people in Georgia Department of Corrections ("GDOC") custody and subject to Georgia Board of Pardons and Paroles ("GBOP") authority.

199.    Plaintiffs reserve the right to amend or modify the class descriptions with greater specificity or division into subclasses or limitation to particular issues based on the results of discovery and to accommodate any of the Court's manageability concerns.

200.    The class meets the prerequisites of Federal Rule of Civil Procedure 23(a):

a.    **Numerosity (Rule 23(a)(1)).** The class is so numerous that joinder of all members is impractical.  As of September 2018, GDOC's records indicate the number of people

who have significant hearing loss in GDOC custody is at least 129 incarcerated people.[14]

        b.      **Commonality (Rule 23(a)(2)).** Common questions of law and fact predominate and are applicable to the entire class, including:

        1.      Whether Defendants deny deaf and hard of hearing people in GDOC custody equally effective communication;

        2.      Whether Defendants deny deaf and hard of hearing people in GDOC custody effective communication in healthcare and minimally adequate healthcare;

        3.      Whether Defendants deny deaf and hard of hearing people in GDOC custody effective telecommunication, including videophones, captioned telephones, and amplified telephones;

        4.      Whether Defendants subject deaf and hard of hearing people in GDOC custody to unreasonable use of and failure to modify solitary confinement;

        5.      Whether Defendants unnecessarily use and place handcuffs on deaf and hard of hearing people in GDOC custody;

        6.      Whether Defendants fail to include deaf and hard of hearing people in emergency planning and fail to make emergency communications accessible;

        7.      Whether Defendants fail to maintain an accessible, adequate, and non-retaliatory administrative exhaustion process; and

        8.      Whether Defendants have failed to establish policies, training, and procedures to ensure compliance with the Americans with Disabilities Act

---

[14] Georgia Department of Corrections, "Inmate Statistical Profile," http://www.dcor.state.ga.us/sites/all/themes/gdc/pdf/Profile_all_inmates_2018_08.pdf at 53.

("ADA") and Section 504 of the Rehabilitation Act ("Section 504") for

deaf and hard of hearing inmates.

    c.    **Typicality (Rule 23(a)(3)).** Plaintiffs' claims are typical of the claims of

members of the proposed class, as their claims arise from the same policies, practices, and

courses of conduct, and their claims are based on the same theory of law as the class claims.

    d.    **Adequacy (Rule 23(a)(4)).** Plaintiffs will fairly and adequately protect the

interests of the proposed class.  Plaintiffs' interests do not conflict with the interests of the class

members and Plaintiffs have retained counsel experienced in complex class action and

constitutional litigation to prosecute this case on behalf of the class.  There are no material

conflicts between the claims of the representative Plaintiffs and the members of the class that

would make class certification inappropriate.  Counsel for the class will vigorously assert the

claims of all class members.

201.    **Final Injunctive Relief (Rule 23(b)(2)).** In addition to satisfying the

prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action

under Rule 23(b)(2).  Defendants have acted or refused to act on grounds that apply generally to

the proposed class, making final injunctive relief appropriate with respect to the proposed class

as a whole.

## CLAIMS FOR RELIEF

## COUNT I

**Discrimination On The Basis Of Disability
In Violation Of Title II Of The ADA
(42 U.S.C. § 12131, *et seq.*)**

*By All Plaintiffs, On Behalf Of Themselves And
All Others Similarly Situated, Against All Defendants*

202.    Plaintiffs allege and incorporate by reference each and every allegation above as

if fully set forth herein.

203.     On July 12, 1990, Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. §12101(b)(1).  Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

204.     Plaintiffs are "qualified individual[s] with a disability" within the meaning of the ADA.

205.     Public entities are required under the ADA to "take appropriate steps to ensure that communication with . . . participants . . . with disabilities are as effective as communication with others." 28 C.F.R. § 35.160(a)(1).  Ensuring effective communication includes "furnish[ing] appropriate auxiliary aids and services," 28 C.F.R. § 25. 160(b)(1), including "[q]ualified interpreters . . . real-time computer-aided transcription services . . .  telephone headset amplifiers; assistive listening devices . . . telephones compatible with hearing aids; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones[.]"  28 C.F.R. § 35.104.

> The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place.  In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of the individuals with disabilities.  In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

28 C.F.R. § 35.160(b)(2).

206.    In providing any aid, benefit or service, a public entity "may not . . . [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service," "[a]fford a qualified individual with a disability an opportunity to participate in an aid, benefit, or service that is not equal to that afforded others," "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity . . . as that provided to others," or "[o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others."  28 C.F.R. § 35.130(b)(1)(i), (ii), (iii), (vi).  A public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the natures of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

207.    Defendants have violated the ADA and its regulations by, *inter alia*: (a) failing to provide equally effective communication to Plaintiffs, including communication within prison, communication with GBOP, and telecommunication during incarceration; and (b) failing to make reasonable modifications to policies, practices and procedures to avoid disability discrimination in handcuffing, administrative and punitive isolation, administrative grievance processes, parole, and emergency planning.  Defendants have also failed to establish and provide personnel training, course materials, and other mechanisms to ensure that such policies as they have established or may establish in the future to comply with the ADA with regard to deaf or hard of hearing inmates have been and will be propagated effectively to wardens, correctional officers, GBOP officers, and other personnel to produce necessary understanding and

compliance.

208.    Defendants' unlawful actions were and continue to be intentional, willful,

malicious, and/or done with reckless disregard to the right of Plaintiffs and other people similarly

situated to be free from discrimination based on disability.

209.    Plaintiffs and those similarly situated are entitled to declaratory relief, injunctive

relief, attorneys' fees and costs, and such other and further relief as the Court deems just and

proper.

210.    In the event that a class is certified, each class representative seeks a reasonable

service award.

**COUNT II**

**Discrimination On The Basis Of Disability**
**In Violation Of Section 504 Of The Rehabilitation Act**
**(29 U.S.C. § 794 *et seq.*)**

*By All Plaintiffs, On Behalf Of Themselves And*
*All Others Similarly Situated, Against All Defendants*

211.    Plaintiffs allege and incorporate by reference each and every allegation above as

if fully set forth herein.

212.    Section 504 of the Rehabilitation Act states that no

qualified individual with a disability in the United States . . . shall, solely by
reason of [] disability, be excluded from the participation in, be denied the
benefits of, or be subjected to discrimination under any program or activity
receiving Federal financial assistance.

29 U.S.C. § 794(a).

213.    Plaintiffs are qualified "individual[s] with a disability" within the meaning of the

Rehabilitation Act, 29 U.S.C. § 705(20).

214.    Defendants receive "Federal financial assistance" within the meaning of 29

U.S.C. § 794(a).

215.    The operations of GDOC and GBOP are "program[s] or activit[ies]" within the

meaning of 29 U.S.C. § 794(b)(l)(A)–(B) and/or (b)(2)(B).

216.    The Rehabilitation Act requires that recipients of federal financial assistance,

including Defendants,

> shall provide appropriate auxiliary aids to qualified handicapped persons with
> impaired sensory, manual, or speaking skills where a refusal to make such
> provision would discriminatorily impair or exclude the participation of such
> persons in a program or activity receiving federal financial assistance.

28 C.F.R. § 42.503(f).

217.    Appropriate auxiliary aids include, but are not limited to, "qualified interpreters . .

.  and telephonic devices."  28 C.F.R. § 42.503(f).

218.    As detailed herein, Defendants have violated Section 504 and its regulations by,

*inter alia*: (a) failing to provide equally effective communication to Plaintiffs, including

communication within prison, communication with the Georgia Board of Pardons and Paroles,

and telecommunication during incarceration; and (b) failing to make reasonable modifications to

policies, practices and procedures to avoid disability discrimination in handcuffing,

administrative and punitive isolation, administrative grievance processes, parole, and emergency

planning.  Defendants have also failed to establish and provide personnel training, course

materials, and other mechanisms to ensure that such policies as they have established or may

establish in the future to comply with Section 504 with regard to deaf or hard of hearing

individuals in GDOC custody have been and will be propagated effectively to wardens,

correctional officers and other personnel to produce necessary understanding and compliance.

219.    Defendants' unlawful actions were and continue to be intentional, willful,

malicious, and/or done with reckless disregard to the rights of Plaintiffs and others similarly situated to have effective communication and be free from discrimination based on disability.

220.    Plaintiffs and those similarly situated are entitled to declaratory relief, injunctive relief, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

221.    In the event that a class is certified, each class representative seeks a reasonable service award.

## COUNT III

### Cruel And Unusual Punishment In Violation Of
### The Eighth And Fourteenth Amendments
### (42 U.S.C. § 1983)

*By All Plaintiffs, On Behalf Of Themselves And
All Others Similarly Situated, Against Defendants Dozier,
Ward, Nix, Myrick, Sauls, Bowen, Philbin, and Caldwell*

222.    Plaintiffs allege and incorporate by reference each and every allegation above as if fully set forth herein.

223.    Under the Eighth and Fourteenth Amendments of the U.S. Constitution, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

224.    Defendants have, in their official capacities, deprived and continue to deprive Plaintiffs of their right to be free from cruel and unusual punishment as secured by the Eighth Amendment to the U.S. Constitution and made applicable to the States by the Fourteenth Amendment.

225.    Defendants have systematically denied Plaintiffs access to minimally adequate health care during their incarceration.  Defendants have failed to provide interpreters and other

auxiliary aids and services necessary for Plaintiffs to communicate with medical staff. Defendants refuse to provide Plaintiffs with hearing-related health care, including hearing aids, hearing aid batteries, other hearing devices, and appointments with hearing specialists. Defendants have also systematically denied Plaintiffs access to vital health and safety information and announcements, such as emergency alarms.

226.   Defendants have actual knowledge of the unconstitutionally dangerous conditions to which Plaintiffs were, and continue to be, subjected.  Plaintiffs have submitted numerous written complaints to GDOC staff requesting that sign language interpreters and other auxiliary aids and services be provided for medical appointments, that minimally adequate hearing-related care be provided, and that important health and safety announcements be provided to them.

227.   Despite actual knowledge of the substantial medical and safety risks Plaintiffs face while in their custody, Defendants continue to disregard Plaintiffs' medical, health, and safety needs in violation of the Eighth and Fourteenth Amendments of the U.S. Constitution. Defendants' actions and inactions place Plaintiffs at a substantial risk of serious harm.

228.   Defendants' failure to comply with the Eighth and Fourteenth Amendments of the U.S. Constitution has resulted in harm to Plaintiffs, and will continue to result in harm to Plaintiffs.  Plaintiffs will remain in the custody of GDOC and continue to receive inadequate medical care and treatment and access to health and safety information, unless and until Defendants are ordered by this Court to make modifications to their policies, practices, and procedures pursuant to Eighth and Fourteenth Amendments of the U.S. Constitution.

229.   Plaintiffs and those similarly situated are entitled to declaratory relief, injunctive relief, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

230.    In the event that a class is certified, each class representative seeks a reasonable service award.

## COUNT IV

### Violation Of The Due Process Clause Of The Fourteenth Amendment
### (42 U.S.C. § 1983)

*By All Plaintiffs, On Behalf Of Themselves And*
*All Others Similarly Situated, Against Defendants Dozier,*
*Ward, Nix, Myrick, Sauls, Bowen, Philbin, and Caldwell*

231.    Plaintiffs allege and incorporate by reference each and every allegation above as if fully set forth herein.

232.    Under the Fourteenth Amendment of the U.S. Constitution, "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.

233.    Defendants have, in their official capacities, deprived and continue to deprive Plaintiffs of their due process rights as secured by the Fourteenth Amendment. "[P]risoners have a constitutional right of access to the courts."  *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *see also Miller v. Donald*, 541 F.3d 1091, 1096 (11th Cir. 2008). The PLRA mandates that incarcerated people exhaust their administrative remedies before they can bring a case in federal court.  42 U.S.C. § 1997e(a).  In light of the PLRA, Defendants' failure to provide meaningful access to the administrative grievance process for Plaintiffs and others similarly situated jeopardizes Plaintiffs' constitutionally protected access to federal courts.

234.    Defendants' failure to comply with their duties under the Fourteenth Amendment has resulted in harm to Plaintiffs, and will continue to result in harm to Plaintiffs, as Plaintiffs

will remain in the custody of GDOC, be returned to GDOC custody sooner, and continue to be denied the ability to pursue complaints regarding unlawful treatment.

235.    Plaintiffs and those similarly situated are entitled to declaratory relief, injunctive relief, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

236.    In the event that a class is certified, each class representative seeks a reasonable service award.

## CONDITIONS PRECEDENT

237.    All conditions precedent have been performed, have occurred, or have been waived.

## PRAYER FOR RELIEF

1.    For an order certifying the class sought above;

2.    For an order enjoining Defendants from engaging in the unlawful discrimination complained of herein;

3.    For an order granting such other injunctive relief as may be appropriate;

4.    For declaratory relief;

5.    For reasonable attorneys' fees and costs of suit, including expert fees;

6.    For reasonable service awards for the named Plaintiffs;

7.    For such other and further relief as the court deems just and proper.

Respectfully submitted this 3rd day of October, 2018,

Sean Young, Georgia State Bar No. 790399
Kosha Tucker, Georgia State Bar No. 214335
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
Phone: (678) 981-5295
Fax: (770) 303-0060
SYoung@acluga.org
KTucker@acluga.org


Ralph Miller, *pro hac vice* pending
WEIL, GOTSCHAL & MANGES LLP
2001 M Street, NW
Suite 600
Washington, DC 20036
Phone: (202) 682-7000
Ralph.Miller@weil.com


Audrey Stano, *pro hac vice* pending
WEIL, GOTSCHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Phone: (650) 802-3000
Audrey.Stano@weil.com


Nigar Shaikh, *pro hac vice* pending
Alexandria Swette, *pro hac vice* pending
WEIL, GOTSCHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Phone: (212) 310-8000
Nigar.Shaikh@weil.com
Alexandria.Swette@weil.com

*/s/ Zoe Brennan-Krohn*
Susan Mizner, *pro hac vice* pending
Claudia Center, *pro hac vice* pending
Zoe Brennan-Krohn, *pro hac vice* pending
Talila A. Lewis, *pro hac vice* pending
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
DISABILITY RIGHTS PROGRAM
39 Drumm Street
San Francisco, CA 94111
Phone: (415) 343-0781
Fax: (415) 395-0950
SMizner@aclu.org
CCenter@aclu.org
ZBrennan-Krohn@aclu.org
Talila.A.Lewis@gmail.com


Anna Bitencourt, *pro hac vice* pending
NATIONAL ASSOCIATION OF THE
DEAF
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
TTY: (301) 587-1789
Fax: (301) 587-1791
Anna.Bitencourt@nad.org