**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **RICARDO HARRIS,** *et al.,* on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs,* <br><br> **v.** <br><br> **GEORGIA DEPARTMENT OF CORRECTIONS,** *et al.,* <br><br> *Defendants.* | **CIVIL ACTION NO.** <br> **5:18-cv-00365-TES** |

## ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

In this action, seven deaf and hard of hearing individuals incarcerated at various Georgia Department of Corrections (the "GDC") prison facilities challenge the adequacy of hearing-related accommodations and services available to them. These individuals—Ricardo Harris; Tommy Green; Tony Moore, Jr.; Christopher Shields; Andrew Smith; Darrell Smith, Jr.; and Jorae Smith (collectively, "Plaintiffs")—suffer from some form of hearing impairment that affects their abilities to communicate effectively with others when deprived of the use of auxiliary aids and/or services, assistive devices, and other necessary accommodations.

Plaintiffs allege that Defendants—the GDC, various GDC officers, and the Georgia State Board of Pardons and Paroles ("GBOP") (collectively, "Defendants")—

deprived them the use of such aids and/or services, devices, and accommodations in violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12131, *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*; and the United States Constitution. Based upon this allegation, Plaintiffs filed a Motion for Class Certification [Doc. 49], which Defendants have opposed. *See* [Doc. 60]; [Doc. 102]; [Doc. 115]. Plaintiffs' Motion has been fully briefed, and the Court has held oral argument on two occasions to discuss class certification. *See* [Doc. 102]; [Doc. 115]. Accordingly, upon careful consideration of both parties' arguments and upon review of the applicable law, the Court **GRANTS** Plaintiffs' Motion for Class Certification [Doc. 49].

## BACKGROUND

### A.     Procedural Background

On October 3, 2018, Plaintiffs filed this putative class action against Defendants seeking broad-based declaratory and injunctive relief. *See generally* [Doc. 1]. Plaintiffs allege that Defendants deny them and other deaf and hard of hearing prisoners the accommodations and services that they require to communicate effectively and participate in GDC programs, services, and activities—all in violation of the ADA, Rehabilitation Act, and the Eighth and Fourteenth Amendments of the United States Constitution. *See generally* [*id.*]. Nearly one year later, Plaintiffs moved to certify their claims as a class action under Federal Rule of Civil Procedure 23(b)(2). *See* [Doc. 49]. Initially, Plaintiffs proposed a class to consist of

> all present and future deaf and hard of hearing individuals in GDC custody and/or subject to GBOP authority, who require hearing-related accommodations and services—including but not limited to interpreters, hearing devices, other auxiliary aids or services, or reasonable modifications—to communicate effectively and/or to access or participate in programs, services, or activities available to individuals in GDC custody and subject to GBOP authority.

[Doc. 49, pp. 1–2]. Naturally, this proposed class begged the question of exactly who would be considered "deaf and hard of hearing." Plaintiffs defined "deaf and hard of hearing" to mean "individuals with hearing levels or hearing loss that qualify as disabilities under the ADA and Section 504 [of the Rehabilitation Act]." [Doc. 49-1, p. 2 n.1]. But then, Plaintiffs went a step further and sought to include "individuals who identify with the culturally deaf community" as "deaf." [*Id.*].

Defendants oppose class certification, arguing that Plaintiffs lack standing to pursue relief because the GDC developed and implemented a formal statewide ADA policy (the "2018 ADA Policy") that resolved Plaintiffs' complaints and mooted their claims for systemic relief. [Doc. 60, pp. 2–11]. In the alternative, Defendants argue that even if Plaintiffs have standing, class certification should still be denied because Plaintiffs proposed a class that is overly broad and not reasonably ascertainable. [*Id.* at pp. 14–16].

After its initial review of the parties' arguments, the Court observed that the thorniest part of the dispute centered on how the class should be defined—if at all. The Court set a hearing to discuss whether Plaintiffs' proposed class (as defined in the initial

pleadings) met the requisite definiteness for certification. *See* [Doc. 102]. At the hearing,

defense counsel started the conversation by voicing concerns with Plaintiffs' approach

to defining the class:

> [W]hat the plaintiffs' approach has been in terms of a class definition is it's
> just been, essentially . . . everyone. Just . . . everyone that has any hearing
> deficit. And . . . that's a problem . . . . [T]here are more discrete ways that
> the class should be not only defined but also broken down and analyzed
> for purposes of class certification. . . . But obviously, the way it's currently
> defined, it is—it's an enormous, huge, undefined class.

[Doc. 102, p. 7:13–23]. Similarly, the Court expressed its concerns with the

appropriateness of defining a class of "deaf and hard of hearing" prisoners so broadly

as to encompass individuals "who *identify* with the culturally deaf community." [Doc.

49-1, p. 2 n.1 (emphasis added)]; [Doc. 102, pp. 8:10–17; 12:5–15]. In response, Plaintiffs

refined their proposed class definition to include only those individuals with "objective

hearing loss."[1] [Doc. 102, pp. 12:16–20 ("To be very clear, [Plaintiffs'] class for deaf and

hard of hearing is people with objective hearing loss."); 62:7–10 ("[T]he way to define

the class is to go based on a medical definition of [a prisoner's] hearing loss and

whether or not . . . they need a hearing aid in order to have equal access.")].

Plaintiffs' counsel elaborated on this point by explaining that "the medical

definition for deaf would be 'profound hearing loss'" and the medical definition for

---

[1] Prior to this hearing, Plaintiffs had not articulated that "deaf and hard of hearing" referred to a
"medically objective definition." *See* [Doc. 1]; [Doc. 49-1]; *see also* [Doc. 102, p. 19:15–20 (defense counsel
noting that the May 26th hearing was the first time that Plaintiffs' counsel linked "deaf and hard of
hearing" to a "medically objective definition")].

"hard of hearing would be between moderate . . . [and] profound hearing loss." [*Id.* at pp. 13:21–25; 65:23—66:3]. The extent of a prisoner's hearing loss (i.e., whether it was moderate or profound) could be measured by objective decibel level ranges. [*Id.* at pp. 10:13–16; 63:6–21]. Although Plaintiffs' counsel did not have the decibel levels for "moderate to profound" hearing loss or "profound" hearing loss, they offered to provide such numbers on a later date. [*Id.* at pp. 13:21–25; 67:24—68:2]; *see also* [*id.* at p. 67:11–12 ("[Counsel] can provide a decibel level. I am not an audiologist. I don't have the number offhand, but that's a knowable fact.")].

During this discussion, the Court sought more information about the GDC's current intake and evaluation process for classifying hearing impairments, with an eye towards integrating it into a potential class definition. [*Id.* at pp. 20:11—21:22; 74:6–13]. Plaintiffs pointed out that part of their complaints concerned the GDC's failure to establish objective policies and standards at its facilities for identifying "deaf and hard of hearing" prisoners in accordance with the applicable medical definitions. [*Id.* at pp. 26:20—27:24]. Interested in learning more about the GDC's present intake process and classification system, the Court scheduled a second hearing to permit the parties to call witnesses to testify about the current classification system and the medical definitions for "deaf" and "hard of hearing." [*Id.* at pp. 76:4—77:19].[2]

---

[2] Following this hearing, the parties discussed the possibility of agreeing to a class definition; however, the parties couldn't reach such an agreement. [Doc. 100]; [Doc. 101]. As a result, the parties requested that the Court schedule a second hearing on class certification. [Doc. 101].

Three months later, the parties reconvened at a second hearing to discuss class certification. *See generally* [Doc. 115]. Defense counsel put up two witnesses: (1) Dr. Joseph Fowlkes—former medical director at Georgia Diagnostic and Classification Prison ("GDCP"); and (2) Dr. Edgar Bohannon—an audiologist who assesses and treats hearing loss for prisoners in GDC custody. [*Id.* at p. 3]. And, Plaintiffs' counsel put up Dr. Kimberly M. Cavitt—an audiologist with experience in assessing and treating hearing loss at the Ohio Department of Corrections.[3] [*Id.*]. Before any witness testified, defense counsel noted his objections to Plaintiffs' counsel calling Dr. Cavitt as a witness. [Doc. 115, p. 5:16–20]. Defense counsel anticipated that Dr. Cavitt would improperly opine as to how the class should be defined (a legal matter) based on her experience with the Ohio Department of Corrections. [*Id.* at pp. 112:6—113:25]. The Court briefly addressed the objection, noting that it could certainly discern the appropriate weight to give Dr. Cavitt's testimony. [*Id.* at pp. 114:7—116:23]. The Court reiterated its interest in hearing testimony about deafness and hearing loss as it relates to objective decibel levels. [*Id.* at p. 116:12–19].[4] Such an interest arose from the parties' discussions about the GDC's intake process and classification system for hearing impaired prisoners.

---

[3] It appears that the correct name of the institution that Dr. Kimberly M. Cavitt references throughout her testimony is not the "Ohio Department of Corrections" but the "Ohio Department of Rehabilitation and Correction." [Doc. 115, pp. 160:20—162:6]. However, for consistency, the Court will refer to the institution by the name that Dr. Cavitt uses throughout her testimony.

[4] Regarding Dr. Cavitt's testimony, the Court specifically stated the following:

The Court now briefly summarizes that system below based upon the testimony proffered at the second hearing.

### 1.    Dr. Fowlkes

Dr. Fowlkes served as the Medical Director for the GDC at its diagnostic facility for 20 years. [*Id.* at p. 15:8–14]. During his time in this role, Dr. Fowlkes supervised all medical staff (nurse practitioners, physician assistants, and physicians) that clinically evaluated and treated prisoners upon their entry into confinement. [*Id.* at pp. 15:15—16:18]. At the diagnostic facility, all prisoners participate in an orientation to the facility and its medical division where they are instructed to complete the following two forms: (1) the "Medical History Form" and (2) the "Receiving Health Screening Form." [*Id.* at pp. 19:20—20:9; 22:21–24]. Both forms provide space for a prisoner to document any hearing impairments and/or the use of hearing-related assistive devices. *See* [Doc. 115, pp. 20:3–19; 23:4–19]. Once these forms are completed, a clerk files them into an electronic database that medical staff can review on the date of a prisoner's diagnostic physical exam. [*Id.* at p. 31:8–11]. Each prisoner (usually within seven to ten days from the date of their arrival) will meet with a medical professional and undergo a diagnostic physical exam. [*Id.* at pp. 21:14–16; 25:16–21].

---

[I]f [Plaintiffs'] expert wants to come up and say, "This is where [the Court] ought to draw the line for class certification from a legal standpoint." Well, that would be ignored. That's not going to help [the Court]. If [Dr. Cavitt] is going to say, "This is what it means to be deaf at this level and these are the ramifications of that." Well, then [the Court] may want to consider that or [it] may not give it any weight.

[Doc. 115, p. 116:12–19].

During the diagnostic physical exam, the medical professional assesses and screens the patient's hearing. [*Id.* at p. 25:3–7]. The medical professional reviews all screening forms in the patient's file to see if there is a documented hearing impairment. [*Id.* at p. 25:15–19]. If the patient discloses that he has a hearing impairment, the medical professional uses an otoscope to look into the patient's ear canals to make sure that there is not an obstruction impacting hearing. [*Id.* at p. 27:9–17]. If the medical professional observes an obstruction, he treats the patient; if he does not observe an obstruction, he refers the patient to an audiologist for further assessment and possible treatment. [*Id.* at pp. 26:4–7; 26:8–10; 33:13–17]. At no time during the diagnostic physical exam does the medical professional attempt to make any formal clinical decisions about the patient's perceived hearing impairment. [*Id.* at p. 26:15–16]. Details of the physical are recorded on the following two forms: (1) the "Diagnostic Physical Exam" form; and (2) the "Health/Activity Profile" form. [*Id.* at pp. 24:4–11; 28:6–23].

The "Health/Activity Profile" form has a section labeled "H" that is specifically reserved for medical professionals to document any noted hearing impairments. [*Id.* at pp. 28:11–12; 33:1–9]. The medical professional documents an impairment in accordance with the classifications for hearing loss set forth in the GDC's Standard Operating Procedures manual, under the policy titled Medical Classification and Profiling. [Doc. 114-5, p. 5]. This policy requires medical professionals to classify and profile a patient's hearing along the following spectrum:

| H1 | The offender hears adequately (i.e., normal conversational level, whispering, ticking watch, TV or phone). |
|----|-----------------------------------------------------------------------------------------------------------|
| H2 | Unilateral hearing loss with no loss in the other ear or mild bilateral hearing loss. |
| H3 | Total unilateral hearing loss with mild hearing loss in the other ear. The clinician should consider audiometry to evaluate hearing loss. |
| H4 | Severe bilateral hearing loss confirmed by an audiometric examination that does not improve with hearing aids. Functionally deaf. |
| H5 | Absence of useful hearing of any manner bilaterally. Offenders assigned this grade will likely require specialized housing. |

[Doc. 114, p. 5]. The H1-H5 classification system presents the "different levels of degrees of impairment based on clinical findings." [Doc. 115, p. 34:10–12]. However, since the GDC medical professionals do not actually perform clinical assessments during the diagnostic physical exams, this classification system does not correlate to the system employed in practice. [*Id.* at p. 34:11–13].

Dr. Fowlkes stated that he and his staff "used the current policy more as a guideline." [*Id.* at p. 29:16–17]. Rather than adhere to the H1-H5 classification system set forth above, Dr. Fowlkes and his staff would classify hearing loss as follows:

> [W]hen we are trying to define someone's hearing it's, Okay, are they normal? So, that's a 1. Are they deaf? That's a 5. And then if there is impairment it could be a 2, it could be a 3. But what we are trying to communicate on this [Health/Activity Profile] form for the people who are going to see this . . . [is] . . . if the [patients] do not have a 1, anything above that means there is some level of impairment.

9

[*Id.* at p. 29:16–25]. Dr. Fowlkes and his staff did not use the classification system to diagnose the extent of a patient's perceived hearing loss[5]—they left that for the audiologist. [*Id.* at p. 30:17–24]. Instead, the medical staff categorized patients one of three ways: (1) normal: (2) deaf; or (3) somewhere in between. [*Id.* at p. 34:14–16]. They clearly ignored the existing Medical Classification and Profiling policy.[6]

    If a medical professional perceived any sort of hearing impairment, he would then refer the patient to an audiologist. [*Id.* at pp. 34:13–17; 37:19–22]. Dr. Fowlkes had to approve all referrals before they were sent to audiology. [*Id.* at p. 37:14–16]. And, during his time as medical director, Dr. Fowlkes never denied a referral; he always signed off on them. [*Id.* at p. 37:17–19]. Those patients with documented hearing

---

[5] Dr. Fowlkes stated that once he determined that a patient had a hearing impairment, he would not "try to clinically decide whether the [impairment] was in one ear, whether it was in two ears or whether [the patient actually] needed to be referred to the audiologist or not." [Doc. 115, p. 34:13–17]. Rather, Dr. Fowlkes "just referred everybody to the audiologist" with a hearing impairment. [*Id.* at p. 34:16-17].

[6] The following exchange details Dr. Fowlkes' modified implementation of the H1–H5 system in his regular practice.

Plaintiffs' Counsel:      [W]hen you assign people to H levels you weren't trying to be scientific or specific about it, correct?

Dr. Fowlkes:      Well, I wasn't —again, I was breaking patients into categories. "So are you normal?" And that means normal meaning you need no assistive devices, there is nothing going on with your ears, the nerves that affect your ears, you're a 1.

     If you're deaf, then you're up in the 4 or 5 range. And then if there is any sense of impairment you have to be greater than 1. That's how I would categorize how I filled out the [Health/Activity Profile] form or use those numbers.

[Doc. 115, p. 61:7–17].

impairments (anything higher than an H1) were sent to an audiologist—specifically, Dr.

Edgar R. Bohannon.

### 2. Dr. Bohannon

For 22 years, the GDC contracted with Dr. Bohannon, a licensed audiologist, to

assess hearing and treat hearing loss for prisoners with documented hearing

impairments. [*Id.* at p. 72:18–24]. Dr. Bohannon travels twice a month to Augusta

Medical Prison ("AMP") to perform diagnostic hearing evaluations on those patients

specially referred to him by Dr. Fowlkes. [*Id.* at p. 73:3–20]. He typically evaluates 20

patients per visit and spends about 30 minutes with each one. [*Id.* at p. 75:7–19]. He

stated that Dr. Fowlkes and his staff "screen [the patients] so well that anybody [he]

see[s] has a definite hearing loss." [*Id.* at p. 83:9–11].

During an evaluation, Dr. Bohannon reviews the patient's chart and performs a

series of tests to evaluate hearing levels and obtain an objective "level of hearing loss"

and the "frequency [of] the hearing loss[.]" [*Id.* at p. 76:7–19]. He tests hearing at

different frequencies to obtain an overall decibel level that can be used to measure

hearing loss (i.e., whether the loss is mild, moderate, severe, or profound). [*Id.* at pp.

77:1—78:8; 80:3–5]. Through these tests, Dr. Bohannon is able to diagnose the cause of

the patient's hearing loss. [*Id.* at p. 82:1–3]. He usually then sends the patient to an ear,

nose, and throat doctor to "evaluate[] why the hearing loss is there." [*Id.* at p. 82:4–19].

Dr. Bohannon, in his role as an audiologist, describes the patient's hearing loss based on findings from an audiogram report. [*Id.* at p. 95:22–24]. He measures the degree of hearing loss based on objective decibel level ranges. [*Id.* at p. 85:2–4]. In his practice, he describes moderate hearing loss as 40 to 60 decibels, severe hearing loss as 60 to 80 decibels, and profound hearing loss as 80 decibels and above. [*Id.*]. Dr. Bohannon documents a patient's hearing loss on the "Audiological Evaluation Form," which also includes the patient's audiogram results. [*Id.*]. If Dr. Bohannon believes the patient could benefit from the use of a hearing aid, he prescribes him one and then programs the aid based on whether the audiogram report shows the hearing loss as mild, moderate, severe, or profound. [*Id.* at pp. 83:20–24; 84:15–21; 87:4–9]. He testified that he does not use the GDC's H1-H5 classification system to categorize hearing loss. [*Id.* at pp. 86:3–13; 110:15–22].

### B.       Factual Background

#### 1.       The Parties

All Plaintiffs in this putative class action are persons with disabilities within the meaning of Title II of the ADA and Section 504 of the Rehabilitation Act. [Doc. 1]. However, the extent of each person's disability is not necessarily the same.

Plaintiffs Ricardo Harris ("Harris") and Tommy Green ("Green") are deaf and communicate using American Sign Language ("ASL"). [Doc. 1, ¶¶ 16, 18]. While

Plaintiff Harris can understand limited English, Plaintiff Green does not use or understand any written or spoken English. [*Id.*].

Plaintiffs Tony Moore, Jr. ("Moore) and Christopher Shields ("Shields") have been deaf for most of their lives. [Doc. 49-14, ¶ 2]; [Doc. 49-16, ¶ 3]. Plaintiff Moore has been deaf since he was eight years old and communicates using ASL and Signed Exact English ("SEE"). [Doc. 49-14, ¶ 2]. He can only understand simple information in written English. [*Id.*]. Prior to Plaintiff Moore's incarceration, he "used a cochlear implant to help [him] hear better[,]" but has now been "forced" into using a hearing aid that "sound[s] like static all the time" and bothers him. [*Id.* at ¶ 6]. Plaintiff Shields lost most of his hearing when he was 18 months old because of a high fever. [Doc. 49-16, ¶ 2]. While he primarily communicates using ASL, he can speak limited English. [Doc. 1, ¶ 21]. Plaintiff Shields uses a hearing aid but admits that he cannot hear very well even with the use of the aid. [*Id.*]. In addition to his hearing impairment, Plaintiff Shields suffers from diabetes, arthritis, and depression. [*Id.*].

Plaintiff Darrell Smith, Jr. ("Darrell") has been deaf his entire life and communicates using ASL. [Doc. 49-7, ¶ 4]. He cannot speak, read, write, or understand English. [*Id.*]. As he puts it, "English is not [his] language." [*Id.*]. Plaintiff Darrell also suffers from significantly impaired vision in one eye and severe pain in his ankle. [*Id.* at ¶¶ 15–18]; [Doc. 1, ¶ 23]. Similarly, Plaintiff Jorae Smith ("Jorae") is deaf and communicates using ASL. [Doc. 49-12, ¶ 3]. He can use and understand only simple

written English. [Doc. 1, ¶¶ 24, 190]. Plaintiff Jorae has used a hearing aid prior to and during his incarceration. [Doc. 49-12, ¶ 28]. He also has a psychiatric disability. [Doc. 1, ¶ 24].

In contrast to the other named Plaintiffs, Plaintiff Andrew Smith ("Andrew") is not deaf, but hard of hearing, and has been this way his entire life. [Doc. 49-4, ¶ 2]. He primarily communicates using ASL but can speak in English "when the topic is fairly simple." [*Id.*]; [Doc. 1, ¶ 22]. Since Plaintiff Andrew can speak English, prison officials often ask him to serve as an interpreter for other deaf inmates, which he does not like. [Doc. 49-4, ¶ 8]. He uses a hearing aid. [*Id.* at ¶ 16]. In addition to his hearing impairment, Plaintiff Andrew "also [has] other disabilities[,]" such as a prosthetic leg which requires constant medical attention. [*Id.* at ¶¶ 3, 13].

Despite the above-noted individualistic concerns, each Plaintiff suffers from total or partial hearing loss that substantially limits their ability to communicate effectively with others. Based upon this proposed commonality, Plaintiffs move to represent a class of similarly situated deaf and hard of hearing individuals. *See* [Doc. 49].

### 2.   Class Action Allegations

Plaintiffs allege that Defendants "deny [them] and other similarly situated deaf and hard of hearing people the modifications and auxiliary aids and services they need to communicate effectively and to participate equally in the GDC's programs, services, and activities." [Doc. 49-1, p. 1]. Specifically, they allege that Defendants' "policies,

procedures, and practices systematically fail to ensure modifications and effective communication for deaf and hard of hearing incarcerated people." [*Id.* at p. 4]. Plaintiffs identify several areas in which Defendants fail to reasonably accommodate the proposed members of the class.

> a.      *The 2018 ADA Policy*

In April 2018, the GDC issued its first-ever statewide policy regarding its compliance with the ADA. [Doc. 49-1, p. 6]. The 2018 ADA Policy sets out a multi-step grievance process whereby prisoners can request accommodations relevant to their disabilities. [*Id.*]. Plaintiffs argue that the 2018 ADA Policy is inaccessible to members of their proposed class because it is "laid out in complex written English at the college reading level" and most members are not literate in English and cannot understand the accommodation request process. [*Id.* at pp. 6–7]. They allege that the 2018 ADA Policy fails to ensure that deaf and hard of hearing prisoners have "effective, prompt access to qualified interpreters," which "is critical for ensuring effective communication." [*Id.* at p. 7]. In fact, "requesting an ASL interpreter using the accommodation request process [can] take up to 52 days." [*Id.*].

Plaintiffs also allege that the 2018 ADA Policy fails to ensure that important written documents, such as rules, procedures, and handbooks, are accessible to prisoners who cannot read or understand English. [*Id.* at p. 8]. As a result, proposed class members routinely attend medical and mental health appointments and

disciplinary hearings without effective communication access. [*Id.*]. Plaintiffs contend that it is especially important that members of the proposed class are provided with timely communication access in the context of disciplinary proceedings because "discipline can lead to harsh punishments, including extended periods in solitary confinement, and may prevent an incarcerated person from receiving parole or transfer to a lower-security facility." [*Id.* at p. 9].

### b.  *Telecommunications*

Next, Plaintiffs allege that the GDC's telecommunications policy focuses solely on the use of teletypewriters ("TTYs")—an "outdated" and "virtually obsolete" means of communication for deaf and hard of hearing individuals. [*Id.* at pp. 9–10]. As a result, Plaintiffs contend that they cannot effectively communicate with people outside the prison system. [*Id.*]. They argue that the preferred means of telecommunications for most deaf and hard of hearing people is a videophone (for ASL users) or a captioned and/or amplified phone (for hard of hearing users). [*Id.*]. While Plaintiffs admit that the GDC has implemented videophones in some of its facilities, it maintains that deaf and hard of hearing individuals routinely are denied access to such devices. [*Id.* at p. 10].

### c.  *Use of Force and Restraint for Offender Control*

Plaintiffs allege that the GDC's current policy regarding the use of force and restraint on deaf and hard of hearing prisoners unduly limits their abilities to communicate fully using sign language. [*Id.* at pp. 10–11]. Plaintiffs describe ASL as a

"full-body language" with the "size of a gesture and other body language [being]

necessary to convey meaning accurately." [*Id.*]. Handcuffing deaf and hard of hearing

prisoners in waist chains substantially limits their communication for the duration of

the handcuffing. [*Id.* at p. 11].

        *d.*     *Segregation and Administrative Disciplinary Measures*

Another grievance relates to the placement of deaf and hard of hearing prisoners

in solitary confinement. [*Id.* at pp. 11–12]. Plaintiffs allege that the GDC has "numerous

complex procedures" governing solitary confinement that are inaccessible to members

of the proposed class who cannot read English or understand spoken English. [*Id.* at p.

11]. Additionally, Plaintiffs contend that solitary confinement is a form of cruel and

unusual punishment because "the sensory deprivation of isolation is magnified and

especially harsh for people who do not hear or speak to communicate." [*Id.*]. Their

overall complaint is that none of the GDC's solitary confinement policies provide

modifications that could "mitigate the disability-based impacts of isolation[.]" [*Id.*].

        *e.*     *Accessible Administrative Exhaustion Process*

Plaintiffs' last main argument is that the GDC's current administrative

exhaustion procedure is complex and written entirely in English, thereby making it

inaccessible to deaf prisoners who are not fluent in English. [*Id.* at p. 12]. "There is no

practice of explaining the grievance policy itself, or the means of requesting assistance

with the grievance process, to people who, because of their disabilities, cannot read or write English." [*Id.*].

## DISCUSSION

### A.    Class Certification Standard

"The district court has broad discretion in determining whether to certify a class." *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992) (citing *Coon v. Ga. Pac. Co.*, 829 F.2d 1563, 1566 (11th Cir. 1987)). However, before the district court can make such a determination, the party seeking class certification "must establish that the proposed class is 'adequately defined and clearly ascertainable.'" *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)). Once the party has established that the proposed class is adequately defined and clearly ascertainable, the party must then establish the requirements set forth in Federal Rule of Civil Procedure 23(a). *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009). Pursuant to Rule 23(a), Plaintiffs, as the ones seeking certification, must establish that:

1) the class is so numerous that the joinder of all members is impracticable;
2) there are questions of law or fact common to the class;
3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "These four requirements commonly are referred to as the prerequisites of numerosity, commonality, typicality, and adequacy of representation,

18

and they are designed to limit class claims to those fairly encompassed by the named plaintiffs' individual claims." *Piazza v. Ebsco Indus. Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)). In addition to meeting these requirements, the party seeking certification must also demonstrate that the proposed class fits into one of the types of class actions listed in Rule 23(b). Here, Plaintiffs seek certification under Rule 23(b)(2), which states that a class action may be maintained only if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2).

The district court must undergo a "rigorous analysis" to determine whether these prerequisites have been established. *Falcon*, 457 U.S. at 160. "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). This is often the case because "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* (quoting *Falcon*, 457 U.S. at 160). As a result, the district court may need to "probe behind the pleadings" and examine those facts and evidence comprising the class action. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Falcon*, 457 U.S. at 160). Importantly, the burden lies with the party seeking certification to show that the requirements of Rule 23

have been satisfied. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 981 (11th Cir. 2016); *see also Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016) ("The party *seeking* class certification has the burden of proof.").

### B.    Threshold Issues

#### 1.    Mootness

Since federal court jurisdiction is defined and limited by Article III of the U.S. Constitution, "any analysis of class certification must begin with the issue of standing[.]" *Murray v. U.S. Bank Trust Nat'l Ass'n*, 365 F.3d 1284, 1289 n.7 (11th Cir. 2004); *see also Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) ("[I]t is well-settled that prior to the certification of a class . . . the district court must determine that at least one named class representative has Article III standing to raise each class subclaim.").

Federal courts are limited in their jurisdiction only to those claims constituting "[c]ases" and "[c]ontroversies." U.S. Const., art. III, § 2. "This limitation means that federal courts lack jurisdiction over cases where the issue in controversy has become moot." *A.R. v. Sec'y Fla. Agency for Health Care Admin.*, 769 F. App'x 718, 725 (11th Cir. 2019); *see also United States v. Al-Arian*, 514 F.3d 1184, 1189 (11th Cir. 2008) ("[M]ootness is jurisdictional, and the court must resolve any question of mootness before it assumes jurisdiction."). "Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the

litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496–97 (1969). Put in simpler terms, a case becomes moot only "when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)). That is not the case here.

Defendants argue that Plaintiffs' claims for systemic relief are moot because events subsequent to the commencement of this action have created a situation in which the Court can no longer grant "effectual relief" to Plaintiffs—assuming of course, they were to succeed on the merits of such claims. *See generally* [Doc. 60, pp. 1–11]; *see also* [Doc. 60, p. 3 (citing *Jews for Jesus v. Hillsborough Cnty. Aviation Auth.*, 162 F.3d 627, 629 (11th Cir. 1998))]. They allege that Plaintiffs' claims are "premised on policies and practices that pre-date [the] GDC's current policies and practices." [*Id.* at p. 11]. Defendants stress in detail that there are "current policies and practices" that moot Plaintiffs' claims: the 2018 ADA Policy; ADA coordinators at GDC facilities; ADA training programs for GDC personnel; new technology and services; auxiliary aids for effective communication; qualified ASL interpreters for GDC programs and activities; and videophones and video relay services at seven GDC facilities. [*Id.* at pp. 5–11]. And

this is hardly an exhaustive list. Upon review of the evidence, there is no question that Defendants have attempted to address the alleged deficiencies that make up the vast majority of Plaintiffs' claims. However, "[i]t long has been the rule that 'voluntary cessation of allegedly illegal conduct does not . . . make the case moot.'" *Sec'y of Labor v. Burger King Corp.,* 955 F.2d 681, 684 (11th Cir. 1992) (citation omitted). Voluntary cessation renders a case moot only when the defendant has carried "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Doe v. Wooten*, 747 F.3d 1317, 1322 (11th Cir. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

"Admittedly, [w]hen the government is the defendant, [courts] extend a reasonable presumption that government actors are unlikely to resume illegal activities, and [t]his presumption is particularly warranted in cases where the government repealed or amended a challenged . . . policy—often a clear indicator of unambiguous termination." *Walker v. City of Calhoun*, No. 4:15-CV-170-HLM, 2016 WL 361580, at *3 (N.D. Ga. Jan. 28, 2016) (quoting *Cook v. Bennett*, 792 F.3d 1294, 1299–1300 (11th Cir. 2015)). And, upon a cursory review of the record, it appears that Defendants (government entities) amended their challenged policies (by implementing the 2018 ADA policy)—thereby indicating an unambiguous termination of their alleged illegal

activities. However, in this action, the Court cannot conclude that Defendants' voluntary cessation has mooted Plaintiffs' claims.

Plaintiffs offered evidence in turn that shows members of the proposed class are still subject to the alleged illegal activities set forth in their initial pleadings. *See* [Doc. 65-2]; [Doc. 65-3]; [Doc. 65-4]; [65-5]. For example, Defendants claim that their current policies and practices mandate that qualified ASL interpreters are available for deaf and hard of hearing prisoners during orientation services. [Doc. 60-2, ¶ 11]. However, Plaintiffs have provided evidence showing that members of their class are still denied these interpreters. [Doc. 65, p. 7 n.17].

Upon review of the evidence, the Court cannot conclude that Defendants have shown an unambiguous termination of their alleged illegal conduct to render Plaintiffs' claims moot. Therefore, Plaintiffs clearly still have standing to pursue their claims.

## 2. Ascertainability

As noted briefly above, before the Court can certify a class, it must first determine whether the proposed class is "adequately defined and clearly ascertainable." *Little*, 691 F.3d at 1304; *see Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021) ("Ascertainability is an implied prerequisite of Rule 23."). "The Eleventh Circuit has traditionally collapsed class definition and ascertainability into one inquiry." *Lyttle v. Trulieve, Inc.*, No. 8:19-cv-2313-CEH-TGW, 2021 WL 3602996, at *3 (M.D. Fla. Aug. 13, 2021). It only makes sense that "without an adequate definition for a proposed

class, a district court will be unable to ascertain who belongs in it." *Cherry*, 986 F.3d at 1302.

"[A] proposed class is ascertainable if it is adequately defined such that its membership is capable of determination." *Id.* at 1304. And, a particularly important point to remember for this action is that "membership can be capable of determination without being capable of *convenient* determination." *Id.* This means that "the party seeking certification need not establish its ability to identify class members in a convenient or administratively feasible manner." *Rensel v. Centra Tech., Inc.*, 2 F.4th 1359, 1361 (11th Cir. 2021). Although there is no just cause for the Court to consider administrative feasibility since this action involves a proposed Rule 23(b)(2) class, Defendants focus the lion's share of their arguments against class certification on administrative feasibility. *Cherry*, 986 F.3d at 1304.

During the May 6th hearing, Defendants argued that they would be unable to identify potential class members based on Plaintiffs' proposed class definition. However, upon closer review of the argument, their real issue with the proposed class definition isn't identifying class members, it's *feasibly* identifying them. Defendants argue that they "ought to be able to identify a class member when [the prisoner] walk[s] in [the] door[]" because that would be the "common sense, practical application of an ascertainable class in a corrections environment[.]" [Doc. 102, p. 69:4–9]. And perhaps, it very well would be. But Plaintiffs aren't required to limit their proposed class to the one

that is the easiest to figure out. "[N]either foreknowledge of a method of identification nor confirmation of its manageability says anything about the qualifications of the putative class representatives." *Cherry*, 986 F.3d at 1303.

As this stage of the proceedings, Plaintiffs are only required to show that the class is "not defined through vague or subjective criteria[]" so that it is "capable of being determined." *Id.* at 1302–03. The Court concludes that the following proposed class turns on objective criterion and is sufficiently capable of being determined:

> All present and future deaf and hard of hearing individuals in GDC custody, who require hearing-related accommodations and services to communicate effectively and/or to access or participate equally in programs, services, or activities available to individuals in GDC custody.

For purposes of the class definition, the terms "deaf" and "hard of hearing" refer to their objective, medical definitions as testified to by Dr. Bohannon. Additionally, "deaf and hard of hearing" includes those individuals with hearing levels or hearing loss that qualify as disabilities under the ADA and Section 504 of the Rehabilitation Act. It is

sufficient that Plaintiffs have defined their proposed class through the aforementioned objective criteria.[7]

To the extent that Defendants argue that this class is not ascertainable because it requires individualistic determinations about each prisoner's hearing loss, the Court finds such an argument to be grounded in administrative feasibility concerns and not relevant to the ascertainability analysis. *See McCullough v. City of Montgomery*, No. 2:15-

---

[7] Over the course of this litigation, the Court has been mindful of the standard that "[a] party seeking class certification must *affirmatively* demonstrate his compliance with [Rule 23(a).]" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis added). Accordingly, certification is only appropriate once the "trial court is satisfied after a *rigorous analysis* that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). The Court reviewed both parties' pleadings on the issue of class certification and determined that its ultimate ruling on the matter needed to be based on more information than the pleadings provided. *See, e.g., In re Am. Med. Sys.*, 75 F.3d 1069, 1079 (6th Cir. 1996) (citations omitted) ("[Certification] may be determined by the court on the basis of the pleadings, if sufficient facts are set forth, but ordinarily the determination should be predicated on more information than the pleadings will provide…. The parties should be afforded an opportunity to present evidence on the maintainability of the class action."). The Eleventh Circuit has held that "district courts will [often] need to go beyond the pleadings and permit some discovery and/or an evidentiary hearing to determine whether a class may be certified." *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008). Accordingly, the Court held two hearings on the issue of class certification and heard testimony from three witnesses on topics related to the overall focus of the litigation. For example, the Court heard testimony from Dr. Joseph Fowlkes about the GDC intake process and H1-H5 classification system for hearing-impaired prisoners—which was relevant to Plaintiffs' claims, but a topic not discussed in detail by either party in their briefs. [Doc. 115, pp. 14:20—70:16]. Additionally, the Court heard testimony from Dr. Kimberly M. Cavitt about her experience evaluating hearing loss in a correctional setting at the Ohio Department of Corrections. [*Id.* at pp. 126:8—202:19]. Given the nature of the case, the Court welcomed all potentially relevant evidence regarding the evaluation of hearing loss, so as "to understand the [parties'] claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000). Only after Court has received the relevant evidence, can it then decide how much weight to assign each piece. Related to this point, Defendants moved to exclude Dr. Cavitt's testimony and declaration on the ground that these pieces of evidence "lack[] any indication of reliability," and they improperly "attempt[] to provide a class definition[.]" [Doc. 116, ¶¶ 2–3]. For purposes of the Rule 23(a) analysis, the Court has considered Dr. Cavitt's testimony and declaration (and therefore will not exclude this evidence); however, the Court has determined that it will not afford any weight to either piece of evidence. Accordingly, the Court **DENIES** Defendant's Motion to Exclude the Testimony and Declaration of Dr. Kim Cavitt [Doc. 116].

cv-463-RCL, 2021 WL 20449900, at *11 (M.D. Ala. May 21, 2021) (noting that the argument that a class is not ascertainable if individual inquiries are necessary to determine class membership is simply a "repackag[ing of] the administrative feasibility test that *Cherry* rejected[]"). It appears that Defendants' main concern with Plaintiffs' proposed definition is the possibility that each prisoner may have to be individually screened to see if he is a member of the proposed class. To this point—simply because Defendants' H1-H5 classification system does not assign hearing loss in accordance with objective medical criteria (as evidenced by Dr. Fowlkes' testimony), this does not mean that Defendants can use this as a reason to thwart class certification efforts. And, since the GDC's medical professionals send every prisoner with a perceived hearing impairment to Dr. Bohannon for further evaluation—where he assesses hearing loss in accordance with objective medical criteria—the GDC has the requisite medical information readily available.

Having settled all threshold matters, the Court now turns to whether Plaintiffs satisfied all of Rule 23(a)'s prerequisites.

B.    **Rule 23(a) Requirements**

1.    **Numerosity**

A proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[W]hile there is no fixed numerosity rule, generally less than [21] is inadequate, more than [40] adequate, with numbers between

varying according to other factors." *Cox v. Am. Cast Iron Pope Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (citation omitted). Relatedly, while "mere allegations of numerosity are insufficient to meet this prerequisite, a plaintiff need not show the precise number of members in the class." *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983). This standard does not negate the fact that a plaintiff "bears the burden of making *some* showing, affording the district court the means to make a supported factual finding, that the class actually certified meets the numerosity requirement." *Vega*, 564 F.3d at 1267.

Plaintiffs argue that the proposed class is sufficiently numerous because there are at least 156 individuals in the GDC's custody with a documented hearing impairment—i.e., hearing levels classified as H3, H4, or H5. While the record is replete with testimony that the GDC's medical professionals do not assign hearing loss in strict accordance with the H1-H5 classification system set forth in the Medical Classification and Profiling policy, this does not mean that such a system has no purpose or relevancy. For example, Dr. Fowlkes testified that he assigned patients an H4 or H5 levels when they either (1) came to the diagnostic physical exam wearing hearing aids, or (2) self-declared as being deaf. Based upon the record, it is clear that those individuals (persons needing hearing-related assistive devices) would belong in Plaintiffs' proposed class. Therefore, even if the Court only considered those patients assigned an H4 or H5 hearing level, the numerosity requirement would be met. However, the record as it stands, serves as a

good evidentiary indicator that patients assigned an H3 hearing level may also be members of this class. For example, the record shows that Dr. Fowlkes and his medical staff assigned Plaintiff Jorae an H3 hearing level. However, when Plaintiff Jorae went to receive further evaluation under the care of Dr. Bohannon his audiogram report showed profound hearing loss. The Court concludes that Plaintiffs have satisfied their burden of showing that the class meets the numerosity requirement.

### 2.   Commonality

Next, there must be questions of law or fact common to the entire class. Fed. R. Civ. P. 23(a)(2). However, there is no requirement that all questions of law and fact be common. *Vega*, 564 F.3d at 1268 (citing *Dukes*, 564 U.S. at 359). "[E]ven a single [common] question" will suffice. *Dukes*, 564 U.S. at 359. Therefore, the Rule 23(a)(2) commonality requirement is not meant to be overly burdensome for plaintiffs; in fact, at least in the Eleventh Circuit, it has been described as a "low hurdle" to overcome. *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009).

Plaintiffs argue that there are several common questions of law and fact to the proposed class, such as:

(1) Whether Defendants' policies fail to provide equal access to programs, services, and activities for deaf and hard of hearing class members. [Doc. 49-1, p. 5].

(2) Whether Defendants follow their own policies. [*Id.* at p. 12].

(3) Whether Defendants have accessible emergency planning and notifications. [*Id.* at pp. 14–15].

(4) Whether Defendants provide constitutionally adequate hearing-related care. [*Id.* at p. 15].

(5) Whether Defendants ensure effective communication and reasonable modifications for parole. [*Id.*].

In response, Defendants argue that these questions do not show commonality because the class members vary in their degree of hearing loss and their respective accommodation needs. Specifically, Defendants contend that

> the *answer* to each of the questions posed by Plaintiffs will depend on the particular circumstances of each offender, their housing, the degree of hearing impairment, the auxiliary aid preferred by the offender, the auxiliary aid provided by GDC, the reasonableness of particular accommodations in light of the prison setting, and the effectiveness of the communication with the offender.

[Doc. 60, p. 17 (emphasis in original)]. It appears that this contention arises from Defendants' concerns about the proposed class definition. They allege that "Plaintiffs have defined their proposed class so broadly that they cannot show that the class members have suffered the same injury." [*Id.* at p. 16]. But that simply is not true— especially given the nature of this action.

It is always important to consider Rule 23(a)'s requirements in relation to the particular nature of the action. Here, this action involves a challenge to system-wide practices, policies, and procedures that affect all members of the proposed class. In prison-litigation cases involving such a challenge, the commonality requirement is often satisfied because the prisoners share "a common interest in preventing the recurrence of the objectionable conduct." *Jones v. Goord*, 190 F.R.D. 103, 111 (S.D.N.Y. 1999) (citation

omitted). Of course, Defendants are correct in noting that each member of the proposed class has "particular circumstances" that will undoubtedly affect the nature of his claim. However, "[t]hat each class member's case is in other ways unique does not affect the commonality of the action, as long as the members of the class have allegedly been affected by a general policy of the defendant, and the general policy is the focus of the litigation." *Glover v. Johnson*, 85 F.R.D. 1, 4–5 (E.D. Mich. 1977). As Plaintiffs make clear, the focus of this litigation is on the alleged systemic discrimination in policy and practice across the GDC's prison facilities. And, that is a sufficiently narrowed focus common amongst members of the proposed class to satisfy the commonality requirement.

### 3. Typicality

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The typicality element overlaps somewhat with the commonality element." *Taylor v. Screening Reports, Inc.*, 294 F.R.D. 680, 689 (N.D. Ga. 2013) (citations omitted). However, the two can be distinguished by the notation that, "commonality refers to the group characteristics of the class as a whole and typicality refers to the individual characteristics of the named plaintiff in relation to the class." *Prado-Steiman*, 221 F.3d at 1278; *see also Piazza*, 273 F.3d at 1346. However, the importance in typicality (unlike in commonality) is the measure of whether "a sufficient nexus exists between the claims of the named representatives

and those of the class at large." *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1322–23 (11th Cir. 2008). Such a nexus can be said to exist when the "claims or defenses of the class and the class representatives arise from the same event or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984).

Defendants' arguments against typicality once again center on the contention that each class member varies in the extent of his hearing loss, which invariably affects the accommodations that he may need to receive effective communication. [Doc. 60, pp. 22–25]. The Court does not ignore the fact that many of these class members hold unique life experiences regarding their hearing impairments. However, for typicality purposes, there is no requirement that all members of the proposed class share the same experiences. "[The typicality] requirement may be satisfied even though varying fact patterns support the claims or defenses of individual class members[.]" *Collins v. Int'l Dairy Queen, Inc.*, 168 F.R.D. 668, 674 (M.D. Ga. 1996) (quoting *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D 677, 698 (N.D. Ga. 1991)). Instead, typicality can be satisfied by the showing of a "strong similarity of legal theories" amongst individual class members. *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001). That is exactly what Plaintiffs have shown here.

In this action, all members of the proposed class suffer from some form of a hearing impairment that affects their ability to communicate without the use of hearing-

related accommodations. They seek injunctive and declaratory relief regarding Defendants' alleged failure to provide such accommodations; their grievances all arise from Defendants' alleged wrongful polices, practices, and procedures. For this reason, the Court concludes that Plaintiffs' claims are typical of those of the class.

### 4. Adequacy of Representation

The last requirement under the Rule 23(a) analysis is for Plaintiffs to show that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy-of-representation requirement encompasses two separate inquires: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Busby*, 513 F.3d at 1323 (quoting *Valley Drug Co. v. Geneva Pharms. Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003)).

As to the first inquiry, there is nothing in the record to indicate that a substantial conflict exists between any class representative and the proposed class. And, as to the second, the Court notes that Defendants do not contest the adequacy of Plaintiffs' counsel in this case. [Doc. 102, p. 49:1–4]. Upon review of the relevant facts, the Court finds no issue either.

Therefore, upon this final point, the Court concludes that Plaintiffs have satisfied all of Rule 23(a)'s requirements. Now, the only thing left to consider is whether the proposed class meets one of the criteria listed in Rule 23(b).

B.    **Rule 23(b) Requirements**

Plaintiffs seek class certification under Rule 23(b)(2), which states that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Supreme Court has elaborated on the appropriateness of a Rule 23(b)(2) certification, stating that it "applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360. It does not apply "when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Id.*

In this action, Plaintiffs assert class-wide grievances against Defendants for implementing and adhering to unlawful policies, practices, and procedures that affect *the entire class*. Therefore, Plaintiffs' claims for systemic relief can be resolved with a declaratory judgment that Defendants' actions and/or inactions are unlawful and injunctive relief that enjoins the unlawful policies, practices, and procedures. *See, e.g., M.H. v. Berry*, No. 1:15-cv-1427-TWT, 2017 WL 2570262, at *7 (N.D. Ga. June 14, 2017) (certifying class under Rule 23(b)(2) upon finding that the "class action [could] be resolved in one stroke with an injunction or declaratory judgment finding the [d]efendant's policies and practices to be [unlawful]"). Furthermore, this is a civil rights case, and "[c]ivil rights cases against parties charged with unlawful, class-based

discrimination are prime examples[]" of lawsuits properly brought under Rule 23(b)(2).

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *see Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132, 163 n.214 (N.D. Cal. 2015) (quoting 7AA Wright & Miller, *Federal Practice & Procedure*; § 1776.1 (3d. ed. 2005)) ("[I]t should be noted that a common use of Rule 23(b)(2) is in [prisoner] actions brought to challenge various practices or rules in the prisons on the ground that they violate the constitution."). Based upon the nature of this action, the Court concludes that the requirements of Rule 23(b)(2) are met.

## CONCLUSION

For the reasons discussed in detail above, the Court **GRANTS** Plaintiffs' Motion for Class Certification [Doc. 49].[8] Although the Court has certified Plaintiffs' class, the Court expresses no opinion as to their potential success on the merits. The Court will allow class discovery to proceed and, if the parties can't settle this action on their own, they will face the inevitable motions for summary judgment and/or decertification in the future. The parties are to submit a new and updated discovery order within 30 days from entry of this Order.

**SO ORDERED**, this 28th day of December, 2021.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[8] The Court **TERMINATES** Plaintiffs' Motion for Leave to File Supplemental Declaration in Support of Motion for Class Certification [Doc. 111] **as moot**.