**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

**RICARDO HARRIS, *et al.*,**
on behalf of themselves and all others similarly
situated,

Plaintiffs,

v.

**GEORGIA DEPARTMENT OF**
**CORRECTIONS, *et al.*,**

Defendants.

Case No. 5:18-cv-00365-TES

**CLASS ACTION**

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.     The ADA and Section 504 of the Rehabilitation Act. ................................................................2

II.    It is undisputed that Plaintiffs and class members are individuals with disabilities and that Defendants are subject to the ADA and Section 504. ................................................................7

III.   GDC is violating Title II and Section 504 in numerous ways. ..................................................7

   A.   GDC fails to consistently or accurately identify and assess people who are deaf or hard of hearing. ................................................................................................................8

      1.   GDC's lists of people in its custody who are deaf and hard of hearing are incomplete. ................................................................................................8

      2.   Relevant experts agree that GDC's system of tracking those class members it does identify is flawed and must be modified. ...............................................10

   B.   GDC fails to provide auxiliary aids and services necessary for in-person encounters, including classes, group therapy, religious programs, and medical and mental health encounters. ........................................................................................................13

      1.   GDC is denying class members equal access to group meetings, including classes, therapeutic programs, and religious programming. ......................13

      2.   GDC is discriminating against class members by failing to provide equally effective communication in medical and mental health encounters. ...............20

   C.   GDC is discriminating against class members by failing to provide captioned telephones. ..............................................................................................................24

   D.   GDC is discriminating against class members by failing to make reasonable modifications to handcuffing policies. ......................................................................26

IV.   GDC is violating the Eighth Amendment as a matter of law. ................................................27

V.    Pardons and Paroles is failing to provide effective communication in violation of Title II and Section 504 in several ways. ................................................................................................33

   A.   P&P fails to identify deaf and hard of hearing people and maintain necessary records. .......33

   B.   P&P fails to communicate effectively during class members' orientation period. ...............35

      1.   Group meeting ................................................................................................36

      2.   PIC video ........................................................................................................37

      3.   Personal History Statement. ...........................................................................38

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Alexander v. Choate,*
    469 U.S. 287 (1985).........................................................................................................4

*Allah v. Gramiak,*
    No. 5:13-CV-186 (MTT), 2015 WL 269478 (M.D. Ga. Jan. 21, 2015) ............................28

*Ancata v. Prison Health Services, Inc.,*
    769 F2d 700 (11th Cir. 1985).........................................................................................28

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986).........................................................................................................2

*Barcelona v. Jones,*
    No. 9:15-CV-80102, 2019 WL 4277048 (S.D. Fla. Sept. 10, 2019), *aff'd sub nom. Barcelona
    v. Sec'y, Dep't of Corr.*, 847 F. App'x 689 (11th Cir. 2021) ............................................28

*Bax v. Drs. Med. Ctr. of Modesto, Inc.,*
    52 F.4th 858 (9th Cir. 2022) ...........................................................................................6

*Bennett-Nelson v. La. Bd. of Regents,*
    431 F.3d 448 (5th Cir. 2005)............................................................................................5

*Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist.,*
    133 F.3d 816 (11th Cir. 1998)..........................................................................................2

*Borum v. Swisher Cnty.,*
    No. 2-14-CV-127, 2015 WL 327508 (N.D. Tex. Jan. 26, 2015) ...................................5, 16

*Braggs v. Dunn,*
    257 F.Supp.3d 1171 (M.D. Ala. 2017) .................................................................*passim*

*Carswell v. Bay Cnty.,*
    854 F.2d 454 (11th Cir. 1988)........................................................................................28

*Chisolm v. McManimon,*
    275 F.3d 315 (3d Cir. 2001)......................................................................................25, 26

*Clarkson v. Coughlin,*
    898 F.Supp. 1019 (S.D.N.Y. 1995)..................................................................13, 20, 26, 39

*Clemons v. Dart,*
    168 F. Supp. 3d 1060 (N.D. Ill. 2016) ..........................................................................6, 16

*Delano-Pyle v. Victoria Cnty,*
    302 F.3d 567 (5th Cir. 2002)........................................................................................5, 16

*Frazier v. Kelley,*
    460 F. Supp. 3d 799 (E.D. Ark. 2020) ...............................................................................6

*United States v. Georgia*,
  546 U.S. 151 (2006)..................................................................................................4

*Gilmore v. Hodges*,
  738 F.3d 266 (11th Cir. 2013).....................................................27, 28, 29, 33

*Hill v. Dekalb Reg'l Youth Det. Ctr.*,
  40 F.3d 1176 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730
  (2002)..................................................................................................................28

*Horn v. United Parcel Servs., Inc.*,
  433 F. App'x 788 (11th Cir. 2011) .......................................................................2

*J.S., III by & through J.S., Jr. v. Houston Cty. Bd. of Educ.*,
  877 F.3d 979 (11th Cir. 2017)..............................................................................3

*Tennessee v. Lane*,
  541 U.S. 509 (2004)..............................................................................................4

*Levy v. Louisiana Dep't of Pub. Safety & Corr.*,
  371 F. Supp. 3d (M.D. La. 2019)........................................................................6

*Luke v. Texas*,
  46 F.4th 301 (5th Cir. 2022) ................................................................................4

*McBride v. Mich. Dep't of Corr.*,
  294 F.Supp. 3d 695 (E.D. Mich. 2018)...................................................20, 22, 26

*McCoy v. Texas Dep't of Crim. Just.*,
  No. C-05-370, 2006 WL 2331055 (S.D. Tex. Aug. 9, 2006) ....................4, 5, 16

*McCullum v. Orlando Reg'l Healthcare Sys., Inc.*,
  768 F.3d 1135 (11th Cir. 2014)............................................................................6

*Packer v. Lamour*,
  No. 21-10022, 2022 WL 1297821 (11th Cir. May 2, 2022) ..............................28

*Parker v. William Beaumont Hosp.*,
  No. 20-12475, 2023 WL 3606653 (E.D. Mich. May 23, 2023)..........................21

*Pennsylvania Dep't of Corr. v Yeskey*,
  524 U.S. 206 (1998)...........................................................................................2, 7

*Pierce v. D.C.*,
  128 F. Supp. 3d 250 (D.D.C. 2015) ..............................................................*passim*

*Randolph v. Rodgers*,
  170 F.3d 850 (8th Cir. 1999)...............................................................13, 20, 39

*Redding v. Nova Se. Univ. Inc.*,
  165 F. Supp. 3d 1274 (S.D. Fla. 2016) ...............................................................4

*Roa v. Conway,*
    No. 1:18-CV-4652-TWT, 2019 WL 13275782 (N.D. Ga. May 16, 2019) ............................................4

*Robertson v. Las Animas Cnty. Sheriff's Dep't,*
    500 F.3d 1185 (10th Cir. 2007)................................................................................................5

*Sacchetti v. Gallaudet Univ.,*
    344 F. Supp. 3d 233 (D.D.C. 2018) ......................................................................................26

*Shotz v. Cates,*
    256 F.3d 1077 (11th Cir. 2001)................................................................................................3

*Silva v. Baptist Health,*
    856 F.3d 824 (11th Cir. 2017)....................................................................................4, 20, 22

*Taylor v. Adams,*
    221 F.3d 1254 (11th Cir. 2000)..............................................................................................27

*Wright v. New York State Dep't of Corr.,*
    831 F.3d 64 (2d Cir. 2016)................................................................................13, 20, 39

**Statutes**

42 U.S.C. § 12132 ...................................................................................................................2, 7

Americans with Disabilities Act Title II (ADA) ................................................................*passim*

Section 504 of the Rehabilitation Act...............................................................................*passim*

**Other Authorities**

28 C.F.R. § 35 .........................................................................................3, 8, 17, 25, 28

28 C.F.R. § 42 .........................................................................................................................7

28 C.F.R. § 130 .........................................................................................................3, 8, 28

28 C.F.R. § 540 .......................................................................................................................24

U.S. Const. amend. VIII .........................................................................................7, 27, 28, 33

Fed. R. Civ. P. 56(a) ...............................................................................................................2

# Introduction

Deaf and hard of hearing people in the custody of the Georgia Department of Corrections (GDC) continue to face widespread and systemic exclusion, discrimination, and lack of communication access, in violation of Title II of the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act (Section 504), and the United States Constitution. While certain aspects of this case are complex, the issues raised in this brief are not. They are straightforward and supported by extensive, clear, uncontroverted evidence. The record evidence shows that GDC and the Georgia State Board of Pardons and Paroles (P&P) deny deaf and hard of hearing class members[1] an equal opportunity to participate in and benefit from GDC's and P&P's programs, services, and activities. Because there are no disputes of material fact on the issues raised here, Plaintiffs are entitled to summary judgment.

Specifically, as outlined below, the undisputed facts in the record demonstrate that:

1. GDC fails to adequately identify and assess deaf and hard of hearing people in its custody;

2. GDC fails to provide effective communication access to deaf and hard of hearing people in classes, group therapeutic programs, and religious programming;

3. GDC fails to provide effective communication access to deaf and hard of hearing people in medical and mental health encounters;

4. GDC fails to provide equal access to telecommunications to deaf and hard of hearing people who require captioned telephones;

5. GDC fails to make reasonable modifications to its handcuffing policies for deaf and hard of hearing people;

6. GDC fails to provide medically necessary hearing-related devices and care; and

7. P&P fails to provide effective communication to deaf and hard of hearing class members.

---

[1] This case was certified as a class action pursuant to Rule 23(b)(2) on December 29, 2021. ECF No. 121.

**Statement of Facts**

The undisputed material facts in this matter are described in full in the Statement of Undisputed Material Facts (SUF). These facts are discussed throughout the memorandum in the context of legal argument and analysis.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is not genuine unless the evidence would allow a reasonable jury to return a verdict for the nonmovant, and a fact is not material unless it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering this motion, "[t]he evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* at 255. However, the Court need not draw "all possible inferences" in favor of the nonmovant. *Horn v. United Parcel Servs., Inc.*, 433 F. App'x 788, 796 (11th Cir. 2011).

**Argument**

**I.      The ADA and Section 504 of the Rehabilitation Act**

Title II of the ADA prohibits disability discrimination in the programs, services, and activities of state or local governmental entities, including in jails and prisons. 42 U.S.C. § 12132; *see also Pennsylvania Dep't of Corr. v Yeskey*, 524 U.S. 206 (1998). The Eleventh Circuit has described "services, programs, or activities" as "a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context." *Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist.*, 133 F.3d 816, 821-22 (11th Cir. 1998) (quoting *Innovative Health Sys. v. City of White Plains*, 117 F.3d 37 44-45 (2d Cir. 1997) (overturned on other grounds)).

The ADA's implementing regulations require covered entities to "take appropriate steps to ensure that communications with [people] with disabilities are *as effective as* communications with

others." 28 C.F.R. § 35.160(a)(1) (emphasis added). The regulations require covered entities to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1). "In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities." 28 C.F.R. § 35.160(b)(2). The regulations include a non-exhaustive list of auxiliary aids and services, including, as relevant here:

> Qualified interpreters on-site or through video remote interpreting (VRI) services … real-time computer-aided transcription services … open and closed captioning, including real-time captioning… captioned telephones … or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing. 28 C.F.R. § 35.104.[2]

Public entities are also required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i). Public entities are prohibited from using "methods of administration … [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability[.]" 28 C.F.R. § 130(b)(3)(i).

To succeed on a ADA claim, Plaintiffs must show that: (1) they are qualified individuals with a disability; (2) they are being excluded from participation in, or are being denied benefits, services, or programs of a public entity, or are otherwise being discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination is by reason of their disability. *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001). "Discrimination claims under the ADA and Rehabilitation Act are governed by the same standards, and the two claims are generally discussed together." *J.S., III by & through J.S., Jr. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017).

---

[2] Descriptions of these and other auxiliary aids and services discussed in this brief are described in the Statement of Undisputed Facts. SUF ¶¶ 622-32.

Failure to provide auxiliary aids and services or to make necessary reasonable modifications are types of disability discrimination under the ADA and Section 504. *Tennessee v. Lane*, 541 U.S. 509, 531 (2004); *United States v. Georgia*, 546 U.S. 151 (2006); *Redding v. Nova Se. Univ. Inc.*, 165 F. Supp. 3d 1274, 1294 (S.D. Fla. 2016) ("failure to provide reasonable accommodation is a distinct, actionable theory of discrimination under the ADA and Rehabilitation Act"). Failure to provide equally effective communication is also a violation of the ADA and Section 504. Plaintiffs need not show any specific harm flowing from the lack of effective communication. *Silva v. Baptist Health*, 856 F.3d 824, 834 (11th Cir. 2017) ("the ADA and RA focus on the communication itself, not on the downstream consequences of communication difficulties"); *Luke v. Texas*, 46 F.4th 301, 306 (5th Cir. 2022) ("Lack of meaningful access is *itself* the harm under Title II, regardless of whether additional injury follows."); *see also Roa v. Conway*, No. 1:18-CV-4652-TWT, 2019 WL 13275782, at *4-5 (N.D. Ga. May 16, 2019); *McCoy v. Texas Dep't of Crim. Just.*, No. C-05-370, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006).

This framework imposes both affirmative and negative obligations. Title II of the ADA and Section 504 prohibit both discrimination that is intentional and discrimination that is "the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985). These statutory and regulatory provisions impose affirmative obligations on GDC and P&P to make services, programs, and activities accessible to deaf and hard of hearing persons, including by providing auxiliary aids and services and making reasonable modifications necessary to ensure equal access. An entity like GDC does not have "the option of being passive in [its] approach to disabled individuals as far as the provision of accommodations is concerned." *Pierce v. D.C.*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015).

"The ADA expressly provides that a disabled person is discriminated against when an entity fails to *take such steps as may be necessary* to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of

auxiliary aids and services." *Delano-Pyle v. Victoria Cnty*, 302 F.3d 567, 575 (5th Cir. 2002) (cleaned up, emphasis in original). "Congress intended to impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability. *Id.*; *accord* 28 C.F.R. §§ 35.160(a)(1), (b)(1); *see also Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454-55 (5th Cir. 2005); *Borum v. Swisher Cnty.*, 2015 WL 327508, at *4 (N.D. Tex. Jan. 26, 2015) ("In addition to a disability-based discrimination *prohibition*, the ADA also imposes on public entities an affirmative *obligation* to make reasonable accommodations for disabled individuals – including prisoners – who take advantage of a public entity's services or programs") (emphases in original).

Where a person's disability is obvious or is known to a public entity, the public entity's obligations under the ADA and Section 504 apply regardless of whether the person has expressly requested an accommodation. Courts have repeatedly and roundly rejected arguments that public entities need only act if they receive a request. *Pierce*, 128 F. Supp. 3d at 269-70 (the "suggestion that a prison facility need not act to accommodate an obviously disabled inmate if the inmate does not ask for accommodations . . . is truly baffling as a matter of law and logic. . . [N]o matter how fervently [defendant] holds the belief that a public entity's duty to provide accommodations arises only by request, there is neither legal nor logical support for that proposition."); *id*. at 272 ("prison officials have an affirmative duty to assess the potential accommodation needs of inmates with known disabilities . . . and to provide the accommodations that are necessary for those inmates to access the prison's programs and services, without regard to whether or not the disabled individual has made a specific request for accommodation."); *McCoy*, 2006 WL 2331055, at *7 ("A disabled person's failure to expressly 'request' an accommodation, however, is not fatal to an ADA claim where the defendant otherwise had knowledge of an individual's disability and needs, but took no action.").[3]

---

[3] *See also Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1197-98 (10th Cir. 2007) ("[A] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, *either* because that need is obvious *or* because the individual requests an

5

Furthermore, the affirmative obligation under the ADA and Section 504 to make programs and services accessible is "at its *apex* in the context of a prison facility, in light of the uneven power dynamic between prison officials and inmates that inherently and appropriately exists, and also the fact that departments of corrections have complete control over whether prison inmates (disabled or not) receive any programs or services at all." *Pierce*, 128 F. Supp. 3d at 269 (emphasis in original); *see* ██████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

Plaintiffs need not show intentional discrimination, or animus, or even deliberate indifference, to succeed on the merits of an injunctive and declaratory case like this. *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 n.8 (11th Cir. 2014) (where "plaintiff is not seeking compensatory damages [under Title II of the ADA], discriminatory intent is not required."); *see also Frazier v. Kelley*, 460 F. Supp. 3d 799, 844 (E.D. Ark. 2020) ("a plaintiff seeking prospective injunctive relief is not required to make [a] showing" of intentional discrimination) (citing *Meagley v. City of Little Rock*, 639 F.3d 384, 388-89 (8th Cir. 2011)). Defendants are liable for their failures to meet their

---

accommodation.") (emphases added); *Levy v. Louisiana Dep't of Pub. Safety & Corr.*, 371 F. Supp. 3d, 274, 285 (M.D. La. 2019) ("[I]t is axiomatic that the ADA and RA do not require a plaintiff to specifically request a certain accommodation in order to prevail on a claim of disability discrimination."); *Clemons v. Dart*, 168 F. Supp. 3d 1060, 1068 (N.D. Ill. 2016) ("[I]n arguing that assistance was available to [plaintiff] whenever he asked for it, the Sheriff gets things backward; [defendant] was required to *provide* non-discriminatory access; [plaintiff] was *not required to request it.*") (emphasis added); *Bax v. Drs. Med. Ctr. of Modesto, Inc.*, 52 F.4th 858, 869 (9th Cir. 2022) ("It is axiomatic that an entity's duty to look into and provide a reasonable accommodation may be triggered when the need for accommodation is obvious, even if no request has been made.") (internal citations and quotations omitted).

affirmative obligations under disability rights laws even if those failures were not driven by institutional or individual animus, or even deliberate indifference,[4] against persons with disabilities.[5]

## II.    <u>It is undisputed that Plaintiffs and class members are individuals with disabilities and that Defendants are subject to the ADA and Section 504.</u>

It is undisputed that the named Plaintiffs are individuals with disabilities under the ADA and Section 504. SUF ¶ 1. The rest of the class is defined, in part, by identity as individuals with disabilities under the ADA and Section 504. *See* ECF No. 121 at 25. Class members are "qualified" to participate in prison life at GDC because they are in its custody. *See Yeskey*, 524 U.S. They are "qualified" to participate in parole because P&P has authority to grant them parole, reprieve, and pardons. *Id.*

Title II of the ADA applies to "public entities," defined as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1). GDC and P&P admit that they are both public entities within this definition. SUF ¶¶ 2-3. Section 504 applies to entities that receive "Federal financial assistance." 28 C.F.R. § 42.102(c). GDC and P&P admit that they both receive federal financial assistance. SUF ¶¶ 4-5.

## III.    <u>GDC is violating Title II and Section 504 in numerous ways.</u>

Plaintiffs' Complaint alleges discrimination against deaf and hard of hearing people across virtually all aspects of prison life. *See* ECF No. 136-2. While some of these issues remain disputed and appropriate for trial, the issues outlined in this brief are not. The undisputed record evidence discussed in this brief shows that Defendants have repeatedly and systemically failed to provide deaf and hard of hearing people with equally effective communication and equal access to specific aspects of prison life

---

[4] Deliberate indifference <u>is</u> part of the analysis of the Eighth Amendment violations, even when plaintiffs are not seeking damages. This analysis is discussed in the context of medically necessary devices such as hearing aids, *infra*, § IV. All other claims in this brief rely on Title II and Section 504, and do not require a showing or finding of deliberate indifferent in order for plaintiffs to prevail.

[5] Accordingly, as discussed in Plaintiffs' *Daubert* motions, ECF No. 175-177, because Plaintiffs do not need to establish that Defendants or their personnel acted with discriminatory intent. ████████

in violation of the ADA and Section 504. To narrow the scope of a trial, Plaintiffs now move for partial summary judgment on these issues in which there is no genuine dispute of material fact.

> A. GDC fails to consistently or accurately identify and assess people who are deaf or hard of hearing.

GDC's affirmative obligations begin with the obligation to identify, track, and assess incarcerated persons with hearing-related disabilities. Public entities are required to "furnish appropriate auxiliary aids and services when necessary to afford individuals with disabilities … an equal opportunity to participate in," a public entity's programs." 28 C.F.R. 35.160(b)(1). "The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication *used by the individual*." 28 C.F.R. § 35.160(b)(2) (emphasis added); *see also* 28 C.F.R. § 35.130(b)(7); 28 C.F.R. § 35.130(b)(3). GDC cannot provide equal access to deaf and hard of hearing people in its custody if it fails to identify them or determine their communication needs. Thus, "the failure of prison staff to conduct an informed assessment of the abilities and accommodation needs of a new inmate who is obviously disabled . . . violates Section 504 and Title II as a matter of law." *Pierce*, 128 F. Supp. 3d at 268; *see also Braggs v. Dunn*, 257 F.Supp.3d 1171, 1201 (M.D. Ala. 2017) ("Timely identification and appropriate classification of prisoners with mental illness are essential to a functioning mental-health care system."). The undisputed record evidence shows that GDC systematically fails to identify and adequately assess deaf and hard of hearing people in its custody.

> 1. GDC's lists of people in its custody who are deaf and hard of hearing are incomplete.

GDC fails to reliably identify people in its custody who have hearing disabilities. GDC attempts to classify people with hearing disabilities by an "H-level" system,, through which people with normal hearing should be classified as H1, while anyone with hearing loss should be classified H2 through H5, depending on severity. SUF ¶¶ 48-50, 57, 63. *See also infra* § III(A)(2). But there are dozens of incarcerated people who have significant hearing disabilities who are not identified by GDC's H-level

classification system as having hearing disabilities. Plaintiffs' expert Julian Martinez ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

Unrebutted evidence confirms that GDC systemically fails to identify large numbers of deaf and hard of hearing people in its custody. While GDC has identified 1.72% of its incarcerated population as having at least "some" hearing loss, SUF ¶¶ 33, ████████████████ statistics indicate that the actual number should be at least twice as high, based on comparable statistics ████████████████ and rates of hearing disabilities in Georgia (where 3.5% to 6% of adults have hearing disabilities). ████████ ████████████████████████████████████████ SUF ¶¶ 34-40. *See Braggs*, 257 F. Supp. 3d. at 1201-04 (prevalence rate of mental illness among Alabama prison population significantly below rate in the general population demonstrated inadequate identification system).

GDC's vast undercounting of class members in its custody is the foreseeable consequence of its inadequate approach to identifying deaf and hard of hearing people at intake. The former medical director at GDC's main male intake facility, Georgia Diagnostic and Classification Prison (GDCP), Dr. Joseph Fowlkes testified that he and his staff identified deaf and hard of hearing people based only on self-report or obvious signs of disability. SUF ¶¶ 41-47. ████████████████████████ ████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████ [6]

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████ It is not in dispute that GDC maintains lists of deaf and hard of hearing persons. ████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████████████████████████

2.  <u>Relevant experts agree that GDC's system of tracking those class members it *does* identify is flawed and must be modified.</u>

██████████████████████████████████, GDC attempts to track hearing disabilities using the H-level system. Under GDC's applicable Standard Operating Procedure, each incarcerated person is supposed to[7] be given an "H-level" on the following scale:

| | |
|---|---|
| **Hearing:** Hearing should be tested by having the offender listen to a softly ticking watch or by rubbing one's fingers a few inches from the ear. Other gross measures to include maybe whispering or speaking to the offender in a low, conversational tone of voice. If hearing is diminished, the Weber test should be performed. Lateralization to the diminished hearing side suggests conductive loss. Lateralization to the normal hearing side suggests a sensor neural problem. If clinically indicated, the clinician should refer the offender for an audiometry evaluation. | |
| H1 | The offender hears adequately (i.e., normal conversational level, whispering, ticking watch, TV, or phone). |
| H2* | Unilateral hearing loss with no loss in the other ear or mild bilateral hearing loss. |
| H3* | Total unilateral hearing loss with mild hearing loss in the other ear. The clinician should consider audiometry to evaluate hearing loss. |
| H4* | Severe bilateral hearing loss confirmed by an audiometric examination that does not improve with hearing aids. Functionally deaf. |
| H5* | Absence of useful hearing of any manner bilaterally. Offenders assigned this grade will likely require specialized housing. |

---

[6] Dr. Robin Bohannon, GDC's audiologist, confirmed that this approach is under-inclusive, testifying that "all" people referred to him for hearing assessments had "a definite hearing loss." SUF ¶ 47. ████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████

[7] 6.8% of the GDC population does not have a recorded H-Level. SUF ¶ 54.

Ex. 52 (Medical Classification and Profiling Policy); *see also* SUF ¶¶ 48-50.

It is undisputed that the H-level scale is not an effective means of classifying people. The former audiologist for GDC, Dr. Robin Bohannon, testified that the H-level scale is the "most outdated thing I've ever seen," and that the whisper test it relies on is "very crude" and "outdated." SUF ¶¶ 55-56. ██████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

This Court concluded that GDCP medical staff "clearly ignored" the H-level system, and that Dr. Bohannon "does not use" it. ECF No. 121 at 10-12. ███████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Not surprisingly, non-medical staff, including wardens and facility ADA coordinators, are also confused or entirely unfamiliar with the H-level system. SUF ¶¶ 59-62.

The H-level system, even on its own terms, purports to track only the level of hearing loss, while failing to provide any information about how a person communicates or what auxiliary aids that person might need. SUF ¶ 50; ███████████████████████████ The H-level system, on its face, does not identify how a person communicates, whether a person uses American Sign Language (ASL), what auxiliary aids they require, or whether they have – or need – hearing aids. SUF ¶ 50. This information is essential to the determination of how to provide effective communication and equal access to a deaf or hard of hearing incarcerated person. The H-level system provides none of it.

This agreement that the H-level system is an inadequate means to identify and track class members is further supported by undisputed evidence showing that GDC's classifications are so inconsistent as to be meaningless. Dr. Fowlkes testified that "what we were trying to make sure we accomplished [with the H-level system] is if there is some level of impairment he is not labeled [H]1." SUF ¶ 63. ████████████████████████████████████████████████

[REDACTED]

And yet, despite the overwhelming evidence on the ineffectiveness of the H-level system, GDC continues to rely on H-level classifications to determine eligibility and access. GDC provides certain devices only to people classified as H4 or H5, and it has repeatedly denied requests for these devices based on H-level classification. SUF ¶¶ 75, 76, 79. GDC has denied requests for personal amplification devices because people were classified as H1. SUF ¶¶ 77-78. It has sought and tracked information only about those people classified as H4 and H5. SUF ¶ 80. It offers training only to people identified as H2 and above. SUF ¶ 81. It designed a system of using certain icons to identify people classified as H2, and different icons for people who are H3-H5. SUF ¶ 82. [REDACTED]

The foregoing undisputed evidence establishes that GDC is failing, on a system-wide level, to identify and assess people who are deaf and hard of hearing in its custody. GDC cannot genuinely dispute that: it substantially undercounts its deaf and hard of hearing population; its H-level classification system provides no insight into what accommodations a person might actually need to participate in GDC's programs; GDC staff do not understand the H-level system and implement it in

arbitrary ways; and GDC nonetheless relies on the H-level system to classify and track deaf and hard of hearing people and determine which auxiliary aids and services they may receive. GDC cannot ensure equal access for a population whose members are poorly tracked and whose communication needs are inadequately recorded. *See Braggs*, 257 F. Supp.3d at 1201; *Pierce*, 128 F. Supp. 3d at 254, 267-68. Accordingly, the Court should grant summary judgment on Plaintiffs' claim that GDC's identification and classification system for hearing-related disabilities violates Title II of the ADA and Section 504.

B.   GDC fails to provide auxiliary aids and services necessary for in-person encounters, including classes, group therapy, religious programs, and medical and mental health encounters.

There is no material genuine dispute that GDC is failing to provide auxiliary aids and services necessary for effective communication in key parts of prison life. Class members are either excluded outright from programs, classes, and medical and mental health encounters, or else are forced to endure unequal, incomplete access due to the failure to provide the auxiliary aids they need.

1.   GDC is denying class members equal access to group meetings, including classes, therapeutic programs, and religious programming.

The ADA and Section 504 require GDC to provide deaf and hard of hearing people access to educational, vocational, and rehabilitative classes in prison. *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1033 (S.D.N.Y. 1995); *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999). "Access" requires not just presence but meaningful access to the information conveyed. *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 73 (2d Cir. 2016).

GDC provides a range of programming, including educational, vocational, counseling, and religious programming for people in its custody. SUF ¶ 84. Some people are eligible to earn up to 12 months off their sentences by participating in programming and acquiring Performance Incentive Credits, or "PIC Points." SUF ¶ 85. ███████████████████████████████████████ ███████████████████████████████████ In GDC's own words, its programming is "critical to a reentry initiative," and can help people to "achieve positive change and to be a more pro-social

13

contributor to society." SUF ¶¶ 87, 88. While programming stopped in 2020 at GDC because of the COVID-19 pandemic, programs have since resumed in GDC. SUF ¶ 89.

But GDC fails to provide auxiliary aids and services that class members need to participate in programming, even though GDC knows of many of their disabilities, their accommodation needs, *and* their desire to participate in classes. The evidence outlined below shows the routine and systemic absence of auxiliary aids commonly needed for access to group encounters. Numerous examples, across GDC facilities, show individuals who, by GDC's own records, want to participate in programming, but whom GDC fails to accommodate, and thereby excludes.



GDC has not provided in-person ASL interpreters at all since approximately April 2020. SUF ¶ 100. [8] In Central State Prison (CSP), where about 18 ASL users are housed, the facility ADA Coordinator testified that they rely on VRI to provide ASL-users with access to classes. SUF ¶¶ 99, 107.

---

[8] the VRI interpreter reported to GDC that she had attempted to provide services on numerous occasions but that it was "impossible to deliver good customer services due to the awkward set up," the interpreter was "unable to provide an accurate and complete rendition of what is being said by the various group members, and the disappointing result is that the [deaf user] misses important information." SUF ¶ 104. GDC testified that it was not aware of these problems, and did not provide any guidance or instruction on how or whether to use VRI in a classroom setting. SUF ¶¶ 105-106.

[9] If VRI is used in group encounters, there must be adequate training to ensure the VRI works effectively, and adequate policies to ensure effective use. GDC has no such training or policies. SUF ¶¶ 90, 92-94, 106.

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ This evidence is undisputed. GDC

systemically fails to provide access to classes for ASL-users in its custody.

For class members who do not use ASL, CART may be necessary to access classes. ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████ Although GDC's classification system does not identify who requires CART, *see*

*supra* § III(A), ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████ GDC has not provided any CART

transcription since 2020. SUF ¶ 121. It is undisputed that Ubi-Duo devices, which contain two

keyboards and allow two people to type back and forth in English, are not appropriate for group

meetings. SUF ¶¶ 96, 632.

████████████████████████████████████████████████████████████

████████████████████████████████████████ But until February 2023, GDC

did not have any FM amplification systems at all. SUF ¶ 122. In February 2023, it received a single

system that it uses for orientation at GDCP. SUF ¶ 123. There is still no FM amplification system for

any classes or programming anywhere else in GDC. *Id.*[10]

GDC staff testified that they would provide these auxiliary aids and services if any class

members wanted them, that the reason these auxiliary aids are not being provided is because they have

not been requested, and that GDC is free to wait until they receive requests before providing access.

---

[10] Hearing aids are necessary for some deaf and hard of hearing people to access classes and group
programs. Extensive evidence shows that class members are frequently without functioning or adequate
hearing aids for extended periods of time, and that this prevents them from participating equally, or at
all, in group encounters. *See infra* § IV.

SUF ¶¶ 124-127. This position is contradicted by both law and fact. Legally, this "wait and see" approach to accommodations is contrary to the affirmative obligations of the ADA and Section 504. *See Pierce*, 128 F. Supp. 3d at 269; *Delano-Pyle*, 302 F.3d at 575; *Borum*, 2015 WL 327508, at *4; *McCoy*, 2006 WL 2331055, at *7; *Clemons*, 168 F. Supp. 3d at 1068; *see also supra*, § II. As a factual matter, GDC's position that it has not received requests for auxiliary aid and services is false. There is extensive evidence that deaf and hard of hearing people *do* want to take classes and participate in group activities, that they have requested auxiliary aids and services to participate, that GDC is aware of this, and that it nonetheless fails to provide the services they need. The following are a few examples:[11]

Plaintiff Darrell Smith has been excluded from GED classes since early 2021, because GDC will not provide interpreters. SUF ¶¶ 129-148. ███████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████ But nearly two years later, as of his deposition in 2023, Mr. Smith still had not been allowed to enroll in the class. SUF ¶ 148.

███████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████████████ █████████████████████████████████████

---

[11] Plaintiffs received discovery, including institutional, medical, and mental health files, from a sample of 122 class members, representing less than a third of class members identified by either GDC or Plaintiffs. ████████████████████████████████████████████████████ Plaintiffs have no reason to believe that other class members are not facing similar barriers.





████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████

Several class members testified that they would go to religious programming but did not because GDC failed to provide communication access. Plaintiffs Harris, Jorae Smith, and Tommy Green each testified that they do not attend religious services because GDC does not provide interpreters, SUF ¶¶ 223-25, and ███████████████████████████████████

The evidence is replete with similar examples spanning the years of this litigation. ████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

GDC's current assertion that it provides accommodations only "upon request," and that interpreters or CART are provided only if requested, assumes that, after years of *denying* requested accommodations and access, deaf and hard of hearing people would somehow know that they should *now* ask again for access and expect a different response. Courts have rejected this precise argument, noting that when a request has been denied in the past, it is "not surprising" that a prisoner does not continue asking for one, and that the prison or jail remains "on notice" from the original request of the need for accommodations. *Pierce*, 128 F. Supp. 33 at 270-75; *Randolph*, 170 F.3d at 858-59.

The undisputed evidence shows, as a matter of law, that GDC fails to provide necessary auxiliary aids and services. Class members over the course of years are repeatedly reporting their interest and need to participate in classes to GDC, but GDC excludes them. This is illegal. *McBride v. Mich. Dep't of Corr.*, 294 F.Supp. 3d 695, 714-16 (E.D. Mich. 2018); *see also Randolph*, 170 F.3d at 858; *Wright*, 831 F.3d at 73; *Clarkson*, 898 F. Supp. at 1033; *Pierce*, 128 F. Supp. 3d at 274-75.

        2.      <u>GDC is discriminating against class members by failing to provide equally effective communication in medical and mental health encounters.</u>

The ADA and Section 504 also require GDC to provide class members effective communication in medical and mental health encounters. *Silva*, 838 F. Appx. at 379; *Pierce*, 128 F. Supp. 3d at 268 ("It is clear beyond cavil that the core principle that underlies the protections of Section 504 and Title II is *equal access*.") (emphasis added). Plaintiffs do not need to experience a negative health outcome or denial of necessary treatment in order to show disability discrimination. *McBride*, 294 F. Supp. 3d at 714 (need for effective communication "is particularly acute in the health care setting where the accurate communication of information between patient and medical provider *during the visit* can significantly impact the patient's health and well-being. In short, a positive outcome in any particular[] medical appointment does not necessarily mean that equal participation was offered or took place.") (emphasis in

original); *see also Parker v. William Beaumont Hosp.*, No. 20-12475, 2023 WL 3606653, at *4 (E.D. Mich. May 23, 2023) (for "hearing-impaired individuals seeking medical treatment, disability discrimination occurs where the facility fails to 'furnish appropriate auxiliary aids and services where necessary to ensure effective communication.'") (citation omitted).

It is undisputed that effective communication is essential during health encounters. ██████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *see also* SUF ¶ 239. GDC's medical provider, Wellpath, takes the position that "patient education is a gigantic part of patient care." SUF ¶ 243. GDC's documents recognize and affirm these obligations to provide effective communication, including giving primary consideration to the person's preferred way of communicating, in medical and mental health encounters. SUF ¶¶ 240-41. ███████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████



People who do not use ASL have suffered similarly.

15 A Pocket Talker is a handheld assistive listening device that has a microphone and amplifies sound. It "is not sold, advertised or intended for use as a personal hearing aid." SUF ¶¶ 628-630.

23

Defendants do not meaningfully dispute any of this evidence of individual failures or the systemic nature of these problems ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ This evidence shows that class members in GDC custody are routinely and repeatedly denied effective communication and equal access in medical and mental health encounters. Their providers know or should know of their disabilities and accommodation needs. This is a violation of the ADA and Section 504.

C. GDC is discriminating against class members by failing to provide captioned telephones.

Telecommunication access in prison is essential. It allows people to communicate with people outside the prison walls and can strengthen ties with family, friends, and community. The federal government has recognized this importance, noting in its regulations of the Federal Bureau of Prisons, "[t]elephone privileges are a supplemental means of maintaining community and family ties that will contribute to an inmate's personal development." 28 C.F.R. § 540.100(a). Incarcerated people in GDC general population typically have access to standard telephones seven days a week. SUF ¶ 284. ████████

---

[16] Additionally, Plaintiffs' have moved to exclude Mr. Smith's *ipse dixit* opinion in their *Daubert* motion filed today. ECF No. 177.

████████████████████████████████████████████████████

████████████████████████████████

GDC must provide equal access to telecommunications devices accessible to deaf and hard of hearing people. *See Chisolm v. McManimon*, 275 F.3d 315, 329 (3d Cir. 2001) ("To the extent that other, non-disabled inmates had access to communication by telephone, [the jail] was required to provide [deaf plaintiff] with such access on nondiscriminatory terms," *citing* 42 U.S.C. § 12132). Numerous devices that deaf and hard of hearing people use to access telecommunications, including videophones, telephone amplification devices, TTY, and captioned phones, are expressly included in the ADA regulations as examples of "auxiliary aids and services." 28 C.F.R. § 35.104. Plaintiffs have extensive evidence of failures by GDC to provide consistent access to all types of telecommunications for class members. For the purposes of summary judgment, however, Plaintiffs seek relief specifically with respect to GDC's failure to provide captioned telephones.

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████ GDC includes in its training material a picture of a captioned phone:

CAPTIONED PHONES



SUF ¶ 627.

GDC does not have

captioned phones. SUF ¶ 287;

Both the GDC's statewide ADA Coordinator and Assistant ADA Coordinator

testified that GDC could provide captioned telephones. SUF ¶¶ 294-295. Nonetheless, GDC refuses to

provide them. This refusal excludes certain class members from meaningful access to

telecommunications, in violation of the ADA and Section 504. *See Chisolm*, 275 F.3d at 319; *McBride*,

294 F. Supp. 3d at 713; *Clarkson*, 898 F. Supp. at 1032.

        D.     <u>GDC is discriminating against class members by failing to make reasonable</u>
                    <u>modifications to handcuffing policies.</u>

A signing person's ability to communicate is entirely dependent on being able to move their

hands.

*Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233, 273 (D.D.C.

2018) ("[B]ecause his hands were handcuffed behind his back, his ability to communicate was limited."). GDC maintains a policy governing Use of Force and Restraint. SUF ¶ 296. This policy makes clear that incarcerated people *must* be able communicate while handcuffed: "[e]ven if the offender is loud or boisterous, he or she shall never have his or her mouth taped in an effort to repress noise." SUF ¶ 298. But by failing to ensure that sign language users have their hands free to communicate unless a direct threat requires restraint that limits communication, this policy allows deaf people to have the equivalent of their mouths taped shut routinely. This discriminates against sign language users.

The policy states that "A deaf offender will be handcuffed in waist chains to allow for hand use for sign language communication." SUF ¶ 297.



Thus, GDC's handcuffing policy violates the ADA and Section 504.

## IV. GDC is violating the Eighth Amendment as a matter of law.

Undisputed evidence demonstrates that GDC is violating the Eighth Amendment by failing to provide adequate hearing-related care and devices to class members who need them. To establish a violation of the Eighth Amendment, Plaintiffs must show that class members had "an objectively serious medical need that, if unattended, posed a substantial risk of serious harm," and that officials "acted with deliberate indifference, *i.e.*, the official subjectively knew of and disregarded the risk of serious harm, and acted with more than mere negligence." *Gilmore v. Hodges*, 738 F.3d 266, 273-74 (11th Cir. 2013) (citing *Bingham v. Thomas*, 654 F.3d 1171, 1175-76 (11th Cir. 2011)); *Taylor v. Adams*, 221 F.3d 1254,

1258 (11th Cir. 2000). Although GDC contracts with private medical providers, GDC's "obligation [to comply with the Eighth Amendment] remains even if it has contracted with private parties to provide medical care." *Braggs*, 257 F. Supp. 3d at 1188; *see also* 28 C.F.R. § 35.130(b)(1), (3) (public entity's obligations apply whether it acts "directly or through contractual … arrangements"). In any event, GDC maintains final decision-making authority regarding medical care for people in its custody. SUF ¶ 304.

The Eleventh Circuit has held that "[s]ubstantial hearing loss that can be remedied by a hearing aid can present an objectively serious medical need." *Gilmore*, 738 F.3d at 276. "Substantial hearing loss" was demonstrated in *Gilmore* where the plaintiff could not hear the TV and "could have had trouble hearing a fire or other alarm [or] responding to commands issued by guards." *Id.* at 275-76; *see also Barcelona v. Jones*, No. 9:15-CV-80102, 2019 WL 4277048, at *7 (S.D. Fla. Sept. 10, 2019), *aff'd sub nom. Barcelona v. Sec'y, Dep't of Corr.*, 847 F. App'x 689 (11th Cir. 2021) (substantial hearing loss where plaintiff "cannot hear T.V., loud speaker, mail calls, meal calls").

"[K]nowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference." *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 704 (11th Cir. 1985); *see also Carswell v. Bay Cnty.*, 854 F.2d 454, 457 (11th Cir. 1988); *Gilmore*, 738 F.3d at 276. Unreasonable delay is also a form of deliberate indifference. *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002); *Packer v. Lamour*, No. 21-10022, 2022 WL 1297821, at *2 (11th Cir. May 2, 2022); *see also Allah v. Gramiak*, No. 5:13-CV-186 (MTT), 2015 WL 269478, at *8 (M.D. Ga. Jan. 21, 2015) (where Plaintiff alleged sleep apnea and required a CPAP machine, the Court found that, "given the established legal norms regarding unreasonable delay of treatment together with [Plaintiff's] obviously serious medical condition, [Defendant's] conduct was constitutionally intolerable."). Evidence of prison officials' knowledge of an incarcerated person's

serious hearing disability, combined with the officials' "repeated[] refus[al] to provide him with hearing aid batteries," establish deliberate indifference and resulting harm. *Gilmore*, 738 F.3d at 276.

Here, there is extensive, undisputed evidence that GDC is deliberately indifferent to class members' serious medical needs again and again. GDC fails to maintain policies and procedures to ensure that incarcerated people who need audiological care, hearing aids, repairs, or batteries, receive these services. Predictably, given the system-wide confusion, ██████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████ that its policy *would* permit this procedure. SUF ¶ 316.

Even where care is not denied outright, ████████████████████████████████████ ████████████████████████████████ Evidence shows that staff are regularly confused about how to obtain hearing care and devices for deaf and hard of hearing people, and that GDC and Wellpath lack policies, coordination, and knowledge on how to ensure people in GDC custody receive necessary

hearing-related care promptly. For example, neither GDC nor Wellpath know how long it typically takes someone to receive a new hearing aid, or for hearing aids to be repaired. SUF ¶¶ 344-347, 351-352.

██████████████████████████████████████████████████████████████

████████████████████████████████████ GDC's medical director does not know how long people wait for hearing aids, or how long is too long. SUF ¶ 350. In October 2022, GDC's Assistant Commissioner of Health Services wrote to Wellpath that he had "some concerns around the issue of hearing aids within GDC sites," specifically "that there was [a] delay in some of them getting them in a timely manner." SUF ¶ 353. Wellpath was unaware of these problems until GDC raised them. SUF ¶ 354. And for a significant part of 2022, Wellpath and GDC did not know which entity was responsible for providing hearing aid batteries. SUF ¶¶ 356-359.

As a result of confusion about how, when, or whether to ensure that class members have the devices they need—and even about who needs such devices—class members are routinely without functioning hearing aids. ███████████████████████████████████████████ ██████████████████████████████████ A GDC employee noted in July 2022 that although she only had two Pocket Talkers, there were "many more" in her prison "that have hearing aids that are broken." SUF ¶ 368. Class members suffer because of these failures. Some examples include:

████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████





The desperate pleas of a parent of an incarcerated person tells the same story again:

> My son has been hearing impaired wearing 2 hearing aids, does sign language and has been diagnosed as mental retardation from a young child … the warden has … denied my son the right to his hearing aids, he is not provided with an interpreter… I have expressed my concern and different situations that could occur as a result of my son not hearing what is said to him or misunderstanding what has been said … My son has faced a lot of scary situations ... Not long ago he was nearly stabbed . . . I am really afraid for my son. … Don't let my son be killed in this place please help me.

> SUF ¶ 506.

In short, GDC's practices and lack of policies, knowledge, and information leave class members without needed devices for extended periods of time. The overwhelming, undisputed evidence in the record shows that class members have hearing loss that is a "serious medical need," *Gilmore*, 738 F.3d at 276, but that they routinely wait months or years for necessary hearing aids, or are denied devices and care altogether. Class members need these devices because they have significant hearing disabilities that limit their ability to participate in daily prison life. GDC's failures to provide necessary hearing devices and care to people in its custody violate the Eighth Amendment.

## V. **Pardons and Paroles is failing to provide effective communication in violation of Title II and Section 504 in several ways.**

Georgia Board of Pardons and Paroles (P&P), like GDC, has affirmative obligations under Title II and Section 504 to provide equally effective communication; to furnish necessary auxiliary aids and services; to give primary consideration to the preferences of the person with a disability; and to ensure class members have equal access to its programs, services, and activities. *See supra*, § II. But P&P fails to meet these obligations. It fails to: identify or assess the people it encounters; maintain a system that allows for ADA requests, accommodations, and grievances; or provide effective communication to class members in their first weeks of incarceration. These failures violate the ADA and Section 504.

### A. P&P fails to identify deaf and hard of hearing people and maintain necessary records.

P&P has no process of its own to assess or determine who is deaf or what they need for effective communication, relying entirely on GDC to identify who is deaf or hard of hearing, and what auxiliary aids and services they need. SUF ¶¶ 581-586. P&P's information, therefore, suffers from the same flaws as GDC's. *See supra*, § III(A). But P&P does not even consistently receive the limited information that GDC *does* have about incarcerated people with hearing disabilities. Anthony Flint is the Chief Parole Investigator at GDCP, where oversees interactions with newly incarcerated people. SUF ¶¶ 518-520. As of September 2022, Mr. Flint had not received information about any new arrivals with disabilities since April 2022. SUF ¶ 595. Record evidence shows other instances when GDC failed to inform P&P of newly arrived deaf or hard of hearing people. SUF ¶¶ 587, 596. P&P's failure to gather adequate and accurate information about the communication needs of class members it interacts with violates the ADA and Section 504. *See Braggs*, 257 F.Supp.3d at 1201; *Pierce*, 128 F. Supp. 3d at 254, 267-68.

Furthermore, P&P provides no way for incarcerated people to affirmatively request accommodations from P&P or to complain about lack of access. As discussed above, a public entity may not rely *only* on grievances or accommodation requests to meet its obligations. *See supra*, § III(B). But accommodation requests and ADA grievances are *one* way that public entities can learn about what people need. These avenues are unavailable to class members in the parole process in Georgia. In 2020, in response to this lawsuit, P&P established an ADA Policy. SUF ¶¶ 523-525. The Policy purports to provide systems to request accommodations, file ADA grievances, and appeal denials of accommodations and grievances. SUF ¶¶ 523-527, 536. But for people in prison, these systems are illusory. The P&P ADA Policy and the forms to request accommodations, file grievances, and appeal denials are only available online. SUF ¶¶ 530, 550. They are not provided in hard copy at any GDC facility. *Id.* Because incarcerated people have no internet access, they have no access to this information. In 2021, GDC and P&P discussed creating a system to remedy this problem, but no such system was never implemented. SUF ¶¶ 528-529. Although Mr. Flint has worked for P&P in GDCP for more than a

decade, he testified in 2023 that he had never seen the P&P accommodation request form or ADA grievance. SUF ¶¶ 531-534, 537-539. Not surprisingly, the Executive Director of P&P, Christopher Barnett, testified that he has never seen a completed accommodation request form or ADA grievance form. SUF ¶ 535. By failing to affirmatively identify who may need auxiliary aids to communicate, and then preventing people from asking for what they need, it is a virtual impossibility that class members can have equal access to communication with P&P.

P&P also fails to track when it *does* use auxiliary aids and services, in contravention of its own binding policy, which requires that staff complete a form to document every time accommodations are provided to interact with an incarcerated person. SUF ¶¶ 524, 541-548. Mr. Flint had never seen the required form at all, much less completed it. SUF ¶ 546. Mr. Barnett also testified that he has never seen the form completed. SUF ¶ 547.

These systems make certain that P&P will fail to communicate effectively with numerous class members. P&P does not know who they are. It does not know what they need or how they communicate. It does not maintain a system where people can tell P&P what they need. And it does not track the use of the limited auxiliary aids and services it does provide.

The facts bear out this prediction. Although numerous ASL-users have entered GDC custody, and encountered P&P staff, during his tenure, Mr. Flint and his staff have only used VRI on a single occasion, in 2022. SUF ¶¶ 575-577. Neither he nor his staff have ever used in-person interpreters. SUF ¶¶ 578-579. Mr. Flint did not know what CART was. SUF ¶ 580. Other than the single VRI use in 2022, the only auxiliary aids and services that Mr. Flint or his staff at GDCP have *ever* used are Pocket Talkers and an Ubi-Duo. SUF ¶ 574. Relying exclusively on these two options, and failing to even document when and if these limited options are being used, excludes a wide range of class members from much of the information P&P provides to, and gathers from, incoming incarcerated people.

      B.    <u>P&P fails to communicate effectively during class members' orientation period.</u>

When incarcerated people enter GDC custody, they interact with and receive information from P&P in three encounters. First, a P&P employee provides information and answers questions in a classroom setting with newly arrived incarcerated people. SUF ¶¶ 551-556. Second, P&P provides information about parole, as required by GDC policy, via a 16-minute minute video, which covers different material than in the classroom setting. SUF ¶¶ 557-562. Third, a member of P&P's staff conducts a one-on-one meeting with each newly incarcerated person, in order to complete a "Personal History Statement," which becomes part of their permanent parole file. SUF ¶¶ 563-572. Each of these interactions provides important, unique information and opportunities related to the parole process. But P&P fails to effectively communicate information to class members in any of these interactions.

### 1.  Group meeting

As part of orientation at GDCP, Mr. Flint speaks for 45 minutes to an hour and answers questions in a classroom setting to provide "an overall introduction to parole." SUF ¶¶ 551-555. Mr. Flint does not use a microphone or ask if everyone can understand him. SUF ¶ 553. Several topics Mr. Flint discusses in this meeting are *only* conveyed in that setting, including: explanation of "parole eligibility date" and "tentative parole month;" information about conditional transfers; requirements for parole plans; and information about the Parole Board members. SUF ¶ 555. This information is not conveyed in the one-on-one session or in the video. *Id.*

This session is inaccessible for many deaf and hard of hearing people. Neither of the auxiliary aids Mr. Flint testified to using are appropriate for this type of encounter. UbiDuos are not appropriate or effective for group encounters at all. SUF ¶ 96. Pocket Talkers are, by their own instructions, designed for one-on-one or "small group" encounters, not classrooms that seat 162 people. SUF ¶ 630.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

2.    PIC video

Incarcerated people also watch a 16-minute video that contains information about PIC points, how to maximize chances of parole, and the impact of disciplinary infractions on PIC eligibility. SUF ¶ 559. But the video does not have captions. SUF ¶ 560. It does not have an on-screen sign language interpreter. SUF ¶ 561. Almost none of the information in the video is conveyed visually. SUF ¶ 562. Instead, the vast majority of content is conveyed only aurally. For example, hearing people receive the following information by voiceover during one portion of the video:

> Other information you need to know: It is important now to begin working with your counselor to construct your program case plan. It is necessary that an offender have an acceptable residence plan before you are released on parole. Residence plans will not be verified until and unless the Parole Board has tentatively decided to grant parole and the TPM for the offender approaches. However, start now in developing the residence plan. It is important to have a viable and legal address in order to avoid slowing or stopping the parole process. Begin putting together your residential or home plan, where you will live once you are paroled. We ask that you get this information to your counselor as soon as possible. It is better, if possible, to present more than one option in case your first residence is not approved by the Parole Board. Residence and employment stability along with continued treatment, if needed, will be vital to successfully reentering society.

SUF ¶ 562.

While conveying this important information, the visual information conveyed in that section is a single image:



*Id.* This is not equal access. It excludes class members from accessing key information that they could use to maximize their chances of release.

### 3. Personal History Statement.

The third type of information exchange with P&P during intake is the Personal History Statement (PHS). The Parole Board holds a one-on-one interview with each incarcerated person to "gather information" and create a PHS "that will be considered by the [Parole] Board as they determine whether the inmate should be paroled." SUF ¶¶ 563-565. The PHS includes information about family, employment, education, substance abuse, and support, as well as the person's version of the charges against them. *Id.* The intent of the PHS is "to get a sense of the offender's life and prior behavior patterns." SUF ¶ 567. P&P "want[s] to have an accurate account of the individual's personal history and their … account of the crime." SUF ¶ 569. It is P&P's policy that, "[t]he purpose of the [PHS] interview should be explained and the importance of the accuracy of the information should be stressed." SUF ¶ 566; *see also* SUF ¶¶ 563-572.

But P&P has failed for years to provide effective communication and equal access in the PHS process. The evidence in the record indicates that only a single deaf or hard of hearing person has ever had an interpreter for this process in the last 10 years. SUF ¶ 575-579. This means that every other ASL user who has entered GDC custody for at least the last 10 years was forced to try to understand and then provide critical information without the ability to use their language. ██████████████

████████████████████████████████████████████████████████████

██████████████████ This person, and others like him, were forced to try to convey his side of the story, and his reasons for being a good candidate for parole, without information about the process or an opportunity to understand the questions or communicate his answers clearly or fully. The same is true for people who require, but are denied, CART transcription. And in lieu of appropriate auxiliary aids and services, P&P has relied on patently ineffective auxiliary aids in the PHS process. For example, in

2022, Joseph Melton was identified as having a hearing disability and being "unable to write." SUF ¶ 590. But P&P used an UbiDuo to conduct his PHS, even though the UbiDuo is a device that relies solely on reading and writing. SUF ¶¶ 591-593.

P&P has been aware since at least 2016 that it is failing to provide equal access to PHS interviews for deaf and hard of hearing people. P&P's Executive Director noted that P&P's methods of communicating with deaf and hard of hearing people in PHS interviews were "concerning." SUF ¶¶ 599-600. But, as discussed above, P&P did not make changes or begin using effective communication and appropriate auxiliary aids and services. It has continued to force class members to participate in the PHS process without equal or effective communication.

It is impossible for P&P to communicate effectively with incarcerated people in critical encounters at the beginning of their incarceration. P&P doesn't know who is deaf and hard of hearing. It only provides two types of accommodations—Pocket Talkers and UbiDuos—neither of which are appropriate for group encounters, or for people who do not use English. It conveys information in a video that relies almost entirely on auditory information. It records important information in a Personal History Statement without access to essential auxiliary aids. All of this evidence—all undisputed and based on Defendants' own testimony and records—shows that P&P is failing to communicate effectively to deaf and hard of hearing people. This violates the ADA and Section 504. *See Randolph*, 170 F.3d at 858; *Wright*, 831 F.3d at 73; *Clarkson*, 898 F. Supp. at 1033; *Pierce*, 128 F. Supp. at 274-75.

## Conclusion

As outlined above, Plaintiffs are entitled to summary judgment as to GDC's: failure to identify and assess class members; failure to provide equally effective communication during group encounters; failure to provide equally effective communication during medical and mental health care; failure to provide equal access to telecommunications for people who require captioned phones; failure to make reasonable modifications to its handcuffing policy; and failure to provide necessary hearing-related care

and devices. Plaintiffs are also entitled to summary judgment as to P&P's failure to communicate effectively and provide auxiliary aids and services to people in GDC custody. The evidence supporting each of these claims is not subject to reasonable dispute, and Plaintiffs are entitled to judgment as a matter of law.

Respectfully submitted this 25th day of September 2023,

/s/ Zoë Brennan-Krohn

W. Sutton Ansley, *pro hac vice*
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Suite 600
Washington, DC 20036
Phone: (202) 682-7000
Sutton.Ansley@weil.com

Brian Liegel, *pro hac vice*
Leah Saiontz, *pro hac vice*
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Phone: (305) 577-3180
Brian.Liegel@weil.com
Leah.Saiontz@weil.com

Aaron Curtis, *pro hac vice*
Samin Mossavi, *pro hac vice*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York NY 10153
Phone (212) 310-8000
Aaron.Curtis@weil.com
Samin.Mossavi@weil.com

Brittany Shrader, *pro hac vice*
Anna Bitencourt, *pro hac vice*
NATIONAL ASSOCIATION OF THE DEAF
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
TTY: (301) 587-1789
Fax: (301) 587-1791
Brittany.Shrader@nad.org
Anna.Bitencourt@nad.org

Susan Mizner, *pro hac vice*
Zoë Brennan-Krohn, *pro hac vice*
West Resendes, *pro hac vice*
Talila A. Lewis, *pro hac vice*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
DISABILITY RIGHTS PROGRAM
39 Drumm Street
San Francisco, CA 94111
Phone: (415) 343-0781
Fax: (415) 395-0950
SMizner@aclu.org
ZBrennan-Krohn@aclu.org
WResendes@aclu.org
Talila.A.Lewis@gmail.com

Cory Isaacson
Georgia Bar No. 983797
Andrés López-Delgado
Georgia Bar No. 552876
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA, INC.
P.O. Box 570738
Atlanta, GA 30357
Phone: (678) 981-5295
Fax: (770) 303-0060
CIsaacson@acluga.org
ADelgado@acluga.org