**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **RICARDO HARRIS, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 5:18-cv-365-TES** |
| | ) | |
| **THE GEORGIA DEPARTMENT OF** | ) | |
| **CORRECTIONS, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**THE STATE'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Contents ........................................................................................................ i

Table of Authorities .................................................................................................... ii

Introduction ................................................................................................................ 1

Statement of Facts ...................................................................................................... 1

Relevant Legal Standards .......................................................................................... 2

     I.     Summary Judgment ............................................................................... 2

     II.    Permanent Injunctive Relief ................................................................. 2

     III.   Prison Litigation Reform Act ("PLRA") .............................................. 3

Argument .................................................................................................................... 4

     I.     Plaintiffs' Motion Fails as to the ADA and RA Claims Against GDC ................. 4

          A.    Identification and Assessment "Claim" ................................... 8

          B.    Auxiliary Aids and Services for In-Person Encounters ........... 16

                i.     Classes and Other Group Encounters ........................... 16

                ii.    Medical and Mental Health Encounters....................... 21

          C.    Captioned Telephones ............................................................. 25

          D.    Handcuffing ............................................................................. 27

     II.    Plaintiffs' Motion Fails as to the Eighth Amendment Claim Against GDC........ 28

     III.   Plaintiffs' Motion Fails as to the ADA and RA Claims Against P&P ................ 36

          A.    Identification and Request Process .......................................... 36

          B.    Communication During Orientation Period............................. 38

Conclusion ................................................................................................................. 40

# TABLE OF AUTHORITIES

## Cases

*Adickes v. S. H. Kress & Co.*,
  398 U.S. 144 (1970)............................................................................ 2

*Allison v. McGhan Med. Corp.*,
  184 F.3d 1300 (11th Cir. 1999) ........................................................ 2

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................................ 2

*Bax v. Drs. Med. Ctr. of Modesto, Inc.*,
  52 F.4th 858 (9th Cir. 2022) ............................................................ 26

*Bircoll v. Miami-Dade Cnty.*,
  480 F.3d 1072 (11th Cir. 2007) ................................................. passim

*Braggs v. Dunn*,
  257 F. Supp. 3d 1171 (M.D. Ala. 2017) ............................................ 9

*Cash v. Smith*,
  231 F.3d 1301 (11th Cir. 2000) ........................................................ 5

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)............................................................................. 3

*Estelle v. Gamble*,
  429 U.S. 97 (1976)........................................................................... 28

*Farmer v. Brennan*,
  511 U.S. 825 (1994)................................................................... 34, 35

*Farrow v. West*,
  320 F.3d 1235 (11th Cir. 2003) ...................................................... 28

*Frazier v. Kelley*,
  460 F. Supp. 3d 799 (E.D. Ark. 2020)............................................... 4

*Ganstine v. Sec'y, Fla. Dep't of Corr.*,
  502 F. App'x 905 (11th Cir. 2012) .................................................... 7

*Gaston v. Bellingrath Gardens & Home, Inc.*,
  167 F.3d 1361 (11th Cir. 1999) ...................................................... 18

*Gilmore v. Hodges*,
  738 F.3d 266 (11th Cir. 2013) ..................................... 29, 30, 31, 32

*Gilmour v. Gates, McDonald & Co.*,
  382 F.3d 1312 (11th Cir. 2004) ........................................................ 8

*GlobeRanger Corp. v. Software AG*,
  2014 WL 4968053 (N.D. Tex. Oct. 6, 2014).................................... 9

*Haberle v. Troxell*,
   885 F.3d 170 (3d Cir. 2018) ........................................................................ 7, 9

*Harper v. Lawrence Cnty.*,
   592 F.3d 1227 (11th Cir. 2010) ....................................................................... 29

*Harris v. Coweta Cnty.*,
   21 F.3d 388 (11th Cir. 1994) .......................................................................... 32

*Harris v. Thigpen*,
   941 F.2d 1495 (11th Cir. 1991) ....................................................................... 29

*Helling v. McKinney*,
   509 U.S. 25 (1993) .......................................................................................... 35

*Hill v. Dekalb Reg'l Youth Det. Ctr.*,
   40 F.3d 1176 (11th Cir. 1994) ......................................................................... 32

*Hoffer v. Sec'y, Fla. Dept. of Corrs.*,
   973 F.3d 1263 (11th Cir. 2020) ................................................................. passim

*Hoffman v. Allied Corp.*,
   912 F.2d 1379 (11th Cir. 1990) ......................................................................... 2

*In re King*,
   624 B.R. 259 (Bankr. N.D. Ga. 2020) ............................................................... 8

*J.S., III by and through J.S. Jr. v. Houston Cnty. Bd. of Educ.*,
   877 F.3d 979 (11th Cir. 2017) ........................................................................... 5

*Johnson v. Lewis*,
   83 F.4th 1319 (11th Cir. 2023) ....................................................................... 29

*Jurich v. Compass Marine, Inc.*,
   764 F.3d 1302 (11th Cir. 2014) ......................................................................... 2

*KH Outdoor, LLC v. City of Trussville*,
   458 F.3d 1261 (11th Cir. 2006) ......................................................................... 3

*Liese v. Indian River Cnty. Hosp. Dist.*,
   701 F.3d 334 (11th. Cir 2012) ........................................................................ 22

*McCullum v. Orlando Reg'l Healthcare Sys., Inc.*,
   768 F.3d 1135 (11th Cir. 2014) ................................................................... 3, 27

*Medina v. City of Cape Coral, Fla.*,
   72 F. Supp. 3d 1274 (M.D. Fla. 2014) ........................................................... 6, 7

*Milliken v. Bradley*,
   433 U.S. 267 (1977) ....................................................................................... 4, 9

*Nunes v. Mass. Dep't of Corr.*,
   766 F.3d 136 (1st Cir. 2014) ............................................................................. 7

*People First of Ala. v. Merrill*,
   467 F. Supp. 3d 1179 (N.D. Ala. 2020) ............................................................ 6

*Pierce v. District of Columbia,*
  128 F. Supp. 3d 250 (D.D.C. 2015) ............................................... 6, 9, 10, 15

*Robertson v. Las Animas County Sheriff's Department,*
  500 F.3d 1185 (10th Cir. 2007) ........................................................ 15, 37

*Rylee v. Chapman,*
  316 F. App'x 901 (11th Cir. 2009) ........................................................ 18

*Sheely v. MRI Radiology Network, P.A.,*
  505 F.3d 1173 (11th Cir. 2007) ........................................................ 3, 28

*Shotz v. Cates,*
  256 F.3d 1077 (11th Cir. 2001) ............................................................. 3

*Silva v. Baptist Health S. Fla., Inc.,*
  856 F.3d 824 (11th Cir. 2017) .............................................. 21, 22, 24, 25

*Smith v. Dunn,*
  568 F. Supp. 3d 1244 (M.D. Ala. 2021) ........................................... 6, 26

*Smith v. Rainey,*
  747 F. Supp. 2d 1327 (M.D. Fla. 2010) ................................... 18, 26, 37

*State Farm Mut. Auto. Ins. Co. v. Stanley,*
  966 F.2d 628 (11th Cir. 1992) ............................................................... 2

*Swain v. Junior,*
  961 F.3d 1276 (11th Cir. 2020) ........................................................... 29

*Thomas v. Bryant,*
  614 F.3d 1288 (11th Cir. 2010) ............................................................. 3

*Thomas v. Evans,*
  880 F.2d 1235 (11th Cir. 1989) ........................................................... 28

*Todd v. Carstarphen,*
  236 F. Supp. 3d 1311 (N.D. Ga. 2017) ............................................ 6, 25

*United States v. Sec'y, Fla. Dep't of Corr.,*
  778 F.3d 1223 (11th Cir. 2015) ............................................................. 4

*United States v. W.T. Grant Co.,*
  345 U.S. 629 (1953) ............................................................................... 3

**Statutes**

18 U.S.C. § 3626 ......................................................................... 3, 4, 27

42 U.S.C. § 12132 ............................................................................ 5, 7

**Rules**

Fed. R. Civ. P. 15 ................................................................................. 8

**Regulations**

28 C.F.R. § 35.139 ............................................................................. 27

28 C.F.R. § 35.160(a)(1) .................................................................................................. 5

28 C.F.R. § 35.160(b)(2) .................................................................................................. 7

28 C.F.R. pt. 3, app. A ..................................................................................................... 7

Defendants Georgia Department of Corrections ("<u>GDC</u>"); Tyrone Oliver, in his official capacity as GDC Commissioner ("<u>Oliver</u>"); Georgia State Board of Pardons & Paroles ("<u>P&P</u>"); and Terry Barnard, in his official capacity as P&P Chairman ("<u>Barnard</u>," and together with GDC, Oliver, and P&P, the "<u>State</u>") hereby file this memorandum in opposition to Plaintiffs' Motion for Partial Summary Judgment.  (Doc. 182, "<u>Plaintiffs' Motion</u>").

## INTRODUCTION

Plaintiffs seek to micromanage GDC's provision of accommodations and hearing-related medical care throughout its 50,000-offender, 95-facility system.  Yet, in their motion for partial summary judgment, Plaintiffs advance an interpretation of the Americans with Disabilities Act ("<u>ADA</u>") unmoored from its plain text and devoid of support in Eleventh Circuit law.  To the extent Plaintiffs seek relief under the Eighth Amendment, the Motion ignores the exacting deliberate indifference standard.  Beyond Plaintiffs' unfounded legal assertions, questions of fact abound in all aspects of this fact-driven litigation.  Accordingly, the State respectfully requests that the Court deny the Motion in its entirety for the following three (3) reasons:

(1)    Plaintiffs failed to establish an entitlement to summary judgment on their ADA and RA claims against GDC;

(2)    Plaintiffs failed to establish an entitlement to summary judgment on their Eighth Amendment claim as to GDC; and

(3)    Plaintiffs failed to establish an entitlement to summary judgment on their ADA and RA claims against P&P.

For these reasons, no basis exists for any judgment in favor of Plaintiffs on any claims or issues.

## STATEMENT OF FACTS

As required by Local Rule 56, the State set forth its Response to Plaintiffs' Statement of Facts (Doc. 182-2, "<u>Plaintiffs' SOF</u>" and "<u>State's Response to Plaintiffs' SOF</u>"), as well as the

State's Additional Statement of Material Facts ("State's SOF"), which demonstrate disputed material facts for trial, in a separate document filed contemporaneously herewith.[1]

## RELEVANT LEGAL STANDARDS

### I.   SUMMARY JUDGMENT

Summary judgment remains appropriate only where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Jurich v. Compass Marine, Inc., 764 F.3d 1302, 1304 (11th Cir. 2014) (citing Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999)). "In its consideration of a summary judgment motion, 'the court must view all evidence most favorably toward the non-moving party, and all justifiable inferences are to be drawn in the non-moving party's favor.'" State Farm Mut. Auto. Ins. Co. v. Stanley, 966 F.2d 628, 630 (11th Cir. 1992) (quoting Hoffman v. Allied Corp., 912 F.2d 1379, 1383 (11th Cir. 1990)). A summary judgment motion "by no means authorizes trial on affidavits." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Instead, the Court's determination of the motion "must be guided by the substantive evidentiary standards that apply to the case," and "[t]he evidence of the non-movant is to be believed[.]" Id. (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970)). As discussed further below, fact issues exist on the merits of all of Plaintiffs' claims, so summary judgment remains inappropriate here.

### II.   PERMANENT INJUNCTIVE RELIEF

Plaintiffs seek only injunctive relief against the State (Amended Complaint, Doc. 136-2 at 60), yet Plaintiffs' Motion fails even to address the standard for permanent injunctive relief, let alone provide any meaningful analysis of its applicability to the claims on which Plaintiffs seek

---

[1] To the extent Plaintiffs failed to properly authenticate evidence submitted in connection with their Motion, that evidence cannot support summary judgment in Plaintiffs' favor. See, e.g., Burnett v. Stagner Hotel Courts, Inc., 821 F. Supp. 678, 683 (N.D. Ga. 1993).

summary judgment.  To establish an entitlement to a permanent injunction, Plaintiffs must show "(1) that [they have] prevailed in establishing the violation of the right asserted in [the] complaint; (2) there is no adequate remedy at law for the violation of this right; (3) irreparable harm will result if the court does not order injunctive relief; and (4) if issued, the injunction would not be adverse to the public interest."  Thomas v. Bryant, 614 F.3d 1288, 1317 (11th Cir. 2010) (citing KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1268 (11th Cir. 2006)).  Importantly, "the irreparable-injury requirement cannot be met absent a real or immediate threat that the plaintiff will be wronged again[.]"  Id.  (citing City of Los Angeles v. Lyons, 461 U.S. 95, 11 (1983)); see also McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1145 (11th Cir. 2014) (court must find that a "real and immediate threat" of future irreparable harm exists before entering an injunction in an ADA case) (citing Shotz v. Cates, 256 F.3d 1077, 1081 (11th Cir. 2001)).  In short, "injunctive relief requires 'something more than the mere possibility which serves to keep the case alive.'"  Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1182 (11th Cir. 2007) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953).  In addition to failing to establish an entitlement to summary judgment on the merits of their claims, Plaintiffs also fail to establish an entitlement to a permanent injunction against GDC at this stage of the litigation.

## III.   PRISON LITIGATION REFORM ACT

In addition to satisfying the typical requirements for injunctive relief, Plaintiffs must also demonstrate that injunctive relief remains appropriate under the heightened standards of the Prison Litigation Reform Act ("PLRA").  The PLRA, 18 U.S.C. § 3626, mandates that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of … plaintiffs."  Id. at § 3626(a)(1)(A).  Particularly, the PLRA's "need-narrowness-intrusiveness" provision specifies that a court

3

> shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

Id.  See also United States v. Sec'y, Fla. Dep't of Corr., 778 F.3d 1223, 1228 (11th Cir. 2015) (requiring that "each requirement imposed by the … injunction satisf[y]" the PLRA's "need-narrowness-intrusiveness" provision).  The PLRA's "need-narrowness-intrusiveness" mandate applies to Plaintiffs' claims under the ADA and Rehabilitation Act ("RA"), as well as to their Eighth Amendment claim.  E.g., Frazier v. Kelley, 460 F. Supp. 3d 799, 834 (E.D. Ark. 2020) (applying PLRA's limits on injunctive relief to ADA claim).  Because "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution" or the ADA, Milliken v. Bradley, 433 U.S. 267, 282 (1977), the PLRA's "need-narrowness-intrusiveness" requirements preclude a court from entering relief solely to meet industry standards or, even more, best practices.  To the extent Plaintiffs seek to impose liability on the State for conditions or practices that do not violate the Constitution or the ADA, the PLRA precludes any such relief, and the Court should deny Plaintiffs' Motion.

## **ARGUMENT**

### I.    PLAINTIFFS' MOTION FAILS AS TO THE ADA AND RA CLAIMS AGAINST GDC.

Plaintiffs' Motion seeks to impose liability as to GDC under the ADA and RA pursuant to a variety of theories.  Plaintiffs first allege that GDC violates the ADA by failing to "consistently or accurately identify and assess people who are deaf or hard of hearing."  (Motion at 8–13).  Plaintiffs also allege that GDC systemically violates the ADA as a matter of law by failing to provide auxiliary aids and services to class members for group interactions (id. at 13–20) and

medical interactions (id. at 20–24), as well as by failing to provide captioned telephones (id. at 24–26) and by failing to make reasonable modifications to its handcuffing policies (id. at 26–27).

Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Discrimination claims under the ADA and the Rehabilitation Act are governed by the same standards, and the two claims are generally discussed together." J.S., III by and through J.S. Jr. v. Houston Cnty. Bd. of Educ., 877 F.3d 979, 985 (11th Cir. 2017) (citing Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000)). A plaintiff proceeding under Title II of the ADA and/or Section 504 of the Rehabilitation Act must prove "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1083 (11th Cir. 2007).

In the context of accommodations for hearing-disabled individuals, the Code of Federal Regulations provides, "[a] public entity shall take appropriate steps to ensure that communications with [individuals] with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). To achieve this goal, the regulations require, "[a] public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities … an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity." Id. at § 35.160(b)(1). "Auxiliary aids" include "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments." 42 U.S.C. § 12132(1)(A). ADA claims alleging a public entity's failure to provide effective

5

communication remain "highly fact-specific," and the Court must "examine all factual circumstances to ascertain whether" effective communication occurred.  Bircoll, 480 F.3d at 1087.

Contrary to Plaintiffs' assertions, Eleventh Circuit precedent establishes that Title II entitles disabled individuals to *meaningful* access—as opposed to *equal* access—to a public entity's programs, services, and activities.  (E.g., Motion at 20) (arguing that "[i]t is clear beyond cavil that the core principle that underlies the protections of Section 504 and Title II is equal access") (quoting Pierce v. District of Columbia, 128 F. Supp. 3d 250, 268 (D.D.C. 2015)) (emphasis omitted).  For example, in Bircoll, the court analyzed whether a public entity violated Title II during a police encounter with a deaf individual who an officer stopped for suspected drunk driving.  480 F.3d at 1076–80.  In affirming summary judgment for the county, the Court found that "[w]hile the communication may not have been perfect, [plaintiff], by his own admission, understood that he was being asked to perform field sobriety tests."  Id. at 1086.  In fact, the Court found that the police provided effective communication when the plaintiff could understand about "***fifty percent*** of what [was] said" through lip reading.  Id.  (emphasis added).  See also Todd v. Carstarphen, 236 F. Supp. 3d 1311, 1334 (N.D. Ga. 2017) (holding that "meaningful access does not mean equal access or preferential treatment") (citing Medina v. City of Cape Coral, Fla., 72 F. Supp. 3d 1274, 1279 (M.D. Fla. 2014)).  Plaintiffs' insistence that class members receive "equal access" to GDC's programs, services, and activities finds no support in applicable law.

It necessarily follows from the "meaningful access" standard that "mere difficulty in accessing a benefit is not, by itself, a violation of the ADA."  Smith v. Dunn, 568 F. Supp. 3d 1244, 1257 (M.D. Ala. 2021) (quoting People First of Ala. v. Merrill, 467 F. Supp. 3d 1179, 1216 (N.D. Ala. 2020)).  In other words, "meaningful access to a public service" may exist "even if [an individual's] disability made that access more difficult than it would otherwise be."  Id.  See also

Ganstine v. Sec'y, Fla. Dep't of Corr., 502 F. App'x 905, 910 (11th Cir. 2012) (prison did not deny access to prison services to wheelchair-bound inmate where other inmates were available to push the wheelchair "most of the time").  Similarly, Title II lacks any requirement that a public entity provide disabled individuals with their preferred manner of accommodation or with their preferred auxiliary aid or service.  To the contrary, the Code of Federal Regulations requires only that public entities, when furnishing auxiliary aids and services to disabled individuals, "give primary consideration to the requests of individuals with disabilities[.]" 28 C.F.R. § 35.160(b)(2); see also, e.g., Bircoll, 480 F.3d at 1082 (holding that a public entity may depart from the disabled individual's requested or preferred method of accommodation provided the public entity ensures effective communication occurs) (quoting 28 C.F.R. pt. 3, app. A).    Put another way, "the ADA entitles disabled persons to "reasonable accommodations, not to optimal ones finely tuned to their preferences." Medina, 72 F. Supp. 3d at 1279 (quoting Nunes v. Mass. Dep't of Corr., 766 F.3d 136, 146 (1st Cir. 2014)).  As discussed further below, the Motion ignores whether class members receive *meaningful* access to GDC's programs, services, and activities.  Instead, Plaintiffs seek to impose systemic liability on GDC to the extent it elected not to provide class members with their precise preferred accommodations in all circumstances.

Fundamentally, a public entity violates the ADA *only* when it fails to reasonably accommodate a disabled individual or otherwise discriminates against a disabled individual.  42 U.S.C. § 12132 ("no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity").  Therefore, a public entity's failure to train its employees regarding the ADA cannot, standing alone, support a cause of action under Title II.  Haberle v. Troxell, 885 F.3d 170, 179 n.7 (3d Cir. 2018).  Instead, a public entity's

alleged failure to adhere to purported industry norms or to maintain certain practices related to ADA compliance "is not actionable unless and until that failure leads directly to a denial of a needed accommodation or improper discrimination. *It is the denial that gives rise to the claim*." Id. (emphasis added); see also id. (holding that plaintiff's argument that a public entity violated the ADA by failing to "institute policies to accommodate disabled individuals" remained incompatible with the text of the ADA) (citation and internal alterations omitted).   Yet, as discussed further below, the Motion seeks throughout to impose liability on GDC for allegedly failing to track disabled individuals, train employees regarding the ADA, and maintain Plaintiffs' preferred policies regarding ADA compliance.

### A.   IDENTIFICATION AND ASSESSMENT "CLAIM"

Plaintiffs first seek summary judgment under the ADA and RA on their "claim" that GDC "fails to consistently or accurately identify and assess people who are deaf or hard of hearing." (Motion at 8).   As a preliminary matter, Plaintiffs' identification and assessment "claim" appears nowhere in their Amended Complaint.   (See Doc. 136-2 at 11-12) (summarizing Plaintiffs' theories of liability).   The Court should deny the Motion as to this theory for that reason alone, as the pleading standard established by the Federal Rules of Civil Procedure, while liberal, "does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage." Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314 (11th Cir. 2004).   Instead, "[a]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." Id. at 1315; see also In re King, 624 B.R. 259, 286 (Bankr. N.D. Ga. 2020) (holding that "if claims or theories are nowhere to be found in the complaint, it would be unfair to require a defendant to defend against such claims or theories that it learns of, for the first time, during summary judgment") (quoting GlobeRanger Corp. v. Software

AG, 2014 WL 4968053, at *2 (N.D. Tex. Oct. 6, 2014)).  The Court should refuse to enter summary judgment against GDC on a theory of liability Plaintiffs failed to include in their complaint.

Even if the Court reaches this "claim," Plaintiffs failed to establish an entitlement to summary judgment on the merits.  As explained above, the ADA and RA require only that GDC *accommodate* class members: they establish no particular requirements regarding the methods GDC uses to identify, assess, and track class members.  See Haberle, 885 F.3d at 179 n.7 (holding that an alleged failure to maintain certain practices related to ADA compliance "is not actionable unless and until that failure leads directly to a denial of a needed accommodation or improper discrimination").[2]  Plaintiffs cite a single case interpreting the ADA[3] for the proposition that "the failure of prison staff to conduct an informed assessment of the abilities and accommodation needs of a new inmate who is obviously disabled violates Section 504 and Title II as a matter of law." (Motion at 8) (citing Pierce v. District of Columbia, 128 F. Supp. 3d 250, 268 (D.D.C. 2015)).  To the extent the court in Pierce—a non-binding, out-of-circuit district court case—created a theory of liability under the ADA based on a public entity's purported failure to identify and assess disabled individuals, it departed far beyond the plain text of Title II.  Indeed, the Pierce court created a theory of ADA liability from whole cloth, not from the text of the statute.

Pierce, however, cannot bear the weight Plaintiffs assign it.  The court in Pierce, after concluding that the District of Columbia Department of Corrections violated the ADA as a matter

---

[2] Because no "identification and assessment" claim exists under the ADA, an injunction requiring GDC to maintain certain policies and practices related to the identification and assessment of class members would necessarily violate the PLRA's "needs-narrowness-intrusiveness" provisions as well, as "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate" federal law.  Milliken, 433 U.S. at 282.

[3] Plaintiffs also cite Braggs v. Dunn, 257 F. Supp. 3d 1171, 1201 (M.D. Ala. 2017), for the proposition that GDC must conduct an "identification and appropriate classification of" deaf and hard of hearing offenders.  However, Braggs discussed the issue of identifying offenders in the context of the Eighth Amendment, not the ADA, and in the context of mental health, not hearing disabilities.  Id.  Plaintiffs' Motion contains no allegation that GDC's policies and practices regarding identification and tracking of class members violates the Eighth Amendment, so Braggs provides no help to the extent Plaintiffs proceed on such a theory under the ADA.

of law by failing to assess a deaf inmate's accommodation needs, went on to find that the public entity *failed to accommodate* the deaf inmate.  See id. at 272–278.  Plaintiffs' Motion, on the other hand, lacks any analysis of whether GDC failed to identify *and* failed to accommodate any offender as required by the ADA.  Instead, Plaintiffs support their "identification and assessment" claim with two arguments: first, that "GDC's lists of people in its custody who are deaf and hard of hearing are incomplete" (Motion at 8), and second, that "GDC's system of tracking those class members it does identify is flawed and must be modified."  (Id. at 10) (emphasis omitted).  Plaintiffs fail even to suggest, much less support with evidence, that any omission of any individual from any list or any failure to track any individual led to a failure to accommodate that individual.

Plaintiffs first allege that "GDC's lists of people in its custody who are deaf and hard of hearing are incomplete."  (Motion at 8).  But, the Motion omits the dispositive step—while Plaintiffs detected a handful of purported class members who failed to appear on certain lists of class members created by GDC, Plaintiffs failed to discuss whether GDC ultimately identified and accommodated those offenders.  In fact, Plaintiffs' own argument and evidence demonstrates that GDC accommodated the individuals Plaintiffs claim GDC omitted from its "lists."  For example, Plaintiffs claim their retained witness, Julian Martinez, ██████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████" (Motion at 9).  GDC identified these six (6) offenders, as set forth below:

- Offender ██████████  The State's expert Dr. Page interviewed this individual, who "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" (Page Report at 22);

- Offender █████  This individual reported to Dr. Page that ████████████████████████████████████████." (Id.; see also State's Response to Plaintiffs' SOF at ¶ 6);

- Offender ███████ Plaintiffs' own Statement of Fact indicates that GDC classified Offender █████ as H3. (Plaintiffs' SOF at ¶ 7). Moreover, Offender ██████████ reported to Dr. Page that he ████████████████████████████████████████████████████; see also State's Response to Plaintiffs' SOF at ¶ 7);

- Offender █████ GDC provided Offender █████ with hearing aids. (Plaintiffs' SOF at ¶ 9; State's Response to Plaintiffs' SOF at ¶ 9);

- Offender ██████ Plaintiffs complain that "██████████████████████████████████████████████." (Plaintiffs' SOF at ¶ 10). However, as of August 2021, GDC identified Offender █████ as H2, and he appeared on GDC's February 2023 list of offenders classified as H2-H5. (State's Response to Plaintiffs' SOF at ¶ 10). The fact that an offender classified H2 fails to appear on a list of offenders classified H3-H5 provides no support for Plaintiffs' claim; and

- Offender ██████████ Offender ████████ possessed a "Detail Restriction: Hearing Impairment" as of March 4, 2015, and GDC identified him as possessing a "Hearing Aid Profile" as of at least September 2016. (State's Response to Plaintiffs' SOF, ¶ 11).

Plaintiffs next claim that another of their retained witnesses, Dr. Homer Venters, "██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." (Motion at 9). Again, GDC recognized and accommodated these individuals' hearing disabilities. (See State's Response to Plaintiffs' SOF, ¶¶ 8, 12-14, 17). Plaintiffs cannot state a claim based on an offender's failure to appear on a list, absent a lack of accommodation.[4] Finally, Plaintiffs argue that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." (Motion at 9 (citing Plaintiffs' SOF at ¶¶ 16, 18-32)). The evidence demonstrates that GDC identified and accommodated these

---

[4] Moreover, in some cases even Plaintiffs' allegations that the individuals fail to appear on lists are incorrect. For example, Plaintiffs complain that Offender █████ "does not appear on GDC's February 2023 list of people classified as H2-H5," but Offender █████ in fact appears on that list. (State's Response to Plaintiffs' SOF at ¶ 17).

individuals.  (State's Response to Plaintiffs' SOF at ¶¶ 16, 18-32; see also Page Rep. at 24-26

(████████████████████████████████████); Smith Rep. at 27 (████████████████████

████████████████████████████████████████████████████)).

Moreover, while GDC's "H-level" system[5] constitutes *one* way GDC identifies and tracks

class members, Plaintiffs fail to acknowledge the other ways GDC accomplishes this goal.  For

example, all offenders enter GDC custody through an intake facility: male offenders enter through

Georgia Diagnostic & Classification Prison ("GDCP"), while female offenders enter through Lee

Arrendale State Prison ("Arrendale").  (State's SOF at ¶¶ 22–25).  GDC employs a Facility ADA

Coordinator ("FADAC") at all facilities (State's SOF at ¶ 8), and the FADACs at GDCP and

Arrendale complete an ADA questionnaire with *all* offenders upon initial intake.  (Id. at ¶ 53).

Additionally, all offenders receive this questionnaire again upon arrival at a new facility after any

transfer.  (Id.).  The ADA questionnaire includes questions regarding the offender's disability,

preferred method of communication, and preferred accommodations.  (Id. at ¶ 55).  The FADAC

then scans the completed questionnaires into GDC's Scribe database, where they remain accessible

to a wide range of GDC staff.[6]  (Id. at ¶¶ 56, 57).  Moreover, medical staff may assign an offender

a "hearing aid profile" in Scribe, or may restrict an offender's participation in certain work details

for safety reasons and enter that restriction in Scribe.  (Id. at ¶¶ 67–68).  Medical staff or FADACs

may also note an offender's hearing disability and needed accommodations in a "banner notice"

---

[5] GDC assigns all offenders an "H-level" representing the degree of the offender's hearing loss pursuant to the
"Health/Activity Profile" completed by medical staff for all offenders on intake and updated as appropriate throughout
the offender's incarceration. (State's SOF at ¶¶ 61–62). Under the "H-level" system, a classification of "H1" indicates
that an offender experiences no issues hearing; "H2" through "H4" indicate various degrees of hearing loss, with
higher "H" numbers indicating more severe hearing loss; and "H5" indicates total deafness. (Id. at ¶ 64). Medical
staff upload an offender's "HAP" designations to Scribe, GDC's electronic offender database, upon completion. (Id.
at ¶¶ 57, 63).

[6] GDC recently began distributing tablets to security staff for use as electronic logbooks. (State's SOF at ¶ 71). The
next phase of the tablet project includes offender rosters organized by housing unit; these offender rosters contain data
imported from Scribe, including relevant information related to offender's ADA needs. (Id. at ¶ 72).

that scrolls across the top of the Scribe profile.  (Id. at ¶ 69).  Thus, the absence of a class member

from "lists" Plaintiffs identify does not mean GDC failed to accommodate that class member.

Plaintiffs' second argument—that "GDC's system of tracking those class members it does

identify is flawed and must be modified" (Motion at 10)—collapses under scrutiny and reflects

Plaintiffs' ignorance of the ways in which GDC identifies and tracks the deaf and hard of hearing

offenders in its custody.  In fact, GDC *did* accommodate, where necessary, the offenders Plaintiffs

assert it failed to properly classify using the H-level system.  (See State's Response to Plaintiffs'

SOF at ¶¶ 6–32).  For example, Plaintiffs point out that GDC classified ███████████████

████, who communicates using American Sign Language ("ASL") and written English, as "H1"

in 2016 but reclassified him as "H3" in 2019.  (Plaintiffs' SOF at ¶ 72; State's SOF at ¶¶ 227–

228).  However, between 2016 and 2019—the period when GDC classified ████████ as "H1"—

GDC provided ASL interpreters to accommodate ████████ in a variety of interactions, including

meetings with GDC counselors, mental health staff, and medical staff.  (State's SOF at ¶ 118).

Similarly, Plaintiffs also incorrectly allege that GDC "continues to rely on H-level classifications

to determine eligibility and access." (Motion at 12).  Instead, the record evidence indicates that

GDC makes eligibility and access determinations based on all relevant evidence, including, *but

not limited to*, an offender's "H-level" designation.  (State's SOF at ¶¶ 84–100; 101–127) (listing

class members who received accommodations regardless of "H-level")).  In short, abundant factual

disputes exist regarding GDC's identification and assessment of class members.

Finally, Plaintiffs argue that GDC's screening processes ████████████████████

████████████████████████████.  (E.g., Motion at 9–10).  Besides resting on an

oversimplification of GDC's screening processes (see State's SOF at ¶¶ 22–77), Plaintiffs'

argument lacks support in applicable law.  In Pierce—the case Plaintiffs cite as establishing an

13

affirmative obligation to identify and assess deaf and hard of hearing inmates—the court found liability under the ADA for failing to accommodate an *obviously* disabled inmate.  128 F. Supp. 3d at 269–70.  Plaintiffs concede that GDC identifies offenders with "*obvious* signs of disability." (Motion at 9) (citing Plaintiffs' SOF at ¶¶ 41–47) (emphasis added).  Thus, even crediting Plaintiffs' assertions that GDC fails to identify some offenders with some degree of hearing loss on intake (an argument for which Plaintiffs provided no factual support, but instead relied solely on the speculation of their retained witness), Plaintiffs still lack any legal support for this claim.

Instead, Plaintiffs' identification and assessment theory



." (E.g., Plaintiffs' SOF at ¶ 33–35) (emphasis added).  This Court, however, expressly rejected the "some degree of hearing loss" standard for identification of deaf and hard of hearing offenders in GDC custody when it defined the class as consisting only of offenders who "require hearing-related accommodations and services to communicate effectively and/or to access or participate equally in programs, services, or activities available to individuals in GDC custody." (Doc. 121 at 35; see also

).  Accordingly, even accepting as true Plaintiffs'

<hr />

[7] As explained above, GDC identifies offenders with hearing loss through methods in addition to the "H-level" system. Accordingly, the March 2023 "inmate statistical profile"—in which GDC identified 1.72% of its offender population as having an "H-level" higher than "H1"—fails to reflect all offenders GDC identified as having hearing loss as of March 2023.  (State's SOF at ¶ 77).  So, ███████████████████████ retained witnesses lack value in any event.

allegation that GDC only identifies offenders with obvious hearing loss, Plaintiffs still fail to establish an entitlement to summary judgment on their "identification and tracking" claim.

To the extent the ADA requires GDC to affirmatively identify and assess deaf and hard of hearing offenders (as opposed to waiting for an offender to request accommodations), the cases cited by Plaintiffs extend that obligation only to offenders with obvious hearing loss.  Pierce, 128 F. Supp. 3d at 269–70.  In fact, Robertson v. Las Animas County. Sheriff's Department, which Plaintiffs cite elsewhere in their brief for the proposition that disabled individuals need not request accommodations from public entities (see Motion at 5 n.6), extinguishes Plaintiffs' identification and assessment claim to the extent they allege that the ADA imposes an affirmative obligation on GDC to identify, track, and assess offenders without obvious hearing loss.  500 F.3d 1185, 1196 (10th Cir. 2007).  In Robertson, the court held that individuals with non-obvious disabilities bear a "duty dictated by common sense" to inform the public entity of their disabilities.  Id.  Specifically, the Court held that

> before a public entity can be required under the ADA to provide an auxiliary aid necessary to afford an individual an equal opportunity to participate in the entity's services, programs, or activities, the entity must have knowledge that the individual is disabled, either because that disability is obvious or because the individual (or someone else) has informed the entity of the disability.

Id.  Even as to offenders with non-obvious disabilities, GDC informs them of their right to seek accommodations under the ADA.  As the State's expert Chris Smith observed during his tours of GDC facilities, "████████████████████████████████████████████████."  (Smith Rep. at 27).  For these reasons, Plaintiffs failed to establish an entitlement to summary judgment on their "identification and assessment" claim.

### B.   AUXILIARY AIDS AND SERVICES FOR IN-PERSON ENCOUNTERS

Plaintiffs next move for summary judgment under the ADA and RA based on their allegation that GDC fails to provide class members with auxiliary aids and services for certain in-person encounters, including classes and group activities (Motion at 13) and medical and mental health encounters (Motion at 20).  As discussed below, Plaintiffs failed to establish an entitlement to summary judgment on either aspect of their ADA claim.

### i.   Classes and Other Group Encounters

As an initial matter, Plaintiffs' argument related to GDC's accommodation of class members during classes and other group encounters rests on a misunderstanding of the processes through which GDC enrolls offenders in classes and obtains auxiliary aids and services for offenders who need them in those encounters.   Plaintiffs acknowledge GDC staff's testimony that GDC will "provide these auxiliary aids and services if any class members wanted them, that the reason these auxiliary aids are not being provided is because they have not been requested, and that GDC is free to wait until they receive requests before providing access." (Motion at 15).  GDC remains well-prepared to provide appropriate auxiliary aids and services to class members for classes and other group encounters.  (See State's SOF at ¶¶ 141–177).  At a minimum, Plaintiffs failed to establish an entitlement to summary judgment on this claim.

First, not all offenders may enroll in any class upon request.  (State's SOF at ¶ 166). Instead, GDC's education office must first confirm that the offender enjoys an eligibility for the class; multiple factors, including release date, influence priority for classes within GDC.  (Id. at ¶ 169).  Additionally, GDC continues to face shortages of qualified educational instructors, which requires smaller class sizes.  (Id. at ¶ 170; State's Ex. A (McElhenney Decl.) at ¶ 31).  Once GDC's education office determines that an offender enjoys eligibility for a class, *either* the offender *or*

GDC staff on the offender's behalf may request auxiliary aids for the class.  (Id. at ¶¶ 146–161). For ASL users, GDC maintains a contract for Video Remote Interpretation ("VRI") services, while both GDC and the State of Georgia maintain contracts for in-person ASL interpretation services. (Id. at ¶¶ 141, 143).  These contracts remain available for use at all facilities housing offenders in GDC custody.  (Id. at ¶ 144).  For class members who communicate in English, the contracts also include CART transcription services.  (Id. at ¶ 143–144).  To ensure awareness of the availability of these services among both staff and offenders, GDC's statewide ADA Unit trains *all* offenders regarding the availability of in-person ASL interpreters and CART.  (Id. at ¶ 154).  GDC's ADA Unit also trains FADACs regarding the availability of these services and instructs FADACs to request these services when an offender who needs them enrolls in a class.  (Id. at ¶ 147).  To date, the ADA Unit received no requests for in-person ASL interpretation or CART services since the COVID-19 pandemic began in 2020.  (Id. at ¶ 161).

Accordingly, to the extent Plaintiffs rely on the absence of evidence of GDC's provision of ASL interpretation services for classes and group encounters in recent years, that argument fails to consider whether class members lacked access to classes for reasons other than their hearing disabilities.  See Bircoll, 480 F.3d at 1083 (holding that, to establish liability under the ADA, a plaintiff must establish "that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability").  In so doing, Plaintiffs impermissibly place the burden on GDC to *disprove* that a lack of accommodations caused class members' recent failure to participate in these activities.  Even more, Plaintiffs' argument that class members need not request accommodations for classes and group programming—beyond ignoring GDC's processes for requesting accommodations—also lacks support in Eleventh Circuit law, which necessitates that "[i]n cases alleging a failure to make reasonable accommodations, [a public entity's] duty to provide a

reasonable accommodation is not triggered until the [disabled individual] makes a specific demand for accommodation." Smith v. Rainey, 747 F. Supp. 2d 1327, 1338 (M.D. Fla. 2010) (quoting Rylee v. Chapman, 316 F. App'x 901, 906 (11th Cir. 2009)); see also Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999) (holding that "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made" by the disabled individual).  In fact, Plaintiffs' own retained witness Richard Ray testified that it would "██████████████████████████████████████████████████

████████████████████████████████████."  (State's SOF at ¶ 177; see also

Plaintiffs' Ex. 75 (Smith Report) at 40 ████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████.

In any event, the record contains widespread factual issues regarding the participation of deaf and hard of hearing offenders in classes and other group activities.  As noted above, the ADA requires only that GDC provide deaf and hard of hearing offenders with "meaningful access" to its programs, services, and activities.  Bircoll, 480 F.3d at 1087.  The inquiry whether class members experienced effective communication in any interaction remains "highly fact-specific," and the Court must "examine all factual circumstances to ascertain whether" effective communication occurred.  Id.  For example, "[i]n many circumstances, oral communication plus gestures and visual aids or note writing will achieve effective communication.  In other circumstances, an interpreter will be needed."  Id. at 1087.  The evidence here fails to establish liability under the ADA against GDC as a matter of law.

For example, prior to the challenges created by the COVID-19 pandemic, GDC routinely provided in-person ASL interpretation services to class members housed at Central State Prison ("CSP"). (State's SOF at ¶¶ 178–181. ASL interpreters traveled to CSP ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████. (Id. at ¶ 181). ███████████████████, who uses ASL and is incarcerated at CSP, successfully completed GDC's ███████████████████ Program in ██████ with the assistance of live interpreters. (Id. at ¶¶ 198–201). Similarly, ███████████ ████████████ received in-person ASL interpretation services for his ███████████████ classes at Augusta State Medical Prison ("ASMP") (id. at ¶¶ 203–207), but ██████████ refused to participate in GDC's re-entry class and reported to his GDC counselor that he lacked any interest in enrolling in vocational groups and that "████████████████████████." (Id. at ¶ 208). ██████████, another ████████████ who communicates in ASL and lives at CSP, received in-person ASL interpretation for re-entry skills building and remedial literacy classes. (Id. at ¶¶ 232–235). Finally, Plaintiffs' assertion that "not one" class member received ASL access to educational classes in recent years (Motion at 14) constitutes an incorrect statement of fact. ████████████ ████████████████████, who was incarcerated at ██████ State Prison prior to her release ██████████ ██████, testified that GDC provided ASL interpretation services through VRI for a re-entry class she took in October 2022 at ██████████ (Id. at ¶¶ 213–215).

Additionally, Plaintiffs omit relevant context from many of the circumstances described in the Motion. For example, Plaintiffs allege that Darrell Smith, who uses ASL and is incarcerated at CSP, "had not been allowed to enroll in [a GED] class" as of his deposition in early 2023. (Motion at 16). GDC, however, offered Darrell Smith the opportunity to participate in the GED

class with ASL interpretation through VRI, but Darrell Smith declined the offer.  (State's SOF at ¶ 225).  After this refusal, GDC initiated the process of scheduling Darrell Smith for GED classes and retaining in-person ASL interpreters for those classes.  (Id. at ¶ 226).  Similarly, Plaintiffs complain that GDC purportedly failed to enroll ████████, who uses ASL, in a GED class prior to his release.  (Motion at 16–17).  But, the evidence indicates that ██████ can communicate through written English in addition to ASL, and that ██████ successfully completed GDC's "Re-Entry Skills Building" and "Motivation for Change" courses in September 2021.  (State's Response to Plaintiffs' SOF at ¶ 149).  Plaintiffs allege that GDC failed to evaluate ASL user ████████████ for classes upon his re-incarceration in 2022 (Motion at 17), but ██████████████████████████████████████████████████████████████████████."  (State's Response to Plaintiffs' SOF at ¶ 158).  Finally, Plaintiffs allege that ASL user █████████████, who is incarcerated at CSP, lacked access to a work detail as an educational aide, but the evidence shows that ██████████ who also communicates in written English and lip-reading, successfully completed his GDC program plan and earned the maximum of twelve (12) Performance Incentive Credits ("PIC") while in GDC custody.  (Id. At ¶ 159).

The record also contains extensive evidence of GDC providing non-ASL users meaningful access to classes and group activities.  For example, ██████████, who Plaintiffs maintain lacked access to GDC programming ████████████ required as a condition of his parole, reported to his GDC counselor that the Pocket Talker GDC provided to accommodate him in the class "██████████████████████████████."  (State's Response to Plaintiffs' SOF at ¶ 184).  ██████ later achieved parole in February 2023, five (5) months prior to his tentative parole month.  (Id. at ¶ 175).  Named Plaintiff Mark Birdow, who is incarcerated at ASMP and communicates through written English and lip-reading, participates in ██████████████████ groups.  (State's



SOF at ¶¶ 182–189, 197).  Birdow's group leader reported that Birdow, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮" that Birdow "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮;" and that Birdow "▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Id. at ¶ 197; see also State's Response to Plaintiffs' SOF at ¶ 484 (non-ASL user ▮▮▮▮▮▮▮ completed his case plan); id. at ¶ 396 (non-ASL user ▮▮▮▮▮▮▮ ▮▮▮ completed her case plan and reported to her GDC counselor that she enrolled in "▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); id. at ¶ 374 (non-ASL user ▮▮▮▮▮▮ completed his program plan and worked a detail at the ▮▮▮▮▮▮▮ )).

For these reasons, Plaintiffs failed to establish that GDC systemically fails to accommodate deaf and hard of hearing offenders in classes and group activities.  The Court should deny Plaintiffs' Motion on this theory of ADA liability.

### ii.    Medical and Mental Health Encounters

As with GDC's accommodation of class members during classes and group encounters, pervasive fact questions exist regarding GDC's accommodation of class members during medical and mental health encounters.  When determining whether a deaf or hard of hearing person experienced meaningful access during a medical encounter, courts must examine whether the disabled individual experienced the ability to "communicate medically relevant information effectively with medical staff."  Silva v. Baptist Health S. Fla., Inc., 856 F.3d 824, 834 (11th Cir. 2017).  Plaintiffs largely ignore this standard and instead focus on whether class members received their *preferred* accommodations during medical encounters.  (See, e.g., Motion at 22) (listing medical appointments class member ▮▮▮▮▮▮, who uses ASL, attended without an interpreter, but failing to analyze whether ▮▮▮ could effectively communicate with medical staff through other means).[8]  But, as noted above, public entities need not furnish a disabled individual

---

[8] Plaintiffs conduct a similarly faulty analysis of the ability of ASL users ▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ to "communicate medically relevant information effectively with medical staff."  Silva, 856 F.3d at 834.  (See Motion

his or her preferred method of accommodation, provided effective communication occurs.  Bircoll, 480 F.3d at 1082 (holding that a public entity may depart from the disabled individual's requested or preferred method of accommodation provided the public entity ensures effective communication occurs) (quoting 28 C.F.R. pt. 3, app. A).  The same principle applies in the context of a public entity's provision of auxiliary aids and services for healthcare interactions.

In Silva, for example, the Court expressly noted that the standard for effective communication with deaf individuals in healthcare interactions "does not mean that deaf patients are entitled to an on-site interpreter every time they ask for it, [because] construing the regulations in this manner would effectively substitute 'demanded' auxiliary aid for 'necessary' auxiliary aid. 856 F.3d at 836 (quoting Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d 334, 343 (11th. Cir 2012)).  Instead, the court clarified that "the task of determining whether an entity subject to the RA has provided auxiliary aids where necessary is inherently fact-intensive," and that effective communication claims in the context of healthcare interactions "often present[] questions of fact precluding summary judgment." Id.  (citing Liese, 701 F.3d at 342–43).  Plaintiffs fail to provide any meaningful analysis of GDC's accommodation of class members under this standard.  Instead, the evidence demonstrates that GDC routinely provides class members with their preferred method of accommodation during healthcare encounters, and that class members experience the ability to communicate medically relevant information with healthcare staff.  These facts render summary judgment on this aspect of Plaintiffs' ADA and RA claim inappropriate.

---

at 23) (arguing only that "medical staff … conducted a wide range of medical … procedures without interpreters"). The evidence shows that ███████ effectively communicated with medical staff through writing, while ███████ effectively communicated with medical staff through writing, lip reading, and residual hearing. (See State's Response to Plaintiffs' SOF at ¶¶ 156, 159, 266, 268). And, ███████ routinely communicates with medical staff at Central State Prison in ASL through VRI.  (See State's Response to Plaintiffs' SOF at ¶ 268).

For ASL users specifically, GDC provides VRI access in the healthcare units at all facilities, and allows Wellpath, its third-party healthcare contractor, to use its VRI services. (State's SOF at ¶¶ 250–53). As part of the staff training provided to medical staff by GDC's ADA Unit, GDC's statewide ADA coordinators, when visiting facilities, require GDC and medical staff to perform a test call of the VRI in all medical areas of the facility without the assistance of the FADAC. (Id. at ¶¶ 255–56). Medical staff generally demonstrate an ability to complete this test call. (Id. at ¶ 257; see also Plaintiffs' Ex. 75 (Smith Report) at 42 (█████████████████████ ███████████████████████████████████")). The evidence shows that this training works, as ASL users routinely receive VRI access during medical encounters.

For example, Plaintiffs complain that ██████████████████ underwent a colonoscopy without ASL interpretation services (Motion at 22); however, ████ testified that medical staff *do* use VRI to communicate with him during healthcare encounters. (State's SOF at ¶ 267). On July 6, 2022, ███████ attended a healthcare appointment at CSP, where medical staff used VRI to communicate with him. (Id. at ¶ 268). During this encounter, medical staff noted that █████ "█████████████" and educated █████ regarding his "████████████████ ████" Id. Likewise, ██████████████████ testified that he communicates with GDC medical and dental staff in ASL through VRI. (Id. at ¶ 269). In the course of a little over a month in early 2022, medical staff at CSP communicated with █████ on multiple occasions using VRI. (Id. at ¶¶ 271–72). Class member ██████ testified that medical staff used VRI "███████████ ███" he visited the medical unit, but that "█████████████████████████████████ █████████████████████████████." (Id. at ¶¶ 276). ███ confirmed that he can effectively communicate with medical staff through VRI. (Id. at ¶¶ 277–78). ██████████ ████████ receives *more effective* communication in GDC custody during healthcare

interactions than he received prior to his incarceration: ███ testified that before he came to prison, he communicated with medical professionals through written notes, but that medical staff at CSP communicate with him in ASL through VRI.  (Id. at ¶¶ 280–81; see also id. at ¶¶ 285–87 (███ uses VRI to communicate with medical and mental health staff in GDC, and medical staff noted ████ "████████████████████"); 288–92 (when ██████████ ███████████ attended medical appointments, medical staff "know that I'm deaf and so they would … get a VRI laptop from somewhere;" medical staff also noted █████ "excellent" adherence with diet and medication)).  These factual issues preclude summary judgment to the extent Plaintiffs allege that GDC violates the ADA by failing to accommodate class members who use ASL during healthcare interactions.

Plaintiffs' Motion, to the extent it argues that non-ASL users lack effective communication during healthcare encounters, fares no better.  Plaintiffs attempt to shift the burden to GDC to prove that these class members received effective communication during healthcare encounters.  But the burden remains on Plaintiffs to establish that these class members *lacked* the ability to effectively communicate with medical staff.  Silva, 856 F.3d at 836; Bircoll, 480 F.3d at 1086.  For example, Plaintiffs allege that class member ██████████, who uses hearing aids, "████████ ███████████████████████████████████████████████████ ████████████████" (Motion at 23).  However, the record lacks any evidence that █████ failed to understand medical staff during these interactions, which constitutes the showing Plaintiffs must make.  (See State's Response to Plaintiffs' SOF at ¶¶ 272–76 (during a medical encounter, ████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████")).  Similar fact issues exist for class member ██████████████, who communicates in English and who Plaintiffs claim

lacked access to effective communication during healthcare encounters.  (Motion at 23–24).  (See State's Response to Plaintiffs' SOF at ¶ 279 (



)).  ███████████████████████, who communicates using English and lip-reading, also testified that he communicates with medical staff through lip-reading and that he possesses a "████████████████████████.  (State's SOF at ¶¶ 261–62).

Because Plaintiffs failed to meaningfully address the proper standard for effective communication during healthcare encounters and instead attempted to shift the burden to GDC to *disprove* that Plaintiffs *lacked* effective communication during these encounters; and because fact questions remain under the proper standard, summary judgment remains inappropriate to the extent Plaintiffs allege that GDC violates the ADA and RA by failing to provide effective communication to class members during healthcare interactions.

### iii.    Captioned Telephones

The Motion next alleges that GDC violates the ADA and RA by failing to provide captioned telephones.  (Motion at 24–26).  Plaintiffs' Motion fails to as to this claim for one very basic reason: Plaintiffs failed to identify a single class member who requires and requested captioned phones to receive meaningful access to telecommunications in GDC.

As explained above, "meaningful access" to a public entity's programs, services, and activities "does not mean equal access or preferential treatment," Todd, 236 F. Supp. 3d at 1334 (citation omitted), nor does it establish an entitlement to a particular auxiliary aid or service.  Silva, 856 F.3d at 836.  GDC provides meaningful telecommunications access to class members who communicate other than in ASL in a variety of ways, including through text telephone (i.e., TTY); couplers to block out background noise from the handset; volume-controlled phones; and email.

(State's SOF at ¶ 293).   Additionally, GDC staff helps class members make phone calls where necessary.  (Id. at ¶ 295).  And, if GDC's ADA Unit receives a request for captioned phones and determines that the request is due to be granted, the ADA Unit will work with its inmate telecommunications provider to explore the installation of a captioned telephone.  (Id. at ¶ 297).

Yet, despite providing training to all offenders regarding the existence of captioned phones, the ADA Unit never received any offender request for captioned phones.  (Id. at ¶ 296).  See Rainey, 747 F. Supp. 2d at 1338 (holding that a "specific demand" for an accommodation triggers a public entity's obligations under the ADA); see also Bax v. Drs. Med. Ctr. of Modesto, Inc., 52 F.4th 858, 869 (9th Cir. 2022) (holding that courts may permissibly consider the absence of a request for a particular auxiliary aid as circumstantial evidence of effectiveness).  For example, Plaintiffs allege class member ███████████ requires a captioned phone to communicate. (Motion at 26).  Notwithstanding Plaintiffs' allegations to the contrary, ███████ never requested a captioned phone.  (See State's Response to Plaintiffs' SOF at ¶ 289; State's SOF at ¶ 306).  In fact, the evidence shows that GDC provides ███████ with meaningful access to telecommunications, in that GDC staff assist ███████ with making calls to family.  (State's SOF at ¶ 300–01).  See Dunn, 568 F. Supp. 3d at 1257 (holding that "mere difficulty in accessing a benefit is not, by itself, a violation of the ADA").  ██████████████████ also never requested a captioned phone, despite a recent meeting with GDC's Statewide ADA Coordinator. (State's SOF at ¶¶ 303–05).  Instead, ███████ communicates with family via email.  (Id. at ¶ 302).

Plaintiffs' failure to identify any class member who requires a captioned phone for meaningful access to communications and requested access to one proves fatal to their ADA claim at the summary judgment stage.  The Motion's allegation that certain class members "would likely require captioned phones" (Motion at 26) directly conflicts with the standard for the entry of

permanent injunctive relief, under which Plaintiffs must show a "real and immediate threat" of future irreparable harm.  McCullum, 768 F.3d at 1145.  An entry of summary judgment at this stage would also violate the PLRA absent a showing that any class member requires a captioned phone to access telecommunications in GDC, as the entry of the injunction would "extend further than necessary" to remedy any ADA violation.  18 U.S.C. § 3626(a)(1)(A).  Because questions of fact exist regarding the need for captioned phones to provide meaningful access to telecommunications to class members within GDC, summary judgment remains inappropriate on this aspect of Plaintiffs' ADA claim.

### iv.    Handcuffing

Plaintiffs' argument regarding GDC's handcuffing of class members who use ASL likewise fails.  Plaintiffs allege that GDC's handcuffing policy "does not ensure that … sign language users are handcuffed in the front[.]" (Motion at 27).  This statement is factually incorrect.  GDC's policy provides for the restraint of deaf offenders in waist chains should they require their hands to communicate.  (State's SOF at ¶ 307).  And, when handcuffing deaf offenders in waist chains, GDC's practice remains to *always* handcuff these offenders initially in the front of the body, unless the offender becomes combative, at which point GDC's obligations under the ADA cease to exist.  (Id. at ¶ 309; 28 C.F.R. § 35.139(a) (public entity bears no obligation to accommodate a disabled individual who "poses a direct threat to the health or safety of others")).

The Court should additionally deny the Motion as to Plaintiffs' handcuffing theory because Plaintiffs failed to identify *any* class member who lacked the ability to communicate because of GDC's handcuffing policy or practices.  (See Motion at 26–27; Plaintiffs' SOF at ¶¶ 296–301).  Plaintiffs therefore failed to establish an entitlement to a permanent injunction at this stage, as "injunctive relief requires something more than the mere possibility which serves to keep the case

alive." Sheely, 505 F.3d at 1182 (quotation omitted).  Genuine issues of material fact exist as to GDC's handcuffing policies and practices and their effects on class members' ability to communicate while restrained.

## II.    PLAINTIFFS' MOTION FAILS AS TO THE EIGHTH AMENDMENT CLAIM AGAINST GDC.

Material factual issues pervade all elements of Plaintiffs' Eighth Amendment claim against GDC as to the hearing-related care it provides to class members.  Specifically, fact issues remain regarding whether many of the purported class members identified in the Motion experienced a "serious medical need" for Eighth Amendment purposes.  Plaintiffs likewise failed to establish the constitutional inadequacy, as a matter of law, of the policies they attack, including GDC's policies related to the provision of multiple hearing aids and cochlear implants.  Finally, Plaintiffs failed to meaningfully analyze the Eleventh Circuit's deliberate indifference standard for Eighth Amendment liability, let alone establish an entitlement to summary judgment.

"The Eighth Amendment prohibits deliberate indifference to the serious medical needs of prisoners." Thomas v. Evans, 880 F.2d 1235, 1242 (11th Cir. 1989) (quoting Estelle v. Gamble, 429 U.S. 97 (1976)).  "'To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry.'"  Hoffer v. Sec'y, Fla. Dept. of Corrs., 973 F.3d 1263, 1270 (11th Cir. 2020) (quoting Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)).  The first prong requires an "'objectively serious medical need'" that "'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention,' and, in either instance, "'one that, if left unattended, poses a substantial risk of serious harm.'"  Id. (quoting Farrow, 320 F.3d at 1243).  "To satisfy the second, subjective prong, the plaintiff must prove that

28

the prison officials 'acted with deliberate indifference to [his serious medical] need.'" Id. (quoting Harper v. Lawrence Cnty., 592 F.3d 1227, 1234 (11th Cir. 2010)).

"'To establish deliberate indifference,' a plaintiff must demonstrate that the prison officials '(1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) acted with more than gross negligence.'" Id. (quoting Harper, 592 F.3d at 1227). But "deliberate indifference is not a constitutionalized version of common-law negligence." Id. (quoting Swain v. Junior, 961 F.3d 1276, 1287–88 (11th Cir. 2020). Instead, "'the deliberate indifference standard ... is far more onerous than normal tort-based standards of conduct sounding in negligence,' and is in fact akin to 'subjective recklessness as used in the criminal law.'" Id. "With respect to prisoners' medical care … the Eighth Amendment doesn't require it to be 'perfect, the best obtainable, or even very good.'" Id. (quoting Harris v. Thigpen, 941 F.2d 1495, 1510 (11th Cir. 1991)). A showing of deliberate indifference constitutes "a 'steep hill' for a plaintiff to climb," Johnson v. Lewis, 83 F.4th 1319, 1327 (11th Cir. 2023) (quoting Hoffer, 973 F.3d at 1272), and requires a plaintiff to show medical care "'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Hoffer, 973 F.3d at 1271 (quoting Harris, 941 F.2d at 1505). Plaintiffs fail to establish an entitlement to summary judgment on their Eighth Amendment claim against GDC.

First, Plaintiffs allege that GDC ███████████████████ to certain offenders. (Motion at 29). Plaintiffs, however, failed to conduct the necessary analysis regarding whether these offenders' hearing loss constituted a "serious medical need" for Eighth Amendment purposes. In the Eleventh Circuit, "significant and substantial hearing loss that can be remedied by a hearing aid is a serious medical need" for Eighth Amendment purposes. Gilmore v. Hodges, 738 F.3d 266, 278 (11th Cir. 2013). But, "[n]ot all hearing loss is a serious medical need, not all

29

hearing loss creates a substantial risk of harm, [and] not all hearing loss can be remediated by a hearing aid." Id. at 281. Instead, the extent to which hearing loss constitutes a "serious medical need" for Eighth Amendment purposes derives from the inmate's ability to function in prison. In Hodges, for example, the court determined that the inmate's hearing loss constituted a "serious medical need" because the inmate "could have had trouble hearing a fire or other alarm, responding to commands issued by guards, and reacting to a fight behind him or to prisoners threatening his safety." 738 F.3d at 275–76. Plaintiffs, however, present evidence simply that GDC ███████ ██████████ to offenders without conducting any meaningful analysis of the degree those offenders' hearing loss impacted their ability to function in prison. (See Motion at 29). Without such an analysis, Plaintiffs failed to carry their burden of demonstrating that GDC's ████████ ██████████ violated the Constitution. And the evidence, which Plaintiffs fail to address, indeed creates fact issues as to whether those offenders' hearing loss constituted a "serious medical need" for Eighth Amendment purposes. (See State's Response to Plaintiffs' SOF at ¶¶ 307–315 (noting that offender ████████ could communicate through ████████ and that offender ████████ GDC counselor communicated with him through ████████ Plaintiffs fail to address this evidence.

Similarly, Plaintiffs attack the adequacy of GDC's treatment decisions as to certain offenders, including the decisions by GDC officials to █████████████ ████████████████████████ in certain circumstances. (Motion at 29). But the adequacy of hearing-related medical care exists on a continuum, and GDC may permissibly make a wide range of treatment decisions without violating the Constitution. Hoffer, 973 F.3d at 1272–73. As the court in Hoffer explained, for an inmate "in the early stages of progressive hearing loss," "[p]rison authorities needn't jump straight to cochlear implants, or even hearing

30

aids.  At least for a spell … the inmate may have to content himself with asking people to speak up."  Id. at 1273.   Regarding cochlear implants in particular, Plaintiffs cite no precedent establishing that prison officials must provide cochlear implants *at all*.   Instead, the Eleventh Circuit in Gilmore expressly held that only "significant and substantial hearing loss that can be remedied by a hearing aid" implicates the Eighth Amendment, and that "not all hearing loss can be remediated by a hearing aid."  738 F.3d at 281.  Dr. Robin Bohannon, the audiologist who contracts with Wellpath to provide hearing-related care to offenders in GDC custody and served in that role for over twenty years, clarified that for offenders who would benefit from cochlear implants, he prescribes hearing aids that allow those offenders to hear certain loud sounds, including fire alarms and other alerts.  (State's SOF at ¶¶ 312–13; 363; see also Plaintiffs' Ex. 1 (Page Report) at 36 (█████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████)).

Plaintiffs' argument as to GDC and Wellpath's policies regarding the provision of ███████ █████████ similarly neglects to examine whether GDC's provision of ████████████ violated the Constitution.  For example, Plaintiffs list ████████████████████████ ██████████████ (e.g., Plaintiffs' SOF at ¶¶ 319–42), but Plaintiffs fail to provide *any* analysis of those offenders' ability to function in prison ████████████.  (See id.).  Fact issues remain as to that critical inquiry.  Randy Sauls, GDC's Assistant Commissioner of Health Services, clarified that GDC's policy remains to provide two hearing aids if an audiologist determines the offenders need two hearing aids to successfully navigate activities of daily living ("ADL").  (State's SOF at ¶¶ 354–57).  Dr. Bohannon clarified that many offenders require only one hearing aid from a clinical perspective, and that many offenders with bilateral hearing loss can successfully perform ADLs with only one hearing aid.  (Id. at ¶¶ 358–60).  GDC's policy directly tracks the

applicable standard in the Eleventh Circuit, which turns on both the degree of the inmate's hearing loss and the minimum treatment required for prison officials to satisfy their constitutional obligations.  Hoffer, 973 F.3d at 1273; Gilmore, 738 F.3d at 275–76.  Plaintiffs fail to conduct any meaningful analysis of this nuanced standard, and instead invite the court to hold GDC liable for treatment decisions with which Plaintiffs simply disagree.

The rest of Plaintiffs' Eighth Amendment argument consists of cherry-picked examples of offenders who, for various reasons, purportedly failed to receive hearing aids or hearing-related care in a timely fashion.   While delay may constitute deliberate indifference in some circumstances, see Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994), "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed."  Id.  Further, "the tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay," so any delay in medical treatment must, for constitutional purposes, "be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for the delay."  Id. at 1188–89 (quoting Harris v. Coweta Cnty., 21 F.3d 388, 393–94 (11th Cir. 1994)).  Plaintiffs make no argument, and present no evidence, as to these dispositive factors.

The evidence instead indicates that a variety of factors influence the timing of GDC's provision of care to offenders in its custody.  To start, all male offenders in GDC custody must travel to ASMP to receive audiology care, regardless of where the offender is permanently housed. (State's SOF at ¶ 366).  Before an offender receives hearing aids, the offender must travel to ASMP for an audiology consultation; then, the offender must return to ASMP to receive the hearing aids.

(Id. at ¶¶ 367).  In some circumstances, GDC may be required to cancel offender appointments at ASMP for any number of reasons, including issues with transportation, a lockdown at either the offender's sending facility or ASMP, or, in the past, restrictions on movement related to COVID-19.  (Id. at ¶ 368).  Additionally, offenders may transfer to county facilities to attend court dates; if an offender's appointment for off-site medical services at ASMP occurs while the offender is "out to court," medical staff must reschedule the appointment.  (Id. at ¶ 369).  Finally, the offender may refuse to attend the appointment, and GDC staff never use force to ensure an offender attends an appointment for auditory or hearing-related care.  (Id. at ¶ 370).  In sum, the need to reschedule off-site medical appointments is not uncommon in a correctional environment.  (Id. at ¶ 371).

The evidence reflects that GDC provides adequate and timely hearing-related care to offenders in its custody.  (State's SOF at ¶¶ 372, 382).  While some facilities historically performed better than others in timely scheduling appointments for hearing-related care and ensuring offenders attended those appointments, GDC and Wellpath's current process works to timely provide hearing-related care to most offenders most of the time.  (Id. at ¶ 373).  For example, as of November 2023, Dr. Bohannon sees approximately forty (40) offenders per month in the ASMP audiology clinic.  (Id. at ¶ 324).  Of those offenders, the majority present for hearing aid repairs, while a minority present for initial consultations.  (Id. at ¶¶ 325–26).  In Dr. Bohannon's decades of experience providing audiology services to the offenders in GDC custody, most offenders return to the ASMP audiology clinic to pick up their new or repaired hearing aids within two (2) months of their initial consultation or consultation for hearing aid repair.  (Id. at ¶¶ 331–36).

The record contains multiple examples of offenders who timely received hearing aids.  (See State's SOF at ¶¶ 394–95 (medical staff ordered an audiology consult for offender ███████ on April 18, 2018; he picked up his hearing aids less than three weeks later, on May 9, 2018); 404

(offender ███████████ received his hearing aids on May 11, 2022, less than a month after his initial consultation in April 2022); 406–407 (offender ███████████ received his hearing aids on August 14, 2019, after an initial audiology consultation on June 26, 2019); 411–12 (offender ███████████ received hearing aids on October 13, 2021, after an initial consultation on August 25, 2021); 415–16 (offender ███████████ received an audiology consult on intake at GDCP on April 13, 2022; he picked up his hearing aids at ASMP on May 25, 2022); 417–418 (on February 13, 2019, offender ███████████ traveled to the ASMP audiology clinic from Valdosta State Prison for an initial audiology consult; on March 27, 2019, he picked up his hearing aids); 419–20 (offender ███████████ attended the ASMP audiology clinic on July 22, 2020 after complaining of defective hearing aids; he received his repaired hearing aids on August 26, 2020); 435–36 (on December 28, 2021, ███████████ visited Gainesville Hearing Services for an audiology consult on referral from intake medical staff at Arrendale; one month later, on February 3, 2022, she returned to Gainesville Hearing Services for a hearing aid placement)).

Beyond failing to account for contrary evidence, Plaintiffs' argument related to the timely provision of hearing-related care suffers from a further fatal flaw—the Motion ignores wholesale the efforts GDC made to address the timely provision of hearing aids. GDC's efforts in this regard run directly to the second, subjective prong of the deliberate indifference standard: whether GDC officials disregarded a known risk of harm in a manner "akin to subjective recklessness as used in the criminal law." Hoffer, 973 F.3d at 1270 (quotation omitted). And in a case like this, where Plaintiffs seek systemic injunctive relief against GDC, the *current* attitudes and actions of GDC officials related to the provision of hearing-related care remain of the utmost relevance to the deliberate indifference inquiry. See Farmer v. Brennan, 511 U.S. 825, 845–46 (1994) (holding that in cases seeking injunctive relief under the Eighth Amendment, "the subjective factor,

deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct" and that, to survive summary judgment, a plaintiff must "come forward with evidence from which it can be inferred that" prison officials, "at the time of summary judgment," are "knowingly and unreasonably disregarding an objectively intolerable risk of harm") (citing Helling v. McKinney, 509 U.S. 25, 36 (1993)).  Plaintiffs' evidence fails to meet this standard.

The evidence demonstrates that, far from "knowingly and unreasonably disregarding an objectively intolerable risk of harm," GDC officials continue to take objectively reasonable actions to address the timely provision of hearing aids and other hearing-related care.  Farmer, 511 U.S. at 845–46.  For example, after receiving isolated complaints regarding the timely provision of hearing aids, Wellpath personnel and Sauls recently created a joint task force to track and evaluate the provision and repair of hearing aids.  (State's SOF at ¶ 345).  As part of the work of the task force, Wellpath maintains a log of all offenders across all facilities who need initial audiology consultations or consultations for new hearing aids or hearing aid repairs.  (Id. at ¶ 346).  Wellpath updates the log multiple times per month, and GDC's Office of Health Services reviews a master log at least monthly.  (Id. at ¶ 347).  GDC's office of Health Services, through Sauls, takes necessary action if Sauls determines that an offender failed to receive new or repaired hearing aids in a timely fashion.  (Id. at ¶ 348).  In fact, Wellpath testified in its 30(b)(6) deposition that the tracking log system came about because of "how important this is to the department, Mr. Sauls, the commissioner[.]" (Id. at ¶ 384).  In the most recent tracking log, Wellpath designated 449 offenders across GDC as using devices to improve hearing, including hearing aids and personal amplification devices.  (Id. at ¶ 350).  Of those 449 offenders, 374 offenders possessed functioning hearing aids, expressed satisfaction with another hearing device, or refused to use hearing aids or

a hearing device.  (<u>Id.</u> at ¶ 351).  Only 37 offenders across GDC's 50,000-inmate system were awaiting audiology consultations, while only 38 were awaiting hearing aids.  (<u>Id.</u> at ¶¶ 3; 352–53).

Additionally, GDC's Statewide ADA Unit provides interim measures for offenders while they await new or repaired hearing aids, including by training medical staff and FADACs to distribute Pocket Talkers to those offenders.  (<u>Id.</u> at ¶¶ 388–89).  And, while Wellpath distributes hearing aid batteries, GDC also provides them if necessary.  (<u>Id.</u> at ¶ 437).  GDC's ADA Unit audits the provision of hearing aid batteries; additionally, all facilities maintain a memorandum from the Warden directing medical staff to distribute hearing aid batteries upon request.  (<u>Id.</u> at ¶ 439).  When touring GDC facilities, GDC's expert Chris Smith interviewed multiple offenders who reported no issues in timely receiving hearing aid batteries.  (<u>Id.</u> at ¶ 440–42).

In sum, Plaintiffs' Motion falls far short of establishing, as a matter of law, that GDC's provision of hearing-related care is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."   <u>Hoffer</u>, 973 F.3d at 1271.  Accordingly, Plaintiffs' Motion is due to be denied as to the Eighth Amendment claim.

III.    **PLAINTIFFS' MOTION FAILS AS TO THE ADA AND RA CLAIMS AGAINST P&P.**

Finally, Plaintiffs allege that P&P "fails to identify deaf and hard of hearing" offenders and fails to "maintain necessary records" (Motion at 33–35); and "fails to communicate effectively during class members' orientation period" (<u>id.</u> at 35–39).  As with Plaintiffs' claims against GDC, the arguments against P&P remain rife with speculation and demonstrably false factual allegations.

A.    **IDENTIFICATION AND REQUEST PROCESS**

Plaintiffs first complain that P&P relies "entirely on GDC to identify who is deaf or hard of hearing and what auxiliary aids and services they need" (Motion at 34); and that "P&P provides no way for incarcerated people to affirmatively request accommodations from P&P or to complain

36

about lack of access." (Motion at 34). As explained above, the ADA imposes no affirmative obligation on P&P to "identify and assess" *any* disabled offenders except, at most, those with obvious hearing loss.[9] In any event, Plaintiffs' arguments related to P&P's processes for identifying and accommodating class members rest on demonstrably false factual allegations.

While P&P regularly receives information from GDC[10] regarding deaf and hard of hearing offenders and the accommodations they need, P&P maintains its own policies and practices to ensure it provides effective communication to class members, regardless of what information it receives from GDC. (State's SOF at ¶¶ 446-453). P&P staff also identify disabled offenders on their own, and offenders self-report their accommodation needs to P&P staff. (Id. at ¶ 536). For example, while giving a presentation regarding parole at GDCP, an offender reported to Chief Parole Investigator Anthony Flint that the offender could not hear the presentation. (Id. at ¶ 513-515). Flint promptly obtained a Pocket Talker from GDC pursuant to the MOU, which allowed the offender to hear the presentation. (Id.). Moreover, Plaintiffs misleadingly allege that "[a]s of September 2022, Mr. Flint had not received information about any new arrivals with disabilities since April 2022" (Motion at 34), but the record indicates that GDC and P&P staff corrected this inadvertent oversight and Flint currently receives this information. (Id. at ¶ 528). And, as explained above, P&P identifies and accommodates deaf and hard of hearing offenders on its own.

Additionally, P&P's accommodation request process remains fully available to any offender who needs accommodations. Despite Plaintiffs' allegations, P&P allows offenders to

---

[9] E.g., Robertson, 500 F.3d at 1196 (noting that disabled individuals owe a "duty dictated by common sense" to inform a public entity of a non-obvious disability); Smith v. Rainey, 747 F. Supp. 2d at 1338 (holding that "[i]n cases alleging a failure to make reasonable accommodations," a public entity's "duty to provide a reasonable accommodation is not triggered until the [disabled individual] makes a specific demand for accommodation") (citation omitted).

[10] P&P and GDC maintain a Memorandum of Understanding ("MOU") regarding the provision of auxiliary aids and services to disabled offenders, under which P&P may use GDC's auxiliary aids and services—including VRI, Pocket Talkers, and UbiDuo—to communicate with deaf and hard of hearing offenders but must retain its own in-person ASL interpreters where necessary. (Plaintiffs' SOF at ¶ 521).

request accommodations orally or through an informal written request; it does not limit its accommodation request process to its formal written forms.  (State's SOF at ¶¶ 448-454).  P&P also affirmatively identifies and accommodates some deaf and hard of hearing offenders without requiring them to submit accommodation requests.  (Id.; see also id. at ¶¶ 513-514).  If P&P staff must request an additional accommodation beyond those GDC provides through the MOU, such as an in-person ASL interpreter, P&P staff—not the offender—fill out the ADA accommodation request form.  (Id. at ¶ 449-454).  To date, P&P never denied any accommodation request (id. at ¶ 483); and, as discussed below, the evidence indicates that P&P provides accommodations to offenders who need them.

### B.    COMMUNICATION DURING ORIENTATION PERIOD

Plaintiffs' allegations that P&P fails to accommodate class members during the orientation period, including during the purported "group meeting" (Motion at 36) the "PIC video" (id. at 37), and the "personal history statement" (id. at 38) also misstate the relevant facts.  For example, while Mr. Flint previously provided a group presentation regarding parole to offenders at GDCP, P&P currently provides this information to offenders through one-on-one interviews.  (State's SOF at ¶¶ 492, 498-505, 506, 507).  P&P staff also distribute a packet of information to all offenders during the orientation process, including information regarding P&P's obligations under the ADA.  (Id. at ¶ 493).  Moreover, prior to the one-on-one interviews, during which P&P investigators complete each offender's personal history statement, offenders fill out a form with all relevant information.  (Id. at ¶ 493).  The P&P investigator then reviews the form with each offender.  (Id.).  Finally, GDC—not P&P—administers the PIC program and shows the PIC video, and GDC recently added closed captions to the PIC video.  (State's SOF at ¶¶ 447–449).[11]

---

[11] The record also indicates that GDC regularly provides information regarding PIC in ASL to class members who use ASL.  For example, ███████ admitted that his GDC counselor, with the assistance of VRI, explained to him that

Because of their mistaken understanding of the facts, Plaintiffs merely speculate that P&P failed to accommodate any deaf or hard of hearing offender during intake.  For example, Plaintiffs speculate that " ████████████████████████████████████████ ████████████████████████ " during his parole presentation (Motion at 36), but Plaintiffs fail to provide *any* evidence supporting this speculation.  Plaintiffs also complain that P&P failed to provide CART and in-person ASL interpreters without identifying a single offender who required these services.  (Motion at 35, 38–39).

Instead, the evidence shows that P&P routinely accommodates class members during the limited interactions offenders have with P&P staff.  For example, P&P maintains a log of accommodations it provides to disabled offenders, including during the orientation process. (State's SOF at ¶ 455).  This log indicates that, contrary to Plaintiffs' assertions, at least two offenders—████████████████—received ASL access to their interview with P&P at intake through VRI.  (Id. at ¶¶ 466, 473).  ████████ testified in his deposition that he met with a parole agent at GDCP using VRI.  (Id. at ¶¶ 450, 451) (██ testified that the parole agent " ████████ ████████████████████████████████████████████████████████ ████████████ ").  ████████, one of the offenders Plaintiffs speculate lacked access to Flint's parole presentation (see Motion at 36) (citing Plaintiffs' SOF at ¶ 621), achieved parole on April 19, 2023.  (State's SOF at ¶ 460).  Although Plaintiffs claim P&P improperly used UbiDuo during offender ████████████ intake parole interview (Motion at 38–39), the evidence shows that ██████ also reported an ability to communicate through lip reading, and that P&P staff used lip reading during ██████ interview.  (State's SOF at ¶ 464).  The evidence contains a multitude of

_____

he lacked eligibility for the PIC program.  (State's SOF at ¶ 231).  GDC staff also explained the PIC process through VRI to ASL users ████████████████████████████████████████h.  (Id. at ¶¶ 452–455).  ████████ earned the maximum of 12 PIC points while in GDC custody and earned parole in January 2022.  (Id. at ¶¶ 239, 241).

further examples of P&P accommodating class members, including through Pocket Talkers and UbiDuo.  (Id. at ¶¶ 457-479).

Plaintiffs completely failed to conduct the necessary, and fact-intensive, inquiry as to whether P&P provided effective communication during these limited interactions.  Bircoll, 480 F.3d at 1087.  This failure proves fatal to Plaintiffs' Motion as to P&P, as the evidence indicates that class members receive meaningful access to P&P's programs, services, and activities.  The Court should deny Plaintiffs' Motion as to the ADA and RA claims against P&P.

## **CONCLUSION**

For the reasons explained above, the Court should deny Plaintiffs' Motion in its entirety.

Dated: November 20, 2023.

_/s/ William R. Lunsford_
William R. Lunsford (_Pro Hac Vice_)
Matthew B. Reeves (_Pro Hac Vice_)
Andrew T. Toler (_Pro Hac Vice_)
**BUTLER SNOW LLP**
200 West Side Square
Suite 100
Huntsville, Alabama 35801
Telephone: (256) 936-5650
Facsimile: (256) 936-5651
bill.lunsford@butlersnow.com
matt.reeves@butlersnow.com
andrew.toler@butlersnow.com

Anne Adams Hill (_Pro Hac Vice_)
**BUTLER SNOW LLP**
250 Commerce Street
Suite 100
Montgomery, Alabama 36104
Telephone: (334) 832-2900
Facsimile: (334) 832-2901
anne.hill@butlersnow.com

Tina M. Piper
Cristina M. Correia
Meghan R. Davidson

**Office of the Attorney General**
**Georgia Department of Law**
40 Capitol Square, SW
Atlanta, Georgia 30334
Telephone: (404) 657-3983
Facsimile: (404) 463-8864
tpiper@law.ga.gov
ccorreia@law.ga.gov
mdavidson@law.ga.gov

*Attorneys for the State*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 20th day of November, 2023, I have served a copy of the foregoing upon the following, via email and/or U.S. Mail, first class postage prepaid and properly addressed:

Brian George Liegel
**WEIL, GOTSHAL & MANGES LLP**
1395 Brickell Ave
Suite 1200
Miami, FL 33131
Telephone: (305) 577-3180
brian.liegel@weil.com

Ralph I. Miller
**WEIL, GOTSHAL & MANGES LLP**
2001 M St Nw
Ste 600
Washington, DC 20036
Telephone: (202) 682-7052
ralph.miller@weil.com

Lauren Fairman
Leah Saiontz
Samin Mossavi
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Ave
New York, NY 10153
Telephone: (212) 310-8543
lauren.fairman@weil.com
leahsaiontz@weil.com
samin.mossavi@weil.com

Talila A Lewis
**HEARD**
P.O. Box 1160
Washington, DC 20013
talila.a.lewis@gmail.com

Anna Bitencourt Emilio
Brittany Shrader
**NATIONAL ASSOCIATION OF THE DEAF**
8630 Fenton St
Suite 820
Silver Spring, MD 20910
Telephone: (240) 650-2832
anna.bitencourt@nad.org
brittany.shrader@nad.org

Susan Mizner
Zoe Brennan-Krohn
Westley Resendes
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0762
smizner@aclu.org
zbrennan-krohn@aclu.org
wresendes@aclu.org

Andrews Martin Lopez Delgado
Cory Isaacson
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
Po Box 77208
Atlanta, GA 30357
Telephone: (770) 303-8111
Facsimile: (770) 303-0060
adelgado@acluga.org
cisaacson@acluga.org

*/s/ William R. Lunsford*_____
Of Counsel

42